**Style**          ADAMS, JOHN H vs. 3M COMPANY (FKA MINNESOTA MINING AND MANUFACTURING

**Case Number**    201781591    **Case Status**    Active - Civil    **Case Type**    MULTIDISTRICT LITIGATION RULE 13

Date                    Description

| | |
|---|---|
| 12/7/2017 | ORIGINAL PETITION **COURT:** 011 **ATTORNEY:** HUMEN, DAVID CHRISTOPHER **PERSON FILING:** ADAMS, JOHN |
| 12/7/2017 | ORIGINAL PETITION **COURT:** 011 **ATTORNEY:** HUMEN, DAVID CHRISTOPHER **PERSON FILING:** ADAMS, LORRAINE |
| 12/8/2017 | ANSWER ORIGINAL PETITION **COURT:** 011 **ATTORNEY:** LAWSON, RODNEY HALL **PERSON FILING:** ROCKWELL AUTOMATION |
| 12/11/2017 | JURY FEE PAID (TRCP 216) **COURT:** 011 |
| 12/11/2017 | ANSWER ORIGINAL PETITION **COURT:** 011 **ATTORNEY:** DODSON, ROBERT EDWIN **PERSON FILING:** Emerson |
| 12/11/2017 | ANSWER ORIGINAL PETITION **COURT:** 011 **ATTORNEY:** DODSON, ROBERT EDWIN **PERSON FILING:** Appleton |
| 12/11/2017 | ANSWER ORIGINAL PETITION **COURT:** 011 **ATTORNEY:** HARRISON, RYAN LEE **PERSON FILING:** CBS CORPORATION |
| 12/11/2017 | ANSWER ORIGINAL PETITION **COURT:** 011 **ATTORNEY:** HUTCHINSON, CLIFTON TRIGG **PERSON FILING:** |
| 12/11/2017 | ANSWER ORIGINAL PETITION **COURT:** 011 **ATTORNEY:** HUTCHINSON, CLIFTON TRIGG **PERSON FILING:** SCHNEIDER ELECTRIC USA FORMERLY KNOWN AS SQUARE D COMPANY |
| 12/11/2017 | ANSWER ORIGINAL PETITION **COURT:** 011 **ATTORNEY:** LEDYARD, DAVID W. **PERSON FILING:** OCCIDENTAL CHEMICAL  CORPORATION |

12/7/2017 4:27 PM
Chris Daniel - District Clerk Harris County
Envelope No. 21159982
By: Adiliani Solis
Filed: 12/7/2017 4:27 PM

## CAUSE NO. _____-ASB

## BEFORE THE ASBESTOS MDL PRE-TRIAL JUDGE

| | | |
|---|---|---|
| JOHN H. ADAMS and | § | IN THE DISTRICT COURT |
| LORRAINE ADAMS | § | |
| | § | |
| VS. | § | 11TH JUDICIAL DISTRICT |
| | § | |
| 3M COMPANY f/k/a MINNESOTA | § | |
| MINING AND MANUFACTURING, | § | |
| ET AL | § | HARRIS COUNTY, TEXAS |

Transferred from:

## CAUSE NO. DC-17-15389

| | | |
|---|---|---|
| JOHN H. ADAMS and | § | IN THE DISTRICT COURT |
| LORRAINE ADAMS | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| 3M COMPANY f/k/a MINNESOTA | § | |
| MINING AND MANUFACTURING, | § | |
| ET AL | § | 192ND JUDICIAL DISTRICT |

## DEFENDANT UNION CARBIDE CORPORATION'S
## NOTICE OF TRANSFER UNDER RULE 13 OF TAG-ALONG CASE

Please take notice that this case has been transferred by the Multidistrict Litigation

Panel (the MDL Panel) to Judge Mark Davidson of the 11th Judicial District Court of

Harris County pursuant to Rule of Judicial Administration 13.

A list of all parties who have appeared and remain in this case, and the names,

addresses, phone numbers, and bar numbers of their attorneys or, if a party is pro se, the

party's name, address, and phone number, as well as a list of those parties who have not

yet appeared in the case, is attached as Exhibit A.  Copies of the MDL Panel's transfer

orders of December 30, 2003, and January 13, 2004, are attached as Exhibit B.

Respectfully submitted,

HARTLINE DACUS BARGER DREYER LLP
800 N. Shoreline Blvd.
2000 One Shoreline Plaza, North Tower
Corpus Christi, Texas 78401
(361) 866-8000
(361) 866-8039 Facsimile
mterry@hdbdlaw.com


By:     */s/ Michael G. Terry*
        Michael G. Terry
        State Bar No. 19799800

**ATTORNEYS FOR DEFENDANT,
UNION CARBIDE CORPORATION**


## CERTIFICATE OF SERVICE

       I, Michael G. Terry, do hereby certify that a true and correct copy of the foregoing document has been served upon all known counsel of record, by the method of service indicated below, on this the 7th day of December, 2017.


      */s/ Michael G. Terry*
      MICHAEL G. TERRY


**VIA File & ServeXpress:**

Mr. David C. Humen
dhumen@waterskraus.com
Ms. Susannah B. Chester-Schindler
schester@waterskraus.com
WATERS & KRAUS, LLP
3141 Hood Street, Suite 700
Dallas, Texas  75219

All Other Known Counsel of Record

# EXHIBIT A

**Cause No. DC-17-15389**

**John H. Adams and Lorraine Adams**

**vs.**

**3M Company f/k/a Minnesota Mining and Manufacturing, et al**

**192nd Judicial District Court of Dallas County, Texas**

| PARTY | ATTORNEY | ADDRESS | PHONE | FAX | EMAIL |
|-------|----------|---------|-------|-----|-------|
| **Plaintiffs:** | | | | | |
| John H. Adams | David C. Humen State Bar No. 24087769<br><br>Susannah B. Chester-Schindler State Bar No. 24056878 | Waters & Kraus, LLP 3141 Hood Street, Suite 700 Dallas, Texas  75219 | 214-357-6244 | 214-357-7252 | dhumen@waterskraus.com<br><br>schester@waterskraus.com |
| Lorraine Adams | David C. Humen State Bar No. 24087769<br><br>Susannah B. Chester-Schindler State Bar No. 24056878 | Waters & Kraus, LLP 3141 Hood Street, Suite 700 Dallas, Texas  75219 | 214-357-6244 | 214-357-7252 | dhumen@waterskraus.com<br><br>schester@waterskraus.com |
| **Defendants**: | | | | | |
| 3M Company f/k/a Minnesota Mining and Manufacturing | | | | | |
| Appleton Grp LLC d/b/a Appleton Group and Emerson Electric Co. | | | | | |

1

| **Defendants**: | | | | | |
|---|---|---|---|---|---|
| The Boeing Company d/b/a Boeing Integrated Defense Systems (sued individually and as successor-in-interest to McDonnell Douglas Corporation and as successor-in-interest to De Havilland Aircraft of Canada Ltd.) | | | | | |
| CBS Corporation (f/k/a Viacom, Inc. successor by merger with CBS Corporation f/k/a Westinghouse Electric Corporation) (successor-in-interest BF Sturtevant) | | | | | |
| Certainteed Corporation | | | | | |
| Cooper Industries, LLC f/k/a Cooper Industries, Inc. (sued individually and as successor-in-interest to Crouse-Hinds Company) | | | | | |
| Cytec Engineered Materials, Inc. f/k/a Cytec Fiberitne, Inc., individually and as successor-in-interest to Fiberite, Inc. | | | | | |
| Eaton Corporation (sued individually and as successor-in-interest to Eaton Electrical, Inc. and Cutler Hammer, Inc.) | | | | | |
| Emerson Electric Co. (sued individually and as successor-in-interest to Appleton Grp LLC d/b/a Appleton Group) | | | | | |
| General Electric Company | | | | | |

| Defendants: | | | | | |
|---|---|---|---|---|---|
| Guard-Line, Inc. | | | | | |
| Hollingsworth & Vose Company, Inc. | | | | | |
| Lockheed Martin Corporation (sued individually and as successor-in-interest to Lockheed Corporation f/k/a Lockheed Aircraft Corporation) | | | | | |
| Meriden Molded Plastics, Inc. | | | | | |
| Occidental Chemical Corporation (sued individually and as successor-in-interest Hooker Chemical and Durez Plastics) | | | | | |
| Plastics Engineering Company | | | | | |
| R.J. Reynolds Tobacco Company (sued individually and as successor-in-interest to Lorillard Tobacco Company, LLC f/k/a Lorillard Tobacco Company f/k/a P. Lorillard Co., a/k/a Lorrilard Tobacco Company) | | | | | |
| Rockwell Automation, Inc. (sued individually and as successor-in-interest Allen-Bradley Company, LLC and as successor-in-interest Rostone Corporation) | | | | | |
| Rogers Corporation | | | | | |

3

| **Defendants**: | | | | | |
|---|---|---|---|---|---|
| Schneider Electric USA, Inc. f/k/a Square D Company | | | | | |
| Union Carbide Corporation | Michael G. Terry State Bar No. 19799800 | Hartline Dacus Barger Dreyer LLP 800 North Shoreline Blvd. Suite 2000-North Tower Corpus Christi, Texas  78401 | 361-866-8000 | 361-866-8039 | mterry@hdbdlaw.com |

# EXHIBIT B

# ORDER OF MULTIDISTRICT LITIGATION PANEL

Order Pronounced January 13, 2004

## APPOINTMENT OF PRETRIAL JUDGE IN THE FOLLOWING MULTIDISTRICT LITIGATION CASE:

03-0895       UNION CARBIDE v. AUDREY AMELIA ADAMS, ET AL.

Pursuant to Administrative Rule 13, Cause No. 03-CV-1402, Audrey Amelia Adams, et al. v. American Standard, Inc., et al., 56th Judicial District Court of Galveston County, Texas; Cause No. 03-10314, Giuseppe Cappelli and Virginia Cappelli v. Allis-Chalmers Corp., et al., 116th Judicial District Court of Dallas County, Texas; and Cause No. 03CV1485, Roy Tittle, et al. v. Quigley Company, Inc., et al., 212th Judicial District Court of Galveston County, Texas, and tag-along cases are transferred to Judge Mark Davidson of the 11th District Court of Harris County.

All members of the Multidistrict Litigation Panel concur in this order.

No. 03-0895

UNION CARBIDE

V.

AUDREY AMELIA ADAMS, ET AL.

ON REVIEW BY THE MULTIDISTRICT LITIGATION PANEL

**Heard on December 12, 2003**

Dissenting opinion filed by JUSTICE CASTILLO.

Respectfully, I dissent.  A party defendant experienced in asbestos litigation filed a response indicating it lacked sufficient information to take a position in favor of granting or denying the motion.   Under the presumption that all allegations in the motion and responses are true, the ultimate burden of persuasion and proof remained with Union Carbide.  Considering the evidence in the record before us, I would deny the motion to transfer.  Turning now to the majority decision, I note that at the heart of the motion as presented are three cases.  I would allow the parties in the tag along cases to show cause why the cases should not be transferred to a pre-trial judge.

Opinion delivered:  December 30, 2003

Errlinda Castillo
Justice

No. 03-0895

UNION CARBIDE

V.

AUDREY AMELIA ADAMS, ET AL.

ON REVIEW BY THE MULTIDISTRICT LITIGATION PANEL

**Heard on December 12, 2003**

Dissenting opinion filed by JUSTICE KIDD.

Over the past quarter of a century, the asbestos litigation docket in Texas has

accomplished the monumental feat of disposing of almost 30,000 cases.  This success is largely

due to the cooperation of counsel on both sides of the asbestos docket and the coordinated effort

of hard-working trial judges across this vast state.  *See In re Ethyl Corp.*, 975 S.W.2d 606, 610-

11 (Tex. 1998).  The centerpiece of this cooperative effort remains a series of agreed standing

pretrial orders and an assigned asbestos judge in ten of our most populous Texas counties,

comprising every major metropolitan area in the state.  As a result, defense counsel have publicly

declared that 99% of all asbestos litigation has been settled amicably.  More importantly, unlike

some contentious mass-tort litigation, asbestos cases have not involved the trial courts in a

number of pretrial hearings because all but a handful of pretrial issues have been concluded by

the entry of agreed orders.

In sharp contrast is the federal asbestos experience of the last decade.  After the

assignment of all pretrial matters in federal asbestos cases to a single federal district court, the

federal asbestos docket suffered from that dreaded disease commonly known as "pretrial

paralysis."  Dying asbestos victims watched in horror as their asbestos cases were, quite literally,

"pretried" to death. *See, e.g.*, *In re Patenaude*, 210 F.3d 135, 138 (3rd Cir. 2000), *cert. denied*, 531 U.S. 1011 (2000).

Today, a bare majority of this panel seeks to adopt the federal model and assign all prospective asbestos cases to a single, statewide asbestos judge. In light of the federal experience, this action, in my view, disregards the standard to be applied in order to justify such a transfer, which requires that the transfer will be for the convenience of the parties and witnesses and will promote the just and efficient conduct of the case. Therefore, I respectfully dissent to the order of transfer.

Opinion delivered: December 30, 2003

Mack Kidd
Justice

# ORDER OF MULTIDISTRICT LITIGATION PANEL

Order Pronounced December 30, 2003

## THE MOTION FOR TRANSFER IN THE FOLLOWING MULTIDISTRICT LITIGATION CASE IS GRANTED AS FOLLOWS:

03-0895        UNION CARBIDE v. AUDREY AMELIA ADAMS, ET AL.

Per Curiam

On December 12, 2003 the Multidistrict Litigation Panel held a hearing on the Motion for Transfer filed by Union Carbide Corporation under Rule 13 of the Texas Rules of Judicial Administration. Having considered the arguments, the evidence, and the authorities presented, a majority of the panel finds that the following cases involve one or more common questions of fact, and that transfer of these cases and tag-along cases to one district judge will be for the convenience of the parties and witnesses and will promote the just and efficient conduct of the cases:  Cause No. 03-CV-1402, Audrey Amelia Adams, et al. v. American Standard, Inc., et al., 56th Judicial District Court of Galveston County, Texas; Cause No. 03-10314, Giuseppe Cappelli and Virginia Cappelli v. Allis-Chalmers Corp., et al., 116th Judicial District Court of Dallas County, Texas; and Cause No. 03CV1485, Roy Tittle, et al. v. Quigley Company, Inc., et al., 212th Judicial District Court of Galveston County, Texas. The panel will issue a second order naming the judge to whom the cases will be transferred.

In the event that the pretrial judge or a litigant concludes that one or more additional pretrial judges are needed in the future, the panel will entertain at that time a request to transfer cases to an additional judge or judges.

If cases that are ready for trial are not remanded to the trial court for trial under rule 13.7, the panel will entertain complaints from litigants about the delay and will decide whether to grant relief.

Dissenting opinion filed by JUSTICE KIDD.
Dissenting opinion filed by JUSTICE CASTILLO.

12/8/2017 3:09 PM
Chris Daniel - District Clerk Harris County
Envelope No. 21182171
By: Lakeisha Williams
Filed: 12/8/2017 3:09 PM

## CAUSE NO. 2017-81591-ASB

## BEFORE THE ASBESTOS MDL PRE-TRIAL JUDGE

| | | |
|---|---|---|
| JOHN H. ADAMS and LORRAINE ADAMS, | § § § | IN THE DISTRICT COURT |
| *Plaintiffs,* | § § | |
| vs. | § § | HARRIS COUNTY, TEXAS |
| 3M COMPANY, *et al.,* | § § § | |
| *Defendants.* | § | 11th JUDICIAL DISTRICT |

## Transferred From

## CAUSE NO. DC-17-15389

| | | |
|---|---|---|
| JOHN H. ADAMS and LORRAINE ADAMS, | § § § | IN THE DISTRICT COURT |
| *Plaintiffs,* | § § | |
| vs. | § § | DALLAS COUNTY, TEXAS |
| 3M COMPANY, *et al.,* | § § § | |
| *Defendants.* | § | 192ND JUDICIAL DISTRICT |

## DEFENDANT ROCKWELL AUTOMATION, INC.'S ORIGINAL ANSWER

TO THE HONORABLE COURT:

Defendant Rockwell Automation, Inc. ("Defendant") files this Original Answer to Plaintiffs'[1] operative petition as follows:

---

[1]    Hereinafter, "Plaintiffs" refers to both John H. Adams and Lorraine Adams.  The singular, "Plaintiff," is used to refer only to John H. Adams.

**DEFENDANT ROCKWELL AUTOMATION, INC.'S ORIGINAL ANSWER**                    **Page 1**

## General Denial

1.        Defendant denies each and every, all and singular, the material allegations contained in Plaintiffs' operative petition and demands strict proof at the time of trial in accordance with the TEXAS RULES OF CIVIL PROCEDURE and the laws of the State of Texas.

## Affirmative Defenses

2.        Defendant pleads, preserves, invokes, and asserts its rights under the provisions of Chapters 32 and 33 of the TEXAS CIVIL PRACTICE & REMEDIES CODE.  Defendant further pleads, preserves, invokes and asserts its rights for contribution and indemnity to the greatest extent allowed by law.   Defendant also pleads, preserves, invokes, and asserts its rights under Section 33.015 of the TEXAS CIVIL PRACTICE & REMEDIES CODE and any other applicable provision of statutory, common, or other law applicable to this case with respect to contribution and indemnity.

3.        In addition and in the alternative, Defendant also pleads, preserves, invokes, and asserts its right to an appropriate credit for any settlements entered into by Plaintiffs under Section 33.012 of the TEXAS CIVIL PRACTICE & REMEDIES CODE and its right to submit the percentage of responsibility, if any, of any settling person or party to the trier of fact for determination under Section 33.003 of the TEXAS CIVIL PRACTICE & REMEDIES CODE.   In addition and in the alternative, Defendant hereby pleads, preserves, invokes, and asserts its right to submit the percentage of responsibility, if any, of any responsible third parties, and against any such defendants who are no longer sued by Plaintiffs at the time of submission to the trier of fact, and against any other person or party who is or may be liable to Plaintiffs or to any of the defendants for all or part of the damages claimed against Defendant in this action to the trier of fact for determination under Section 33.003 of the TEXAS CIVIL PRACTICE & REMEDIES CODE.

4.      Pleading affirmatively, should Plaintiffs compromise or settle any such claims and/or causes of action against any other person, entity, or any other defendant in this action or outside this action, Defendant pleads and reserves the right and option granted to it to receive a credit, a percentage reduction, or any other appropriate relief with respect to such settlement in accordance with Chapters 32 and 33 of the TEXAS CIVIL PRACTICE & REMEDIES CODE.

5.      Defendant alleges that the acts or omissions of Plaintiff or third parties were the sole proximate cause or a new and independent cause of the occurrence in question and injuries complained of in this suit.

6.      Defendant alleges that any alleged injuries, damages, or liabilities complained of by Plaintiffs were caused, in whole or in part, by superseding and/or intervening acts that disrupted the chain of causation and that were wholly beyond the scope and/or control of Defendant.

7.      Defendant alleges that any alleged injuries, damages, or liabilities complained of by Plaintiffs herein were caused by new and independent intervening causes not reasonably foreseeable by Defendant, which became the immediate and efficient causes of such alleged injuries and damages, and any acts or omissions alleged by Plaintiffs as to Defendant were wholly remote and not causative of Plaintiffs' alleged damages.

8.      Defendant alleges that any alleged injuries, damages, or liabilities complained of by Plaintiffs herein are the result in whole or in part of preexisting or subsequent conditions, injuries, natural causes, diseases, and/or disabilities of Plaintiff or complications of such, and are not the result of any act or omission on the part of the Defendant.  Defendant further alleges that the physical condition of Plaintiff was solely due to the acts and omissions of third persons or the Plaintiff.

9.      Defendant alleges that the contributory negligence and/or comparative negligence/fault of Plaintiff proximately caused any occurrence in question and injuries complained of in this suit, in whole or in part.

10.     Defendant alleges that any occurrence in question was an unavoidable accident beyond the control of Defendant and without any negligence, fault, and/or other responsibility on the part of Defendant, and not the result of any act or omission on the part of Defendant.

11.     Defendant alleges that Plaintiffs failed to mitigate any alleged damages.

12.     Defendant asserts the defenses of misuse and/or substantial change of its products, if any be involved herein.

13.     Defendant alleges that if the products being used by Plaintiff possessed any danger or risk as is claimed in Plaintiffs' pleadings, such condition would have been open and obvious, and therefore Plaintiff assumed the risk that may have been involved in connection with continued use of the products and voluntarily proceeded to encounter the risk or danger by assuming or exposing himself to such risk or danger.

14.     Defendant alleges that any products manufactured, sold, packaged, distributed, and/or marketed by Defendant were distributed and sold for use in a limited market by a limited class of workmen and their employers who held themselves out as having special knowledge and expertise in the handling of the products.  Plaintiff and his employers were experienced members of that limited class of skilled individuals, who possessed special knowledge and expertise concerning any possible danger of the operations in which the products of Defendant are used, and Defendant was entitled to rely upon such specialized knowledge and expertise.

15.     Defendant alleges that neither it nor anyone to whom it may have been responsible had any duty or responsibility with regard to the manner, method, and means for

performing the work of Plaintiff.  There was no relationship between Plaintiff and Defendant which created any duty on the part of Defendant regarding the manner, method, or conditions under which Plaintiff performed such work.  Further, Defendant had no right to control the manner, method, or conditions under which the work of Plaintiff was performed.  Defendant would show that the injuries of Plaintiff, if any, resulted from the manner, method, or condition under which this work was performed and over which Defendant had no control, and that the injuries, if any, were not the result of any product defect, breach of warranty, or neglect on the part of Defendant.

16.     Defendant alleges upon information and belief that the product or products of Defendant, if any be involved herein, were materially altered, modified, or changed, as those terms are known in the law of products liability, by third party persons or instrumentalities who were not in any manner connected with or controlled by this Defendant prior to the time Plaintiff used these products.

17.     Defendant denies that it owed any duty or warranty to Plaintiff and denies any fault or breach of warranty, if any of Defendant's products were involved herein.  Defendant asserts that the products distributed and sold by it were at all times reasonably fit and suitable for the purpose for which they were distributed and sold, and that the condition of Plaintiff did not result from any defect in these products, either by way of production defect, design defect, or marketing defect.

18.     Defendant asserts the defense of the applicable statutes of limitations and asserts the Statute of Repose as a bar to Plaintiffs' causes of action.

19.     In addition and in the alternative, Defendant asserts that during the period of time for which Plaintiff has asserted claims for injuries and damages, if Plaintiff contracted illness or

injury because of his occupation, such alleged injuries or illnesses are due to the nature of the employment.  Any remedies are limited to those provided by the Workers' Compensation Law of the State of Texas and other states.

20.     Defendant asserts that in the event Defendant is found to have been liable to Plaintiffs or any other party herein under the theories of negligence, strict liability, breach of warranty, or any other cause of action under law, Defendant asserts the doctrine of "comparative causation" as set out in the Supreme Court of Texas in *Duncan v. Cessna Aircraft Company*, 665 S.W.2d 414 (Tex. 1984), requiring that the harm caused by the negligence of Plaintiff be compared by the trier of fact with the harm, if any, caused by the alleged defective products, the alleged negligence, or alleged breach of warranty of defendants, including this Defendant, and any settling tortfeasor.  Alternatively, Defendant hereby invokes and seeks its remedies pursuant to Chapter 33 of the TEXAS CIVIL PRACTICE & REMEDIES CODE.

21.     Defendant asserts that Plaintiff can have no claim based upon strict liability in tort for any alleged exposure of Plaintiff to asbestos from asbestos-based products prior to June 7, 1967, when the Texas Supreme Court first adopted the doctrine of strict liability set forth in Restatement (Second) of Tort, Section 402A.  Until this time, when the Supreme Court decided *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787 (Tex. 1967), the doctrine of strict liability had not applied to manufacturers or sellers of non-food products.  All claims asserted by Plaintiff, or any other party herein, for recovery based upon strict liability for exposure prior to June 7, 1967, should be stricken and denied because such constitute an *ex post facto* recovery in violation of both the Texas and U. S. Constitutions.

22.     Pleading alternatively, if Plaintiff was injured by any product allegedly designed, manufactured and/or distributed by Defendant, Defendant did not breach any duty to Plaintiff

and is not liable for Plaintiffs' claimed damages since the product, when designed and/or distributed, and any warnings and instructions with respect to its use conformed to the then current applicable industry standards, technological environment, and state of the art and because the then current state of the art medical, scientific and industrial knowledge, and practice were such that Defendant did not and could not have known or foreseen that the product might pose a risk of harm when used in a normal and foreseeable manner.

23.     To the extent that Plaintiffs seek and/or are awarded an amount of punitive or exemplary damages that is unconstitutionally excessive, such award violates the United States and Texas Constitutions, including but not limited to the 5th and 14th Amendments to the United States Constitution and Section 19 of the Texas Bill of Rights, is void for vagueness, and violates the due process test set forth in *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976).

24.     Defendant denies any liability to Plaintiffs for punitive or exemplary damages, but without waiving this denial asserts the limitations and defenses of Chapter 41 of the TEXAS CIVIL PRACTICE & REMEDIES CODE.

25.     Defendant affirmatively pleads that any prior settlement between Plaintiffs and Defendant bars any claims alleged herein against Defendant, or in the alternative, if any relief is awarded to Plaintiffs herein, such relief should be offset by any prior settlement between Plaintiffs and Defendant.

26.     If, at the time of trial, it is shown that Plaintiffs used products manufactured, supplied, distributed or sold by Defendant and said products or a portion thereof were supplied to, by or on behalf of the United States Government, or if those products were supplied or sold by the United States Government, Defendant raises any immunity from suit or from liability as

conferred by the United States Government, and specifically pleads the government contractor defense.

27.     Defendant alleges that if the products being used by Plaintiff possessed any danger or risk as is claimed in Plaintiffs' pleading, Defendant did not have a duty to warn Plaintiff of any alleged risks associated with its products because Plaintiff's employer(s), owner of premise(s) where Plaintiff worked, union(s), and/or the person or entity which purchased and/or utilized Defendant's products was a learned intermediary capable of passing on any warning to Plaintiff.

28.     Defendant alleges that if the products being used by Plaintiff possessed any danger or risk as is claimed in Plaintiffs' pleading, the defense of sophisticated user applies and Defendant had no duty to warn Plaintiff, his employer(s), owner of premise(s) where Plaintiff worked, union(s), and/or the person or entity which purchased and/or utilized Defendant's products of any dangers because each of them knew or should have known of the dangers as a result of their special knowledge and expertise in the handling of these products.

### Reservation of Right to Amend Answer

29.     Defendant reserves the right at this time to amend this answer after it has had an opportunity to further investigate the claims alleged in Plaintiffs' most recent operative petition.

WHEREFORE, Defendant Rockwell Automation, Inc. prays that upon final hearing hereof, it have judgment that Plaintiffs in every capacity listed take nothing, recovery of its attorneys' fees and Court costs, and such other and further relief to which it may show itself to be justly entitled.

Respectfully submitted,


_____/s/ *Rodney H. Lawson*_____

**RODNEY H. LAWSON**
  Texas State Bar No. 12059700
  Email:  rlawson@ccsb.com
**JOSHUA D. KIPP**
  Texas State Bar No. 24078793
  Email:  jkipp@ccsb.com
**DEBRAN L. O'NEIL**
  Texas State Bar No. 24083497
  Email:  doneil@ccsb.com
**CARRINGTON, COLEMAN, SLOMAN**
  **& BLUMENTHAL, L.L.P.**
901 Main Street, Suite 5500
Dallas, Texas 75202-3767
Telephone:  214/855-3000
Telecopy:  214/855-1333

*Attorneys for Defendant*
*Rockwell Automation, Inc.*


### Certificate of Service

The undersigned certifies that a copy of the foregoing instrument was served upon the attorneys of record in the above cause in accordance with the Texas Rules of Civil Procedure via LexisNexis File & ServeXpress on this  _8th_  day of  _December_ , 2017.


_____/s/ *Rodney H. Lawson*_____
Rodney H. Lawson


i_7133734v.1

**DEFENDANT ROCKWELL AUTOMATION, INC.'S ORIGINAL ANSWER**      **Page 9**

12/10/2017 9:30 PM
Chris Daniel - District Clerk Harris County
Envelope No. 21192883
By: Lakeisha Williams
Filed: 12/11/2017 12:00 AM

CAUSE NO. 2017-81591-ASB

## BEFORE THE ASBESTOS MDL PRE-TRIAL JUDGE

| | | |
|---|---|---|
| JOHN H. ADAMS and LORRAINE ADAMS | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | HARRIS COUNTY, TEXAS |
| | § | |
| 3M COMPANY f/k/a MINNESOTA MINING | § | |
| AND MANUFACTURING; ET. AL. | § | 11TH JUDICIAL DISTRICT |

*Transferred From*
CAUSE NO. DC-17-15389

| | | |
|---|---|---|
| JOHN H. ADAMS and LORRAINE ADAMS | § | IN THE DISTRICT COURT |
| *Plaintiffs* | § | |
| | § | |
| vs. | § | DALLAS COUNTY, TEXAS |
| | § | |
| 3M COMPANY f/k/a MINNESOTA | § | |
| MINING AND MANUFACTURING, et al. | § | |
| *Defendants.* | § | 192ND JUDICIAL DISTRICT |

## DEFENDANT SCHNEIDER ELECTRIC USA, INC., FORMERLY KNOWN AS SQUARE D COMPANY'S SPECIAL APPEARANCE, AND SUBJECT THERETO ITS MOTION TO DISMISS FOR FORUM NON CONVENIENS, AND SUBJECT THERETO, ANSWER TO PLAINTIFFS' MOST RECENT PETITION, ANSWER TO CROSS ACTIONS AND/OR THIRD-PARTY ACTIONS

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, SCHNEIDER ELECTRIC USA, INC., FORMERLY KNOWN AS

SQUARE D COMPANY ("Square D" or "Defendant"), Defendant in the above-styled and

numbered cause, and files this its Special Appearance, and subject thereto its Motion to Dismiss

for Forum Non Conveniens, and subject thereto, Answer to Plaintiffs' Most Recent Petition, and

would respectfully show the Court the following:

## SPECIAL APPEARANCE

Defendant makes this special appearance pursuant to Texas Rule of Civil Procedure 120a

for the purpose of objecting to the jurisdiction of the court over the person and property of

Defendant. This Court does not have jurisdiction over Defendant, because Defendant is not

incorporated in Texas and does not maintain its principal place of business in Texas. Defendant does not have contacts with the State of Texas that are so continuous and systematic as to render it "at home" in Texas pursuant to *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014). Moreover, Plaintiff is not a resident of Texas, and his claims do not arise from and are not related to any activity conducted by Defendant in Texas. Subject to Defendant's Special Appearance and without waiver of same, Defendant further states the following.

## <u>MOTION TO DISMISS FOR FORUM NON CONVENIENS</u>

Defendant moves the Court to decline exercising jurisdiction and dismiss Plaintiffs' claims and causes of action pursuant to TEX. CIV. PRAC. & REM. CODE § 71.051 because there is no statutory or factual basis for maintaining this lawsuit in the State of Texas, as more fully set out below. The doctrine of forum non conveniens has been codified as to personal injury and wrongful death actions. TEX. CIV. PRAC. & REM. CODE § 71.051(i) (Vernon's 2003).

Section 71.051(b) of the TEX. CIV. PRAC. & REM. CODE provides that where "a court finds that in the interest of justice and for the convenience of the parties a claim or action" would be more properly brought in a forum outside of the State of Texas, the court shall decline to exercise jurisdiction and shall stay or dismiss the claim or action. This statute provides that a court may consider whether:

(1)     An alternative forum exists in which the claim or action may be tried;

(2)     The alternate forum provides an adequate remedy;

(3)     Maintenance of the claim or action in the courts of this state would work a substantial injustice to the moving party;

(4)     The alternative forum, as a result of the submission of the parties or otherwise, can exercise jurisdiction over all the defendants properly joined to the Plaintiffs' claim;

(5)     the balance of the private interests of the parties and the public interest of the state predominate in favor of the claim or action being brought in an alternate forum; and

(6)     the stay or dismissal would not result in unreasonable duplication or proliferation of litigation.

This suit was filed after September 1, 2003.  This suit seeks damages for personal injury and/or wrongful death allegedly caused by exposure to asbestos.  Upon information and belief, Plaintiff(s) are not legal residents of the state of Texas.  TEX. CIV. PRAC. & REM. CODE §71.051(e).  Further, the acts or omissions that Plaintiff(s) allege were a  proximate or producing cause of injury or death occurred outside Texas.  TEX. CIV. PRAC. & REM. CODE §71.051(f).

Since Plaintiff(s) reside outside of Texas, this state is not the proper forum for the continued litigation of this matter.  The state where Plaintiff(s) reside provides an alternate forum and an adequate remedy for the claims in this case.  Consistent with Texas law, the state courts where Plaintiff(s) reside are authorized to assert personal jurisdiction to the full extent allowed by the United States Constitution.  Like Texas, the long-arm statute of the state where Plaintiff(s) reside allows its court to exert jurisdiction over defendants causing or contributing to cause injury to persons domiciled in that state by virtue of tortuous conduct occurring in whole or in part within the state.

Therefore, Defendant moves the Court to decline exercising jurisdiction and dismiss Plaintiffs' claims and causes of action pursuant to TEX. CIV. PRAC. & REM. CODE  § 71.051.  Subject to Defendant's Motion to Dismiss for Forum Non Conveniens and without waiver of same, Defendant files its Answer as follows.

## I.

## ANSWER

As authorized by Rule 92, Tex. R. Civ. P., Defendant denies each and every, all and singular, the allegations contained in Plaintiffs' pleading, and demand strict proof thereof by a preponderance of the credible evidence.

## II.

Defendant denies that Plaintiffs sustained any injury or illness by reason of any contact with or use of any alleged products or materials manufactured, supplied to, packaged, furnished, delivered, distributed and/or purportedly sold by Defendant or any of its predecessors, and Defendant denies that Plaintiffs' purported injuries, illnesses or damages were in any way caused or produced by the use of or contact with anything for which Defendant or its predecessors are responsible.

1.      Further answering and assuming Plaintiffs prove their allegations, Defendant is not liable because Plaintiffs' claims are barred by the applicable statute of limitations and/or the doctrine of laches.

2.      Alternatively, Plaintiffs are barred from recovery herein by the doctrine of contributory negligence.

3.      Alternatively, the conduct of Plaintiffs and all other appropriate parties (whether parties to the lawsuit or not) should be compared by the court and jury under the doctrine of proportionate responsibility as set forth in Chapter 33 of the Texas Civil Practice & Remedies Code or, if applicable, under the doctrine of comparative causation, as adopted by the Supreme Court of Texas.

4.      Alternatively, Defendant alleges that any injuries and/or damages alleged by Plaintiffs were solely caused by the acts or omissions of others over whom Defendant had no supervision or control, and there was no damage from the conduct of Defendant.  Plaintiffs should not recover any damages from Defendant which were caused by the acts or omissions of others over whom Defendant had no supervision or control.

5.      Alternatively, any amount, which Plaintiffs might be entitled to recover against Defendant must be reduced by the amount of damages attributable to the intervening acts and/or omissions of such third persons.

6.      Alternatively, Defendant alleges that any act or omission attributed to it was not the legal or medical cause of any injury, damages or death alleged herein.  Rather, Plaintiffs' injuries, death and/or damages were caused by the acts and omissions of others for which Defendant has no legal responsibility.

7.      Any injury, damage or loss sustained by Plaintiffs, if any, resulted from natural causes independent of the conduct of Defendant.

8.      Alternatively, Plaintiffs' other employers and others knew or should have known of the alleged risks, and were negligent and careless in, among other things, failing to warn Plaintiffs of any alleged risk; failing to provide Plaintiffs with proper training, clothing and equipment; and failing to provide Plaintiffs with a safe work environment. Such intervening and superseding conduct, was the sole proximate cause of any alleged injury, damage or loss to Plaintiffs, and therefore preclude Plaintiffs from obtaining any recovery against Defendant.

9.      Plaintiffs were reasonably and adequately warned of any alleged risk and had actual, constructive or imputed knowledge thereof.  Accordingly, Plaintiffs are precluded from obtaining any recovery against Defendant.

10.      The state of the medical, scientific and industrial knowledge, art and practice was, at all material times, such that Defendant neither breached any alleged duty owed to Plaintiffs, nor knew, nor could have known, that their conduct presented a foreseeable risk of harm to Plaintiffs.

11.      Defendant alleges, in the alternative and without waiver of any of the foregoing defenses, that risks of harm which Plaintiffs allege were not known or reasonably knowable at

the time of Plaintiffs' alleged exposure.  Thus, any risk of harm was not reasonably foreseeable and Defendant should not be held liable for Plaintiffs' damages, if any.

12.    Defendant specifically denies Plaintiffs' allegations of collusion, conspiracy, negligence, and gross negligence.

13.    The award of exemplary or punitive damages in this cause is unconstitutional under the Constitutions of the State of Texas and the United States for one or more of the following reasons:

      a.      There are no reasonable standards for the award of such damages;

      b.      There are no specific guidelines for maximum and minimum damages if any should be made available;

      c.      Repetitive punitive damages awards for a single course or alleged course of conduct are inappropriate and in violation of the excessive fines clause of the Eighth Amendment and of the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution and in violation of Art., I § 13 of the Texas Constitution;

      d.      The award of punitive damages if an award is based on ex post facto law, and if imposed, would be determined by a standard of conduct formulated after the conduct of which the Plaintiffs' complain and applied retroactively to Defendant;

      e.      An award of punitive damages in this case would be violative of Texas Constitution Art. 1 Paragraph 14;

      f.      An award of punitive damages in this case would be violative of Texas Constitution Art. 1 Paragraph 16;

      g.      An award of punitive damages in this case would be violative of Texas Constitution Art. 1 Paragraph 19;

      h.      An award of exemplary or punitive damages would violate Defendant's right to due process of law under the Fourteenth amendment to the United States Constitution as well as under similar provisions of the constitutions of the State of Texas;

      i.      The contracts clause of Art. 1 § 10 of the United States Constitution prohibits the award of punitive damages because of any party's claim of punitive damages is an attempt to impose punitive damages through retrospective application of new, judge-made substantive rules.  Due process requires fair notice of type of conduct that will subject a person or

entity to monetary punishment and fair notice of range or any monetary punishment that may be imposed for deviation from the standard. Due process prohibits punishment of violation of unsettled standards and a standard not judicially established until the conduct complained of has taken place. Due process and the Contracts Clause of Art. 1 § 10 of the United States Constitution is therefore; also pleaded as a defense to all of Plaintiffs' liability theories which were not in existence at the time Defendant was operating as a corporate entity;

j.      Any award of punitive damages is, by its nature, an imposition of criminal or quasi-criminal sanctions against which no procedural safeguards have been enacted or promulgated by the court. Defendant requests that the Court enact procedural safeguards for the determination of punitive damages questions, including a right of Defendant against self-incrimination, a right to trial by jury of twelve persons, and Plaintiffs' burden of proof "beyond a reasonable doubt" rather than "by a preponderance of the evidence." Alternatively, Plaintiffs should be required to prove an entitlement to exemplary or punitive damages and the appropriate amount of punitive damages by "clear and convincing evidence." Due process also requires proof of liability for punitive damages by a standard greater that "preponderance of the evidence";

k.      It is a denial of due process of law and of equal protection of the laws under the Constitutions of the United States and Texas to permit a corporation to be vicariously liable for punitive and exemplary damages which are awarded on the basis of acts or omissions of employees, agents, or representatives of the corporation on the doctrine of respondent superior or any other vicarious liability doctrine; and

l.      Alternatively, if the Court allows punitive damages to be awarded in this case, Defendant requests that the Court designate a charitable public, or governmental body as recipient of such damages rather than allow Plaintiffs and their counsel a windfall. The present Texas law of punitive damages, if enforced against Defendant, would provide an unjust enrichment to Plaintiffs and Plaintiffs' attorney and would constitute an unconstitutional taking of property without due process.

14.     Alternatively, and without waiving the foregoing, Defendant invokes the limitation of exemplary damages as enumerated in Chapter 41 of the Texas Civil Practice and Remedies Code.

15.     Alternatively, and without waiving the foregoing, Defendant invokes the application of comparative responsibility of Chapter 33 of the Texas Civil Practice and Remedies Code.

16.     Joint and several liability should not be applied in this action because:

a.      The application of joint and several liability among the Defendants in this case would constitute a taking of property without due process of law guaranteed by the Constitutions of the United States and Texas.

b.      The application of joint and several liability, if any, among the Defendants in this case is a denial of due process of law and equal protection of the law under the Constitution of the United States and Texas, in that the liability for damages attributed to certain Defendants are assessed arbitrarily and inconsistently depending upon the solvency, insurability, or economic class of the various Defendants, and in that a solvent or adequately insured Defendant is required to be liable for damages caused by a different party who is insolvent, inadequately insured or of a particular economic class.

c.      Under Texas law, the application of joint and several liability, if any, among the Defendants in this case constitutes an ex post facto law in that a party can be held liable for damages and acts under circumstances which it cannot clearly or readily identify in advance so as to guide its behavior and as such is prohibited by the Constitutions of the United States and Texas.

d.      Application of joint and several liability among the Defendants in this case would violate the excessive fines clause of the Eighth Amendment as applied through the Fourteenth Amendment of the Constitution of the United States.

e.      The application of joint and several liability among Defendants in this case would allow the liability of some Defendants to bear no reasonable relationship to the amount of actual damages caused by those Defendants or the degree of fault attributed to those Defendants by the trier of fact, and therefore constitutes a denial of due process under the Constitutions of the United States and of Texas.

f.      The application of joint and several liability, if any, pursuant to Texas law in this case constitutes a denial of the absolute right to trial by jury as guaranteed by the Constitutions of the United States and Texas, and the application of joint and several liability should be fully explained to and determined by the trier of fact.

g.      The application of joint and several liability in this case would violate the open court's provision of the Constitutions of the United States and of Texas in that the extent of the liability to be imposed on a Defendant, if any, is not determined by the trier of fact.

h.      Joint and several liability, if any, is against the public policy of the United States and Texas in that it promotes and encourages a misalignment of the interests of the various parties to litigation, causing confusion of the jury,

resulting in manifestly unjust verdicts and outcomes, and encourages suits against Defendants who are financially solvent, adequately insured, or of a particular economic class, due to the strategic advantages of forcing a disproportionate amount of liability exposure among such Defendants. In addition, joint and several liability, if any, encourages financial irresponsibility and under insurance by many Defendants, contrary to the public policy of the United States and Texas.

17.     In the alternative, while continuing to deny any and all liability, and without waiver of any of Defendant's pleaded defenses, in the event that Plaintiffs are awarded pecuniary damages herein, Defendant contends that prejudgment interest should be reduced by reason of outstanding settlement offers, if any, during the prejudgment time period. In the unlikely event that exemplary damages are awarded, Defendant contends that Plaintiffs are not entitled to prejudgment interest on same, in accordance with Texas Civil Practice & Remedies Code § 41.006.

18.     Defendant alleges, in the alternative, and without waiver of any of the foregoing defenses, that Plaintiffs' claim for actual damages are barred by the Exclusive Remedy Provision of the Texas Workers' Compensation Act and/or such claims are barred by the Exclusive Remedy Provision of the Texas Workers' Compensation Act through application of the Borrowed Servant Doctrine.

19.     Defendant alleges, in the alternative, and without waiver of any of the foregoing defenses, that Plaintiffs' claim may be barred by the affirmative defenses of release, waiver and estoppel, provided that nothing herein shall be construed to change the burden of proof on such issues as they now exist.

20.     Defendant denies that Plaintiffs sustained any injury or illness by reason of any contact with or use of any alleged products or materials manufactured, supplied to, packaged, furnished, delivered, distributed and/or purportedly sold by Defendant or any of its predecessors, and Defendant denies that Plaintiffs' purported injuries, illnesses or damages were in any way

caused or produced by the use of or contact with anything for which Defendant or its predecessors are responsible.

21. Further answering, Defendant says that the alleged products or materials manufactured, supplied to and/or sold by it or its predecessors, if any, were reasonably fit and suitable for the purposes for which it was manufactured, distributed and/or sold, and Defendant denies that the same were defective or that it breached any warranty with respect thereto.

22. Defendant says that Plaintiffs had or should have had full knowledge of the areas where Plaintiffs were called upon to be or work, and Plaintiffs knew or should have known that the conditions or events complained of were harmful, but nevertheless continued to work and expose themselves to such. Further, it appears Plaintiffs failed to heed warnings, failed to follow instructions, and/or failed to utilize reasonable precautions and safety devices such as masks and respirators, and as a consequence thereof contributed to Plaintiffs' condition; moreover, Plaintiffs voluntarily assumed the risk of injury or illness by continuing work with full knowledge and information of the danger, and Plaintiffs' claims are barred by the doctrine of *volenti non fit injuria* and contributory negligence.

23. Further answering, if such be necessary, Defendant says that Plaintiffs' purported illness or injury, if any, which is specifically denied, are due to other causes and matters and are not related to exposure to any products or materials manufactured, supplied to, distributed, and/or sold by it or its predecessors, but rather was solely caused or contributed to by the acts, derelictions, or conduct of Plaintiffs and/or others for whom Defendant is not responsible.

24. Further answering, Defendant says that it had no control over the circumstances and events in question, including, but not limited to, the use of the alleged products or materials in question, and which were allegedly sold or provided to those engaged in the installation of insulation or other matters. Plaintiffs, their employers, and/or others for whom Defendant were

and are not responsible were aware of the nature of the product(s), material(s) and circumstances in question, the use to which the products or materials were to be put, and any dangers incident to the manner and method of using the same.  Because Plaintiffs, as well as their employers, union, superintendents and foreman, each and all, had or should have had actual knowledge of the conditions under which the products or materials in question were used and the dangers arising therefrom, Defendant had no duty to warn of such hazards; moreover, Plaintiffs' claims are barred by the doctrine of *volenti non fit injuria*, the knowledge of or available to Plaintiffs' employers, their superintendents and foreman being imputed to Plaintiffs.

25.   Defendant says further that if Plaintiffs were in fact exposed to it or its predecessors' products or materials, which is specifically denied, such exposure was only brief and not substantial, and that any exposure to asbestos as a result of Plaintiffs' contact with said products or materials was minimal in nature or nonexistent; and that the purported illnesses or injuries of Plaintiffs, if any, were not caused by contact with or the use of this Defendant's products or materials, but, on the contrary, would have occurred just as it did had Plaintiffs not used or been in contact with said products or materials.

26.   Defendant further denies that it falsely represented any facts, including the alleged dangers of asbestos exposure, and Defendant further denies that it knew of the falsity of any such alleged representations.

27.   In the alternative, the Defendant would show that there was no privity between the Defendant and the Plaintiffs.

28.   In the alternative, Defendant alleges that this Court lacks subject matter jurisdiction over the claims asserted by Plaintiffs.

29.   In the alternative, Defendant asserts that this Court lacks jurisdiction over the person of this Defendant.

30.     In the alternative, Defendant asserts that this jurisdiction is an improper venue to adjudicate Plaintiffs' claims.

31.     In the alternative, Defendant asserts that the claims of the Plaintiffs are barred by the insufficiency of process and/or the insufficiency of service of process.

32.     In the alternative, Defendant asserts that the Plaintiffs' claims are barred by the failure to serve process in a timely manner.

33.     In the alternative, Defendant asserts that the Plaintiffs' Original Petition fails to state any claims upon which relief can be granted against this Defendant.

34.     In the alternative, Defendant asserts that Plaintiffs' claims fail to present a justiciable case or controversy.

35.     In the alternative, without waiving the foregoing, Defendant would show that Plaintiffs' alleged causes of action are barred by the applicable statutes of repose.  Tex. Civ. Prac. & Rem. Code § 16.008, 16.009, and 16.012.

36.     Defendant respectfully reserves the right to file an amended Answer in this cause in the manner authorized by the Texas Rules of Civil Procedure.

## III.

## ANSWER TO CROSS ACTIONS AND/OR THIRD PARTY ACTIONS

In answer to any and all cross-actions and/or third party actions filed or which may be filed in the future by any and all other parties to these proceedings, if any, Defendant denies each and every, all and singular the allegations of fact and conclusions of law contained in such actions and demands strict proof thereof; Defendant denies that such parties are entitled to any relief from them, either directly, indirectly, by way of indemnity, lien, contribution, contract or otherwise.

DEFENDANT SCHNEIDER ELECTRIC USA, INC., FORMERLY KNOWN AS SQUARE D COMPANY'S SPECIAL APPEARANCE, AND SUBJECT THERETO ITS  MOTION TO DISMISS FOR FORUM NON CONVENIENS, AND SUBJECT THERETO, ANSWER TO PLAINTIFFS' MOST RECENT PETITION, ANSWER TO CROSS ACTIONS AND/OR THIRD-PARTY ACTIONS                Page 12
301339740 v1

Without waiver of any of the foregoing, Defendant reasserts their right of indemnity or contribution of and from each of the Co-Defendants and/or other persons or concerns liable or at fault, if any.

## IV.

## DEMAND FOR JURY TRIAL

The Defendant demands a trial by jury as to all issues in this matter.

## V.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Defendant prays that its Motion to Dismiss for Forum Non Conveniens be set for hearing, and that upon hearing the Court grant Defendant's Motion to Dismiss for Forum Non Conveniens, and subject thereto, Defendant prays that the Plaintiffs take nothing from said Defendant; and that costs of Court be assessed against Plaintiffs.  In the alternative, in the event that Defendant is held liable to Plaintiffs herein, Defendant prays for recovery of indemnity or contribution against co-Defendants and/or others. Further, Defendant prays that it be discharged and allowed to go hence without delay, and for such other and further relief, whether general or special, at law or in equity, including costs, reasonable attorneys' fees and interest, as to which this Defendant may be justly entitled.

Respectfully submitted,

**K&L GATES LLP**

*/s/ Clifton T. Hutchinson*

BY:_____

**Clifton T. Hutchinson**
State Bar No. 10347500
1717 Main Street
Suite 2800
Dallas, Texas 75201-6966
T: +1 214 939 5500
F: +1 214 939 5849
cliff.hutchinson@klgates.com

**R. Sean Brennan, Jr.**
State Bar No. 24069414
1000 Main Street, Suite 2550
Houston, Texas 77002
T: +1 713 815 7300
F: +1 713 815 7301
sean.brennan@klgates.com

**ATTORNEYS FOR DEFENDANT,
SCHNEIDER ELECTRIC USA, INC.,
FORMERLY KNOWN AS SQUARE D
COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was sent to counsel of record on the 10th day of December 2017, via File and Serve Xpress.

__*/s/ Clifton T. Hutchinson*_____
**K&L GATES LLP**

12/11/2017 8:34 AM
Chris Daniel - District Clerk Harris County
Envelope No. 21193804
By: Marcella Hill
Filed: 12/11/2017 8:34 AM

CAUSE NO. 2017-81591-**ASB**

**BEFORE THE ASBESTOS MDL PRE-TRIAL JUDGE**

| | | |
|---|---|---|
| JOHN H. ADAMS and LORRAINE ADAMS | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | HARRIS COUNTY, TEXAS |
| | § | |
| 3M COMPANY, ET AL | § | 11TH JUDICIAL DISTRICT |

*Transferred from:*

CAUSE NO. DC-17-15389

| | | |
|---|---|---|
| JOHN H. ADAMS and LORRAINE ADAMS | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| 3M COMPANY, ET AL | § | 192ND JUDICIAL DISTRICT |

**DEFENDANT, OCCIDENTAL CHEMICAL CORPORATION'S**
**MOTION TO TRANSFER VENUE AND ORIGINAL ANSWER SUBJECT THERETO**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, OCCIDENTAL CHEMICAL CORPORATION, hereinafter referred to as "Defendant", respectfully makes this Motion to Transfer Venue and Original Answer Subject Thereto.  In support, the Defendant would show the Court as follows:

**I.**

**MOTION TO TRANSFER VENUE**

Defendant specifically denies the Plaintiffs' venue allegations.  Defendant denies that Dallas County is a proper venue for the maintenance of this suit because Defendant denies that all or a substantial part of the alleged events or omissions giving rise to this cause of action arose in this county.  Further, Defendant denies that all or a substantial portion of Plaintiff's alleged exposure to asbestos and asbestos-containing products which caused Plaintiff's alleged asbestos-related injuries and diseases occurred in this county or that all alleged claims or actions against

Defendant arose out of the same series of transactions or occurrences.  In addition, Defendant denies that its principal office in this state is in Dallas County, Texas.

Instead, Defendant would show that Harris County is a proper county in which this suit should be brought.  Specifically, pursuant to §15.002(3), Harris County is a county in which at least one Defendant maintains its principal office in this state.  Accordingly, Defendant requests that this suit be transferred to Harris County.

In the alternative, if it is determined that Dallas County is a proper county of venue, then Defendant would request the transfer of this case to Harris, Texas, under §15.002(b) of the Texas Civil Practice & Remedies Code.

## II.

Defendant generally denies each and every, all and singular, the material allegations contained in Plaintiffs' petition and says that the same are not true, either in whole or in part, and demands strict proof thereof.

## III.

Further answering herein and in the alternative, Defendant would show that no action or inaction on its part was a cause in fact of Plaintiff's injuries and damages, if any; rather that Plaintiff's injuries and damages, if any, were caused, either solely or partially, by the negligence, fault, or liability of a person or persons over which Defendant had no control, including, but not limited to: Plaintiff, his co-workers, his employers, settled Defendants, and bankrupt asbestos product manufacturers.

## IV.

Further, answering, Defendant specifically invokes the provisions of Chapter 33 of the TEXAS CIVIL PRACTICE AND REMEDIES CODE, including:

(A) Section 33.003, which requires the determination of the percentage of responsibility of each party and settling defendant;

(B) Section 33.001, which provides that any plaintiff may not recover damages if his percentage of responsibility is greater than 50 percent;

(C) Section 33.013(a), which provides that the defendant is liable to a plaintiff only for the percentage of damages found by the trier of fact equal to the defendant's percentage of responsibility;

(D) Section 33.012(a) and (b) providing for reduction of any recovery by (1) plaintiff's percentage responsibility and (2) settlement credits; and

(E) Section 33.013(b) requiring that a defendant be greater than 50 percent responsible to be jointly and severally liable with other defendants.

**V.**

Further answering, Defendant specifically invokes the provisions of Chapter 95 of the TEXAS CIVIL PRACTICE AND REMEDIES CODE and would show that Defendant exercised and retained no control over the manner in which the work of Plaintiff was performed, other than the right to order the work to start or stop or to inspect progress or receive reports. Defendant further denies actual knowledge of the danger or condition Plaintiffs allege resulted in personal injury or death to Plaintiff, if any.

## VI.

Any judgment against Defendant and any recovery by Plaintiffs against it of punitive damages violate its due process rights as guaranteed by the Fourteenth Amendment to the United States Constitution as well as by Article I, Section 19, of the Texas Constitution.  The award of those damages is also impermissible under the public policy and the common law of the State of Texas.

In addition, any award of punitive damages against Defendant, without bifurcation and separate trial of the exemplary damages issues and all other issues in this case, would further violate its due process rights as guaranteed by the Fourteenth Amendment to the United States Constitution and by Article I, Section 19, of the Texas Constitution, as well as by the public policy and common law of this state.

Moreover, any award of punitive damages against Defendant, without requiring the jury to find every element of a cause or causes of actions for punitive damages by clear and convincing evidence, and without specifically and expressly charging the jury that they must find every element of that cause or those causes of action by clear and convincing evidence, would violate its rights to due process as guaranteed by the Fourteenth Amendment to the United States Constitution and by Article I, Section 19, of the Texas Constitution, as well as by the public policy and common law of this state.

In addition, any award of punitive damages against Defendant, without requiring the jury to consider the several factors established by the Supreme Court of this state for imposition of punitive damages, and without specifically and expressly charging the jury to consider those factors (namely, the nature of the wrong, the character of the conduct involved, the degree of culpability of the wrongdoer, the situation and sensibilities of the parties concerned, and the

extent to which the conduct offends a public sense of justice and propriety) would violate its rights to due process as guaranteed by the Fourteenth Amendment to the United States Constitution, and by Article I, Section 19, of the Texas Constitution, as well as by the public policy and common law of this state.

## VII.

To the extent that the Plaintiffs here claim punitive damages against Defendant, an award of punitive damages against it, without any cap or limit whatsoever placed upon the amount of punitive damages which may be awarded, would violate its rights to due process as guaranteed by the Fourteenth Amendment to the United States Constitution, by Article I, Section 19, of the Texas Constitution, as well as by the public policy and common law of this State.

## VIII.

Moreover, the rights of Defendant to due process as guaranteed by the Fourteenth Amendment to the United States Constitution, by Article I, Section 19, of the Texas Constitution, as well as by the public policy and common law of this state, would be violated by any award of punitive damages to the Plaintiffs in this action against it for the following reasons:  (1) under Texas law, a jury is not instructed with respect to the standards or factors to be considered in determining whether an award of punitive damages should be made, and if so, the amount of punitive damages to be awarded, and the jury is therefore given standardless and unfettered discretion to award punitive damages and determine their amount at the jury's whim; (2) the jury is also not instructed with regard to any limit which should be placed upon the amount, if any, of punitive damages, those limits being imposed by the purposes of that type of damages and the factors which should be considered in making the determination of their award and amount; (3) the jury is also not restricted from considering factors which should have no bearing upon their

determination of the award and the amount of punitive damages, i.e., the jury is not restricted from considering such irrelevant factors as the fact that Defendant may be a non-resident of this state, the Defendant's wealth, and the Defendant's status as a corporate entity; (4) the jury may award punitive damages under vague, general, and arbitrary standards which blur and confuse the distinction between conduct for which compensatory damages may be awarded, e.g., negligence, and conduct for which punitive damages may be awarded, e.g., gross negligence, so that the mental state required for the imposition of punitive damages is not clear and is not clearly defined and distinguished from the mental state which does not justify the imposition of punitive damages; and (5) the jury's determinations of whether to award punitive damages, and of the amount of those damages, are not subjected to sufficient scrutiny by either the trial court or the appellate courts of this state to ensure the fairness and reasonableness of both the award and the amount of the award of punitive damages, and the jury is not informed of the standards by which their determination of the award and amount of punitive damages will be measured by reviewing courts.

## IX.

With respect to Plaintiffs' claim for punitive damages, any award of punitive damages against Defendant, which may be based upon any conduct or products not specifically alleged as the basis for Plaintiffs' claims in this action, would violate its due process rights as guaranteed by the Fourteenth Amendment to the United States Constitution, by Article I, Section 19, of the Texas Constitution, as well as by the public policy and common law of this state.

## X.

With regard to Plaintiffs' allegations of conduct which allegedly justify the imposition of punitive damages against Defendant, basic considerations of fairness and Texas Procedure

require that the trial of this action be bifurcated such that all evidence and issues involving claims for punitive damages be tried separately and apart from all other evidence and issues in this action.   Otherwise, if all issues are tried together, including punitive damages issues, Defendant will be unfairly prejudiced.  Defendant hereby requests a bifurcated trial on the issues of punitive or exemplary damages, as required by *Transportation Insurance Company v. Moriel*, 879 S.W.2d 10 (Tex. 1994).

## XI.

To the extent that Plaintiffs seek punitive damages for allegedly wrongful conduct by Defendant, its liability, if any, for punitive damages must be based upon explicit findings by the jury that Plaintiffs have proved each element of their claim by clear and convincing evidence, including the element that they are guilty of conduct, such as gross negligence, justifying imposition of exemplary damages.  Accordingly, the jury should be specifically instructed that they may not award exemplary damages unless they have found that Plaintiffs have proved each element of their claims by clear and convincing evidence.

## XII.

In addition, to the extent that Plaintiffs claim entitlement to exemplary damages against Defendant in this action, Plaintiffs are entitled to recovery of those damages only if the jury is required to consider the appropriate factors, established by the Supreme Court of this state, in deciding whether to award exemplary damages and the amount of those damages.  Accordingly, the jury should be specifically instructed that they must consider the following factors in determining whether to award any amount of exemplary damages and in determining the amount, if any, of those damages:  the nature of the wrong, the character of the conduct involved,

the degree of culpability of the wrongdoer, the situation and sensibilities of the parties concerned, and the extent to which the conduct offends a public sense of justice and propriety.

## XIII.

In the alternative, Defendant pleads and invokes the standards of recovery and limitations on the amount of recovery for punitive and exemplary damages set forth in Chapter 41 of the TEXAS CIVIL PRACTICE & REMEDIES CODE.

## XIV.

Defendant would show that, in any action in which there are two or more Defendants, an award of exemplary damages must be specific as to a Defendant, and each Defendant is liable only for the amount of the award made against that Defendant.

## XV.

Pleading affirmatively, Defendant would show the Court that Plaintiffs' causes of action asserted in their Petition are barred by the applicable statutes of limitation, the doctrine of laches, and/or equity under Texas law.

## XVI.

Defendant alleges, in the alternative, and without waiver of any of the foregoing defenses that the risks of harm which Plaintiffs allege to have suffered, if any, from asbestos-containing products were not known or reasonably knowable at the time of Plaintiff's alleged exposures. Thus, any risk of harm was not reasonably foreseeable, and Defendant should not be held liable for Plaintiffs' damages, if any.

## XVII.

Further answering, and in the alternative, Defendant did not act in concert with any other Defendant in this action.   Therefore, Defendant cannot be considered a joint tortfeasor with respect to any Defendant under any theory of law.

## XVIII.

Further answering, and in the alternative, Defendant specifically denies that Plaintiff was exposed to any asbestos-containing product manufactured or distributed by Defendant and, thus, Defendant cannot be liable under doctrines or enterprise liability, market-share liability, concert of action or alternative liability.

## XIX.

Plaintiffs' claims have been released and assigned to others.   Alternatively Plaintiffs' claims are barred by *res judicata*, merger and bar, accord and satisfaction, and/or collateral estoppel.

## XX.

Defendant would further show that the products used by Plaintiff on Defendant's premises, if any, were distributed and sold for use in a limited market by a limited class of workers who have held themselves out as having special knowledge and experience in the handling of this material.   Upon information and belief, Plaintiff was an experienced member of that limited class of skilled individuals, upon whose special knowledge and expertise concerning the dangers of the product, if any, Defendant was entitled to rely.   Defendant contends that it had no duty to warn of dangers which Plaintiff's employers knew, or should have known, as a result of their special knowledge or expertise in the handling of these products.

## XXI.

Defendant would show that Plaintiff's diseases or medical problems or disabilities, if any, are in no way related to any alleged exposure on Defendant's premises.  Defendant would further show that Plaintiff's damages were caused or aggravated by personal habits or other causes or instrumentalities and not related to any exposure on Defendant's premises.

THEREFORE, Defendant respectfully requests that the Plaintiffs take nothing by way of this suit and that Defendant recover its costs.  Defendant further requests any other relief to which it may be justly entitled.

Respectfully submitted,

STRONG PIPKIN BISSELL & LEDYARD, L.L.P.

*/s/ David W. Ledyard*
David W. Ledyard
State Bar No. 12109400
Vickie R. Thompson
State Bar No. 16448480
595 Orleans, 14th Floor
San Jacinto Building
Beaumont, Texas  77701-3255
Telephone:  (409) 981-1000
Facsimile: (409) 981-1010
dledyard@strongpipkin.com
vthompson@strongpipkin.com

ATTORNEYS FOR DEFENDANT,
OCCIDENTAL CHEMICAL CORPORATION

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing Defendant, Occidental Chemical Corporation's Motion to Transfer Venue and Original Answer Subject Thereto is being furnished to Plaintiffs' counsel via certified mail, return receipt requested, and via e-file, on this the 11th day of December, 2017.

*/s/ David W. Ledyard*
David W. Ledyard

45820/1324628

12/11/2017 8:34:45 AM
Chris Daniel - District Clerk
Harris County
Envelope No: 21193804
By: HILL, MARCELLA D
Filed: 12/11/2017 8:34:45 AM

CAUSE NO. 2017-81591-**ASB**

**BEFORE THE ASBESTOS MDL PRE-TRIAL JUDGE**

| | | |
|---|---|---|
| JOHN H. ADAMS and LORRAINE ADAMS | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | HARRIS COUNTY, TEXAS |
| | § | |
| 3M COMPANY, ET AL | § | 11TH JUDICIAL DISTRICT |

*Transferred from:*

CAUSE NO. DC-17-15389

| | | |
|---|---|---|
| JOHN H. ADAMS and LORRAINE ADAMS | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| 3M COMPANY, ET AL | § | 192ND JUDICIAL DISTRICT |

**<u>JURY DEMAND</u>**

Pursuant to the provisions of Rule 216 of the Texas Rules of Civil Procedure, Defendant hereby formally makes this demand and application for a jury trial in this litigation.

Respectfully submitted,

STRONG PIPKIN BISSELL & LEDYARD, L.L.P.

*/s/ David W. Ledyard*
David W. Ledyard
State Bar No. 12109400
Vickie R. Thompson
State Bar No. 16448480
595 Orleans, 14th Floor
San Jacinto Building
Beaumont, Texas  77701-3255
Telephone:  (409) 981-1000
Facsimile:  (409) 981-1010
dledyard@strongpipkin.com
vthompson@strongpipkin.com

ATTORNEYS FOR DEFENDANT,
OCCIDENTAL CHEMICAL CORPORATION

45820/1324628

<u>CERTIFICATE OF SERVICE</u>

This will verify that a true and correct copy of Defendant's Jury Demand has been furnished to counsel for Plaintiffs, via certified mail, return receipt requested, and via e-file, on this the 11th day of December, 2017.

*/s/ David W. Ledyard*
David W. Ledyard

12/11/2017 9:09 AM
Chris Daniel - District Clerk Harris County
Envelope No. 21194084
By: Lakeisha Williams
Filed: 12/11/2017 9:09 AM

## CAUSE NO. 2017-81591-ASB

## BEFORE THE ASBESTOS MDL PRE-TRIAL JUDGE

| | | |
|---|---|---|
| JOHN H. ADAMS and LORRAINE ADAMS, | § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| vs. | § § | HARRIS COUNTY, TEXAS |
| 3M COMPANY, *et al.* | § § § | |
| Defendants. | § | 11TH JUDICIAL DISTRICT |

## <u>Transferred From</u>

## CAUSE NO. DC-17-15389

| | | |
|---|---|---|
| JOHN H. ADAMS and LORRAINE ADAMS, | § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| vs. | § § | DALLAS COUNTY, TEXAS |
| 3M COMPANY, *et al.* | § § § | |
| Defendants. | § | 192nd JUDICIAL DISTRICT |

## DEFENDANT CBS CORPORATION'S SPECIAL APPEARANCE

TO THE HONORABLE JUDGE OF SAID COURT:

Defendant CBS Corporation ("CBS"), by and through its attorneys, hereby specially appears as authorized by Tex. R. Civ. P. 120a and interposes an objection to any exercise of personal jurisdiction over CBS in the above-styled civil action. As detailed herein, Plaintiffs have not pled, nor can they prove, any facts sufficient to permit a constitutional exercise of jurisdiction over CBS.

## JURISDICTIONAL ALLEGATIONS AND FACTS

On November 6, 2017, Plaintiffs filed an Original Petition and Jury Demand in the 192nd Judicial District Court of Dallas County, Texas.  Plaintiffs, who are Michigan residents (*Pet.*, ¶¶ 3-4), allege that John H. Adams ("Mr. Adams") has been injured by asbestos exposure attributable to various Defendants, including CBS.  It is undisputed that CBS is a Delaware corporation which has its principal place of business in New York.  (*Id.*, ¶ 8); (Excerpts from CBS Corporation's Form 10-K for fiscal year ending 12/31/16, tendered herewith as "Exhibit A").

While Plaintiffs broadly assert that "[c]ertain acts or omissions, which were a proximate or producing cause of [Mr. Adams'] asbestos-related injuries, occurred in Texas" (*Pet.*, ¶ 1), no such Texas-based "acts or omissions" are identified, either generally or with specific regard to CBS.  More specifically, and while Plaintiffs' Original Petition fails, itself, to identify the site (or sites) of Mr. Adams' alleged asbestos exposure, their responses to Master Discovery (excerpts tendered herewith as "Exhibit B"), Plaintiffs assert that Mr. Adams was exposed to asbestos while serving in the United States Navy at duty stations in California and Hawaii and at various civilian worksites in Michigan and Florida.  (*Id.*, Response to Interrogatory #6).  Conversely, no Texas-based asbestos exposure is alleged.

## ARGUMENT

A challenge to the personal jurisdiction of a Texas court must be made by special appearance via a sworn motion as provided by Tex. R. Civ. P. 120a.  The merits of such a challenge are assessed through application of a shifting burden under which:

> the plaintiff bears the initial burden to plead sufficient allegations to bring the nonresident defendant within reach of Texas's long-arm statute.  Once the plaintiff has pleaded sufficient jurisdictional allegations, the defendant filing a special appearance bears the burden to negate all bases of personal jurisdiction

alleged by the plaintiff.  Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading.

If the plaintiff fails to plead facts bringing the defendant within reach of the long-arm statute (i.e., for a tort claim, that the defendant committed tortious acts in Texas), the defendant need only prove that it does not live in Texas to negate jurisdiction.

*Kelly v. General Interior Construction, Inc.*, 301 S.W.3d 653, 658-59 (Tex. 2010) (footnotes and cits., including internal footnotes and cits., omitted).  Notably, a plaintiff fails to satisfy even his preliminary pleading burden by generally asserting that a basis for jurisdiction exists; rather, the plaintiff must allege specific jurisdictional facts on the part of the specific defendant at issue to shift any burden to the defendant beyond its burden to demonstrate that it is not a Texas resident.  See, *e.g.*, *Cadle v. Grubart*, 990 S.W.2d 469, 473 (Tex. App – Beaumont 1999).

At least theoretically, Plaintiffs bear the burden of pleading specific facts that would both: 1) bring their claims within the scope of Texas-ling-arm statute; and 2) demonstrate that an exercise of jurisdiction over CBS in this case would not offend the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  *Schlobohm v. Schapiro*, 784 S.W.2d 355, 356 (1990).  However, as Texas' long-arm statute has been construed to extend personal jurisdiction to the full extent constitutionally allowed, this Court must simply assess whether those facts alleged by Plaintiffs – *i.e.*, an asbestos-related injury incurred by a non-Texas resident due to asbestos exposure outside this State – can support a constitutional exercise of personal jurisdiction over CBS, a Delaware corporation with its principal place of business in New York.  *Kelly*, 301 S.W.3d at 657.  The answer to that question is plainly "no."

## I.    This Court Cannot Constitutionally Exercise Specific Jurisdiction Over CBS In This Case

In the seminal case of *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945),

the Supreme Court declared that a state court can only exercise personal jurisdiction over a non-resident upon a showing of certain "minimum contacts" between the non-resident and the forum state so that the exercise of jurisdiction does not offend "'traditional notions of fair play and substantial justice.'"  (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).  See also *Goodyear Dunlop Tires Ops. v. Brown*, 564 U.S. 915, 923 (2011).  Subsequent Supreme Court precedent has drawn a sharp distinction between two types of personal jurisdiction: "specific jurisdiction" and "general jurisdiction."  See generally *Goodyear*, 564 U.S. at 919.

The more permissive form of personal jurisdiction is specific jurisdiction, which can be exercised where the defendant has certain "minimum contacts" with the forum state and the plaintiff's claims arise from those contacts.  *Goodyear*, 564 U.S. at 919.  See also *Kelly*, 301 S.W.3d at 658.  Here, Plaintiffs have not stated a claim arising from any contact between CBS and the State of Texas; rather, their claims against CBS seemingly arise solely from events and occurrences outside the State of Texas.  As such, specific jurisdiction cannot be exercised over CBS in this case.  Compare *Goodyear*, 564 U.S. at 919 (observing that a North Carolina court could not exercise specific jurisdiction over a tire manufacturer as the accident, as well as the manufacture and sale of the defective tires, had all occurred outside North Carolina).  See also *Bristol-Myers Squibb Co. v. Superior Ct.*, 137 S. Ct. 1773, 1781 (2017).  Cf. *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1559 (2017).

## II.  This Court Cannot Constitutionally Exercise General Jurisdiction Over CBS

The more restrictive form of personal jurisdiction is general jurisdiction, which may be exercised regardless of whether the plaintiff's claims arise from the defendant's contacts with the forum state if, but only if, those contacts "are so 'continuous and systematic' as to render [the defendant] essentially at home in the forum [s]tate."  *Goodyear*, 564 U.S. at 919.  Absent such

circumstances, "those who live or operate primarily outside a State have a due process right not to be subjected to judgment in its courts as a general matter." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 881 (2011).

For an individual, the notion of being "at home" is usually non-problematic, turning on the defendant's domicile. *Goodyear*, 564 U.S. at 924. For a corporation, "it is an equivalent place, one in which the corporation is fairly regarded as at home." *Id.*

The question of what types of contacts are needed to render a corporation "at home" in a forum state was taken up in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014). In that case, the plaintiffs brought suit against Daimler AG ("Daimler") in California for injuries caused by a Daimler subsidiary in Argentina. While acknowledging that specific jurisdiction was not at issue, the plaintiffs urged that Daimler was "at home" in California for purposes of general jurisdiction based on the California operations of another Daimler subsidiary, presenting evidence that Daimler, through its subsidiary, operated numerous facilities in California; that 10% of Daimler's United States vehicle sales occurred in California; and that California sales accounted for 2.4% of Daimler's worldwide sales. See generally *Daimler*, 134 S. Ct. at 752.

The Supreme Court disagreed. Rather, after engaging in an exhaustive analysis of precedent, the *Daimler* Court stressed that "general and specific jurisdiction have followed markedly different trajectories," so that, while "[s]pecific jurisdiction has been cut loose from *Pennoyer*'s sway," "we have declined to stretch general jurisdiction beyond limits traditionally recognized." *Id.*, at 757-58. In keeping with that dichotomy, the Court held that, even if Daimler's subsidiary's contacts with California were attributed to Daimler, itself, those contacts (while "systematic and continuous") could not support an exercise of general jurisdiction. *Id.*, at 760-61. In so doing, the *Daimler* Court explained at length that:

With respect to a corporation, the place of incorporation and principal place of business are "paradig[m] . . . bases for general jurisdiction.  Those affiliations have the virtue of being unique – that is, each ordinarily indicates only one place – as well as easily ascertainable.  These bases afford plaintiffs recourse to at least one clear and certain forum in which a corporate defendant may be sued on any and all claims.

*Goodyear* did not hold that a corporation may be subject to general jurisdiction *only* in a forum where it is incorporated or has its principal place of business; it simply typed those places paradigm all-purpose forums.  Plaintiffs would have us look beyond the exemplar bases *Goodyear* identified and approve the exercise of general jurisdiction in every State in which a corporation "engages in a substantial, continuous, and systematic course of business."  That formulation, we hold, is unacceptably grasping.

As noted, the words "continuous and systematic" were used in *International Shoe* to describe instances in which the exercise of *specific* jurisdiction would be appropriate.  Turning to all-purpose jurisdiction, in contrast, *International Shoe* speaks of "instances in which the continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit . . . *on causes of action arising from dealings entirely distinct from those activities*."  Accordingly, the inquiry under *Goodyear* is not whether a foreign corporation's in-form contacts can be said to be in some sense "continuous and systematic," it is whether that corporation's "affiliations within the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State."

*Id.*, at 760-61 (emphasis in original) (cits. and fns, including internal cits. and fns., omitted).

Admittedly, the *Daimler* Court declined to hold that a corporation could never be subject to general jurisdiction outside the state of its incorporation and/or its principal place of business, suggesting that such jurisdiction could perhaps be exercised in "exceptional cases."  The illustration chosen to reflect such exceptional circumstances is, however, telling.  In *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 448 (1952) an Ohio court was authorized to exercise general jurisdiction over a Philippines corporation whose ordinary principal place of business was in the Philippines, but whose operational base had been effectively and temporarily relocated to Ohio due to Japan's occupation of the Philippines during World War II.  As noted by the *Daimler* Court, under such extreme circumstances, "'Ohio was the corporation's principal, if

temporary, place of business.'" *Daimler*, 134 S. Ct. at 756 (quoting *Keeton v. Hunter Magazine, Inc.*, 465 U.S. 770, 780 n.11 (1984)).[1]

      *Daimler*, however, is clear in its holding that "[a] corporation that operates in many places can scarcely be deemed at home in all of them" as, "[o]therwise, 'at home' would be synonymous with 'doing business' tests framed before specific jurisdiction evolved in the United States." *Id.*, at 761, n.19. Thus, the Supreme Court specifically rejected the idea that "'a particular quantum of local activity'" (in that case, 10% of Daimler's total United States sales and the operation of permanent in-state dealerships and an in-state regional headquarters) "should give a State authority over a 'far larger quantum . . . of activity' having no connection to any in-state activity." *Id.*, at 762, n.20. See also, *e.g.*, *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 629 (2d Cir. 2016); *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1070 (9th Cir. 2015) ("the general jurisdiction inquiry examines a corporation's activities worldwide – not just the extent of its contacts in the forum state – to determine where it can be rightly considered at home").

      In short, simply being physically present in the forum state – and doing business in that state which is not only "systematic and continuous," but also "sizable" – will ***not*** support the constitutional exercise of general jurisdiction over a non-domestic corporation which does an even greater amount of business outside the forum. *Daimler*, 134 S. Ct. at 761. See also *Brown*, 814 F.3d at (*Daimler* "considerably altered the analytic landscape for general jurisdiction," leaving little room to suggest that such jurisdiction could be justified by proof that a defendant

---

[1] As stressed in *Bragg v. Johnson & Johnson*, 2015 WL 4889308 at *6 (S.D.W.V. Aug. 17, 2015), *Daimler*'s reference to *Perkins* can, perhaps, best be understood as reflecting – not that "exceptional cases" exist where general jurisdiction can be exercised over a corporation at some site other than its site of incorporation or principal place of business – but, instead, that there are "exceptional cases" where a corporation can be deemed to have more than one principal place of business. Under such a reading, a case is not rendered "exceptional" in terms of *Perkins* by proof of even substantial systematic and continuous business dealings within the forum state absent proof of activities within the forum state that are "typical of corporate headquarters." *Id.* Cf. *Cahen v. Toyota Motor Corp.*, 147 F. Supp. 2d 955, 965 (N.D. Cal. 2015) (stressing that an "exceptional case" requires more than proof of even extensive continuous and systematic in-state business, it requires evidence of facts rendering the state the defendant's "surrogate place of incorporation" or "temporary place of business").

had "contacts of substance, deliberately undertaken and of some duration" in various states including the forum).[2]

Here, Plaintiffs have failed to satisfy their burden by alleging specific facts that could, if true, support a constitutional exercise of general jurisdiction over CBS.  Quite the contrary, and despite the undisputed fact that CBS carries out some of the same broadcasting and multi-media advertising business activities in Texas that it conducts nationwide and around the globe, Plaintiffs have failed to plead or prove any facts that could even arguably bring those activities within the scope of the narrow "exceptional cases" rule of *Daimler*.  Accordingly, general jurisdiction over CBS is also lacking in this case.

## CONCLUSION AND PRAYER FOR RELIEF

Plaintiffs have failed to establish that this Court's exercise of personal jurisdiction over CBS, through either specific or general jurisdiction, would comport with constitutional due process.  Accordingly, CBS respectfully prays that this Court grant its Special Appearance pursuant to Tex. R. Civ. P. 120a; that it dismiss all claims stated against CBS in the above—styled civil action based on a lack of personal jurisdiction; and that it afford CBS any and all other relief deemed just and proper under the circumstances.

---

[2] As is often the case, the impact of *Daimler* is perhaps best crystallized by a dissenting voice, with Justice Sotomayor – concurring in the judgment only - noting that, under the rule of law announced in *Daimler*, "[t]he problem . . . is not that Daimler's contacts with California are too few, but that its contacts with other forums are too many."  *Daimler*, 134 S. Ct. at 764 (Sotomayor, J., concurring).

DEFENDANT CBS CORPORATION'S SPECIAL APPEARANCE

Respectfully submitted,

**PAINE | BICKERS LLP**
900 S. Capital of Texas Highway
Las Cimas IV, Ste. 460
Austin, Texas 78746
(512) 328-5551 Telephone
(512) 328-5556 Facsimile

By: _____

Ryan L. Harrison
State Bar Number 24068704
rlh@painebickers.com
Brian E. Berger
State Bar Number 24089985
beb@painebickers.com

**ATTORNEYS FOR DEFENDANT
CBS CORPORATION**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been forwarded to counsel for Plaintiffs John H. Adams and Lorraine Adams and all known counsel of record via File&ServeXpress on this _11th_ day of December 2017.

David C. Humen                                                    *via File&ServeXpress*
Susannah B. Chester-Schindler
Waters & Kraus, LLP
3141 Hood Street, Suite 700
Dallas, TX 75219
schester@waterskraus.com
dhumen@waterskraus.com
*Attorneys for Plaintiffs*

All Counsel of Record                                            *via File&ServeXpress*

Ryan L. Harrison

DEFENDANT CBS CORPORATION'S SPECIAL APPEARANCE

12/11/2017 9:09:08 AM
Chris Daniel - District Clerk
Harris County
Envelope No: 21194084
By: WILLIAMS, LAKEISHA
Filed: 12/11/2017 9:09:08 AM

## **VERIFICATION**

COMMONWEALTH OF PENNSYLVANIA    )

                                              )    SS:

COUNTY OF ALLEGHENY             )

         BEFORE ME, the undersigned notary, on this day personally appeared Dorothy M. Alke, who, being duly sworn according to law, deposes and says that she is Assistant Secretary of CBS Corporation, a Delaware corporation, f/k/a Viacom Inc., successor by merger to CBS Corporation, a Pennsylvania corporation, f/k/a Westinghouse Electric Corporation ("CBS Corporation"), and upon her oath further says the matters set forth in the foregoing CBS Corporation's Special Appearance are true and correct.

Dorothy M. Alke
Assistant Secretary

Sworn to and subscribed before me
this 8th day of December, 2017.

Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Marie A. Podvorec, Notary Public
City of Pittsburgh, Allegheny County
My Commission Expires Dec. 8, 2019
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2016

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number 001-09553

# CBS CORPORATION
(Exact name of registrant as specified in its charter)

| **DELAWARE** | **04-2949533** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**51 W. 52nd Street**
**New York, NY 10019**
**(212) 975-4321**
(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

Securities Registered Pursuant to Section 12(b) of the Act:

| **Title of Each Class** | **Name of Each Exchange on Which Registered** |
|---|---|
| Class A Common Stock, $0.001 par value | New York Stock Exchange |
| Class B Common Stock, $0.001 par value | New York Stock Exchange |

Securities Registered Pursuant to Section 12(g) of the Act:
None
(Title of Class)

Indicate by check mark if the registrant is a well-known seasoned issuer (as defined in Rule 405 of the Securities Act of 1933). Yes ☒  No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Securities Exchange Act of 1934. Yes ☐  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that registrant was required to submit and post such files). Yes ☒  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer, or smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Securities Exchange Act of 1934.

| Large accelerated filer ☒ | Accelerated filer ☐ | Non-accelerated filer ☐ (Do not check if a smaller reporting company) | Smaller reporting company ☐ |
|---|---|---|---|

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Securities Exchange Act of 1934). Yes ☐  No ☒

As of June 30, 2016, which was the last business day of the registrant's most recently completed second fiscal quarter, the market value of the shares of CBS Corporation Class A Common Stock, $0.001 par value ("Class A Common Stock"), held by non-affiliates was approximately $448,914,844 (based upon the closing price of $58.18 per share as reported by the New York Stock Exchange on that date) and the market value of the shares of CBS Corporation Class B Common Stock, $0.001 par value ("Class B Common Stock"), held by non-affiliates was approximately $21,535,553,110 (based upon the closing price of $54.44 per share as reported by the New York Stock Exchange on that date); and the aggregate market value of the shares of both Class A Common Stock and Class B Common Stock held by non-affiliates was $21,984,467,954.

As of February 14, 2017, 37,598,604 shares of Class A Common Stock and 371,936,529 shares of Class B Common Stock were outstanding.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of CBS Corporation's Notice of 2017 Annual Meeting of Stockholders and Proxy Statement to be filed with the Securities and Exchange Commission pursuant to Regulation 14A of the Securities Exchange Act of 1934, as amended (the "Proxy Statement") (Portion of Item 5; Part III).

**PART I**

**Item 1.**     *Business.*


CBS Corporation (together with its consolidated subsidiaries unless the context otherwise requires, the "Company" or "CBS Corp.") is a mass media company with operations in the following segments:

- ENTERTAINMENT: The Entertainment segment is composed of the *CBS*® Television Network; CBS Television Studios®; CBS Studios International™ and CBS Television Distribution™; CBS Interactive™; CBS Films®; and the Company's digital streaming services, *CBS All Access*® and *CBSN*®.

- CABLE NETWORKS: The Cable Networks segment is composed of Showtime Networks, which operates the Company's premium subscription program services, *Showtime*®, *The Movie Channel*®, and *Flix*®, including a digital streaming subscription offering; *CBS Sports Network*®, the Company's cable network focused on college athletics and other sports; and Smithsonian Networks™, a venture between Showtime Networks and Smithsonian Institution, which operates *Smithsonian Channel*™, a basic cable program service, and a digital streaming subscription service.

- PUBLISHING: The Publishing segment is composed of Simon & Schuster, which publishes and distributes consumer books under imprints such as *Simon & Schuster*®, *Pocket Books*®, *Scribner*®, *Gallery Books*®, *Touchstone*® and *Atria Books*®.

- LOCAL MEDIA: The Local Media segment is composed of CBS Television Stations, the Company's 30 owned broadcast television stations; and CBS Local Digital Media™, which operates local Websites including content from the Company's television stations and news and sports radio stations.

For the year ended December 31, 2016, contributions to the Company's consolidated revenues from its segments were as follows: Entertainment 67%, Cable Networks 16%, Publishing 6% and Local Media 14%. The Company generated approximately 14% of its total revenues from international regions in 2016. For the year ended December 31, 2016, approximately 54% and 14% of total international revenues of approximately $1.85 billion were generated in Europe and Canada, respectively.

The Company operates businesses which span the media and entertainment industries, including the CBS Television Network, cable networks, content production and distribution, television stations, internet-based businesses, and consumer publishing. The Company's principal strategy is to create and acquire premium content that is widely accepted by audiences, and to generate both advertising and non-advertising revenues from the distribution of this content on multiple media platforms and to various geographic locations. The Company continues to increase its investment in both Company-owned and acquired premium content to enhance its opportunities for revenue growth, which include exhibiting its content on multiple digital platforms, including the Company's owned digital streaming services, as well as third-party live television streaming offerings; expanding the distribution of its content internationally; and securing compensation from multichannel video programming distributors ("MVPDs"), including cable, direct broadcast satellite ("DBS"), telephone company, and other distributors, for authorizing the MVPDs' carriage of the Company's owned television stations (also known as "retransmission fees") and cable networks, and securing compensation from television stations affiliated with the CBS Television Network ("station affiliation fees" also known as "reverse compensation"). The Company also seeks to grow its advertising revenues by monetizing all content viewership as industry measurements evolve to reflect viewers' changing habits.

On February 2, 2017, the Company entered into an agreement with Entercom Communications Corp. to combine the Company's radio business, CBS Radio, with Entercom in a merger to be effected through a Reverse Morris Trust transaction, which is expected to be tax-free to CBS Corp. and its stockholders. In connection with this transaction, the Company intends to split-off CBS Radio through an exchange offer, in which the Company's stockholders may elect to exchange shares of the Company's Class B Common Stock for shares of CBS Radio, which will then be

immediately converted into shares of Entercom common stock at the time of the merger. The merger and related transactions are collectively referred to as the "Radio Transaction". The Radio Transaction is subject to customary approvals and closing conditions. The Company expects to complete the Radio Transaction during the second half of 2017. CBS Radio, which was previously presented in the Company's former Radio business segment, has been presented as a discontinued operation in the Company's consolidated financial statements for all periods presented.

On July 16, 2014, the Company completed the disposition of CBS Outdoor Americas Inc. ("Outdoor Americas"), which was previously a subsidiary of the Company and has been renamed OUTFRONT Media Inc. Outdoor Americas has been presented as a discontinued operation in the Company's consolidated financial statements for all periods presented.

The Company competes with many different entities and media in various markets worldwide. In addition to competition in each of its businesses, the Company competes for opportunities in the entertainment business with other diversified entertainment companies such as The Walt Disney Company, NBCUniversal Media, LLC, Twenty-First Century Fox, Inc. and Time Warner Inc., and with respect to CBS Radio, Cumulus Media Inc. and iHeartMedia, Inc.

As of December 31, 2016, National Amusements, Inc. ("NAI"), a closely held corporation that owns and operates approximately 925 movie screens in the U.S., the United Kingdom ("U.K.") and South America and manages 3 movie screens in South America, directly or indirectly owned approximately 79.5% of the Company's voting Class A Common Stock, and approximately 9.5% of the Company's Class A Common Stock and Class B Common Stock on a combined basis. Owners of the Company's Class A Common Stock are entitled to one vote per share. The Company's Class B Common Stock does not have voting rights. NAI is not subject to the reporting requirements of the Securities Exchange Act of 1934, as amended.

The Company was organized in Delaware in 1986. The Company's principal offices are located at 51 W. 52nd Street, New York, New York 10019. Its telephone number is (212) 975-4321 and its Website address is www.cbscorporation.com.

## CBS CORP. BUSINESS SEGMENTS

**Entertainment** (67%, 67% and 66% of the Company's consolidated revenues in 2016, 2015 and 2014, respectively, and 53%, 51% and 50% of the Company's total segment operating income in 2016, 2015 and 2014, respectively)

The Entertainment segment consists of the CBS Television Network; CBS Television Studios, CBS Studios International and CBS Television Distribution, the Company's television production and syndication operations; CBS Interactive, the Company's online content networks for information and entertainment; CBS Films, the Company's producer and distributor of theatrical motion pictures; and the Company's digital streaming services, *CBS All Access* and *CBSN*.

*Television Network.* The CBS Television Network through CBS Entertainment™, CBS News® and CBS Sports® distributes a comprehensive schedule of news and public affairs broadcasts, sports and entertainment programming to more than 200 domestic affiliates reaching throughout the U.S., including 16 of the Company's owned and operated television stations, and to affiliated stations in certain U.S. territories.

The CBS Television Network primarily derives revenues from the sale of advertising time for its network broadcasts. A significant portion of the sale of advertising spots for the network's non-sports programming occurs annually generally during May through July in the industry's upfront advertising market for the upcoming television broadcast season, which runs for one year generally commencing in mid-September. Advertisers purchase the remaining advertising spots closer to the broadcast of the related programming in the scatter advertising market. Overall advertising revenue for the network is also impacted by audience ratings for its programming. The Company offers dynamic advertising insertions for the CBS Television Network's on-demand programming which allow the

I-2

Company to change advertisements at any time within such programming and offer advertisers greater audience reach. In addition, the CBS Television Network's revenues include station affiliation fees.

CBS Entertainment is responsible for acquiring or developing and scheduling the entertainment programming presented on the CBS Television Network, which includes primetime comedy and drama series, reality-based programming, specials, children's programs, daytime dramas, game shows and late-night programs such as *The Late Show with Stephen Colbert*. CBS News operates a worldwide news organization, providing the CBS Television Network and CBS Radio News™ with regularly scheduled news and public affairs broadcasts, including *60 Minutes*, *48 Hours Mystery, CBS Evening News with Scott Pelley*, *CBS This Morning, CBS Sunday Morning* and *Face the Nation* as well as special reports. CBS News also provides CBS Newspath®, a television news syndication service that offers daily news coverage, sports highlights and news features to the CBS Television Network affiliates and other subscribers worldwide. CBS Sports broadcasts on the television network include *The NFL Today;* certain PGA Tour Golf Tournaments, the Masters and the PGA Championship; certain games from the NCAA Division I Men's Basketball Tournament, the rights to which have been extended through 2032 under a March 2016 agreement with the NCAA and Turner Broadcasting System, Inc.; regular-season college basketball games; regular-season college football games, including games from the Southeastern Conference and the NFL's American Football Conference (AFC) regular-season, post-season wild card playoff, divisional playoff and championship games. In 2016, CBS broadcast *Super Bowl 50,* for which CBS Sports won three *Sports Emmy®Awards*, and certain AFC games in the 2016 season under its February 2014 agreement with the NFL to broadcast the AFC package from the 2014 through the 2022 seasons, which also includes certain National Football Conference regular season games and the Super Bowls in 2016, 2019 and 2022. The Company produced and broadcast certain NFL Thursday Night Football games for the 2016 season and will also do so for the 2017 season under its January 2016 agreement with the NFL.

CBS Television Network content also is exhibited via the internet, including through *CBS.com*™; *CBSN*, the Company's live digital streaming advertiser-supported news network available 24 hours a day, seven days a week; and *CBS All Access*, the Company's digital streaming subscription service which includes a commercial-free option for on-demand content announced in August 2016. *CBS All Access* offers both current and library programming as well as original series, such as the upcoming *The Good Wife* spin-off *The Good Fight* and *Star Trek: Discovery*. In December 2016, the Company commenced a multi-year deal with the NFL for the live, local NFL games broadcast by the CBS Television Network to be streamed on certain *CBS All Access* platforms. Digital streaming services such as *CBS All Access* and *CBSN* are also known as "over-the-top" or "OTT" services which provide video content via the internet to users without payment to a traditional MVPD. *CBS All Access* and *CBSN* are available at *CBS.com* and *CBSNews.com*™, respectively, and through CBS software applications ("apps") on multiple digital platforms, including Android, iOS, Amazon Fire and Windows 8 mobile platforms, and Amazon Fire TV, Android TV, Apple TV, Chromecast, PlayStation, Roku and Xbox connected device platforms, among others. In January 2017, the Company entered into an agreement for the digital streaming of the CBS Television Network's programming on Hulu's upcoming live streaming service. During 2016, the CBS Television Network broadcast the 70th Annual Tony Awards®, the Kennedy Center Honors and the Grammy Awards®. In June 2016, the Company extended an agreement with The Recording Academy® to broadcast the Grammy Awards on the CBS Television Network through 2026. Furthering the Company's analytic tools regarding television advertising and ratings, in 2016, the Company announced the "NYU Stern / CBS Media Analytics Initiative" to focus on the interactions between television and other media platforms and their influence on consumer exposure and behavior and "Purchase-Driven Planning" with Nielsen Catalina Solutions used to maximize return on investment across television and digital advertising campaigns, all of which supplement the Company's "Campaign Performance Audit™," a data-driven approach for analyzing and buying advertising time on broadcast television which helps advertising customers enhance consumer targeting and measure the effectiveness of their advertising.

The CW, a broadcast network and the Company's 50/50 joint venture with Warner Bros. Entertainment, airs programming, including *Jane the Virgin*, *Crazy Ex-Girlfriend*, *Supergirl* and *The Flash.* Eight of the Company's owned television stations are affiliates of The CW. Certain of The CW's series are streamed on Netflix, a subscription video-on-demand service, including pursuant to output license agreements entered into with Netflix, Inc. in July 2016.

I-3

*Television Production and Syndication.* CBS Television Studios, CBS Studios International and CBS Television Distribution produce, acquire and/or distribute programming worldwide, including series, specials, news and public affairs, and generate revenue principally from the licensing and distribution of such programming. The programming is produced primarily for broadcast on network television, exhibition on basic cable and premium subscription services or distribution via first-run syndication. First-run syndication is programming exhibited on television stations without prior exhibition on a network or cable service. The Company subsequently distributes programming after its initial exhibition on a network, basic cable network or premium subscription service for domestic exhibition on television stations, cable networks or video-on-demand services (known as "off-network syndicated programming"). Off-network syndicated programming and first-run syndicated programming distributed domestically, as well as programming distributed internationally, can sometimes be sold in successive cycles of sales known as "first cycle," "second cycle" sales, and so on, which may occur on exclusive or non-exclusive bases. Generally, license fees may decrease with successive sales cycles due to increased program exhibitions.

Programming that was produced or co-produced by the Company's production group and is broadcast on network television includes, among others, *NCIS* (CBS), *Bull* (CBS), *Kevin Can Wait* (CBS), *Madam Secretary* (CBS), *Scorpion* (CBS), *Criminal Minds* (CBS) and *Jane the Virgin* (The CW). Generally, a network will license a specified number of episodes for broadcast on the network in the U.S. during a license period. Remaining distribution rights, including international and/or off-network syndication rights, are typically retained by the Company or, in the case of co-productions, distribution rights are shared with the co-producer for U.S. or international markets. The network license fee for a series episode is normally lower than the costs of producing the episode; however, the Company's objective is to recoup its costs and earn a profit through various forms of distribution, including international licensing, domestic syndication and digital streaming of episodes. Generally, international sales of network series are made within one year of the U.S. network run and series must have a network run of at least three or four years to be successfully sold in domestic off-network syndication; however, increasingly, these time frames are being shortened, particularly for sales to digital streaming services. In off-network syndication, the Company distributes series, such as *Hawaii Five-O, Criminal Minds, Blue Bloods, The Good Wife, Elementary*, *NCIS* and *NCIS: Los Angeles*, as well as a library of older television programs. The Company also produces and/or distributes first-run syndicated series such as *Wheel of Fortune, Jeopardy!, Entertainment Tonight, Inside Edition, The Insider, Dr. Phil* , *The Doctors*, *Rachael Ray, Hot Bench* and *Judge Judy* and produces the upcoming series, *The Good Wife* spin-off *The Good Fight*, and *Star Trek: Discovery*, for streaming on *CBS All Access*. The Company also distributes syndicated and other programming internationally.

The Company continues to monetize its content through digital media. It enters into and renews numerous multi-year licensing agreements for distribution of certain of its programming to various services, including the digital streaming on subscription video-on-demand services owned by Netflix (in the U.S, Canada and countries in Africa, Asia, Europe and Latin America), Amazon (in the U.S., India, Germany and U.K.), Hulu, Hulu Plus (each, in the U.S.), Bell Media (in Canada), Canal Play (in France), DLA (in countries in Latin America and the Caribbean), Foxtel, Stan Entertainment (each, in Australia), iFlix (in Malaysia, Thailand and Philippines), Nippon TV (in Japan), PlayCo (in the Middle East), MultiChoice Africa (in sub-Saharan Africa), Sky TV NZ, Telecom NZ (each, in New Zealand), Telefonica (in Spain), Watchever (in Germany), among others; digital streaming on advertising supported video-on-demand services, such as PPTV (in China); Sony's broadband pay television service, PlayStation Vue (in the U.S.); and the digital downloading on various electronic-sell-through services owned by Amazon (in the U.S., Germany and the U.K.), Apple (in the U.S., Canada, Australia and countries in Europe), Google (in the U.S. and U.K.) and Microsoft (in the U.S.), among others. In July 2016, the Company announced that its upcoming *Star Trek: Discovery* series as well as the existing *Star Trek* series library were licensed to Netflix in 188 countries (excluding the U.S. and Canada) and to Bell Media in Canada.

Fees for television programming licensed for syndication and digital streaming are recorded as revenues at the beginning of the license period in which the programs are made available for exhibition, which, among other reasons, may cause substantial fluctuations in the Entertainment segment's operating results. Unrecognized revenues attributable to such license agreements were $749 million and $847 million at December 31, 2016 and December 31, 2015, respectively.

I-4

The Company has a global channel presence through domestic and international joint ventures. The Company owns a 50% interest in a joint venture with Lionsgate, which owns and operates the entertainment cable network, Pop™. The Company owns a 49% interest in a joint venture with a subsidiary of AMC Networks Inc., which owns and operates six channels in the U.K. and Ireland, including *CBS Action™*, *CBS Drama™*, *CBS Reality™* and *Horror Channel™*. The Company also owns a 30% interest in a joint venture with another subsidiary of AMC Networks, which owns and operates six cable and satellite channels in Europe, the Middle East and Africa broadcasting CBS programming and branded as *CBS Action*, *CBS Drama*, *CBS Reality* and *CBS Europa™*. In Australia, the Company owns an approximately 33% interest in a joint venture with a subsidiary of Ten Network Holdings Limited to provide content to *ELEVEN™*, a digital television channel service. The Company owns a 30% interest in a joint venture with RTL Group, which owns and operates two cable channels in Southeast Asia in English and local languages, *RTL CBS Entertainment™* and *RTL CBS Extreme™*.

**CBS Interactive.** CBS Interactive is one of the leading global publishers of premium content on the internet, delivering this content via Web properties, mobile properties and CBS apps on mobile, as well as internet-connected television and other device platform apps. CBS Interactive is ranked among the top internet properties in the world according to comScore Media Metrix. CBS Interactive's leading brands, including *CNET®*, *CBS.com™*, *CBS All Access*, *CBSSports.com™*, *247 Sports®*, *GameSpot®*, *MaxPreps®,TVGuide.com™*, *CBSNews.com™*, *CBSN*, *ZDNet®*, *Last.fm®*, and *MetroLyrics.com®*, among others, serve targeted audiences with text, video, audio, and mobile content spanning technology, entertainment, sports, news, business, gaming and music categories. In addition to its U.S.-based business, which reached approximately 163 million multi-platform unique monthly visitors during December 2016 according to comScore Media Metrix, January 2017, CBS Interactive operates in Asia, Australia and Europe.

CBS Interactive generates revenue principally from the sale of advertising and sponsorships, in addition to fees derived from search and commerce partners, licensing fees, subscriptions, e-commerce activities, and other paid services. Advertising spending on the internet, as in traditional media, fluctuates significantly with economic conditions. In addition, online marketing spending follows seasonal consumer behavior throughout the calendar year to reflect trends during the calendar year.

CBS Interactive owns and operates digital properties, including: *CNET*, one of the preeminent digital properties for technology and consumer electronics information and featuring news, reviews, downloads and instructional and entertaining video and audio shows about technology; *CNET en Espanol™*, which delivers *CNET.com*'s information in the U.S. to Spanish speakers; *TVGuide Digital™*, which provides comprehensive information about television programming; *GameSpot*, a leading gaming information digital property providing video game reviews and previews, news, eSports, Webcasts, videos, and game downloads; *CBSSports Digital™*, which provides sports content, fantasy sports, community and e-commerce features, and also owns and operates *MaxPreps*; *Last.fm*, which is a music recommendation, discovery and social networking property; *MetroLyrics.com*, which is one of the most popular databases for song lyrics online; and *TV.com*, which is a destination for entertainment and community around television where visitors can watch videos and discuss and obtain information about television shows across all networks.

CBS Interactive also operates *CBS.com*, the online destination for CBS Television Network programming. Further extending the *CBS.com* experience, the Company offers a CBS app for on-demand streaming of various programs from the Company's current network and library programming to users on multiple digital platforms, including Android, iOS, Amazon Fire and Windows 8 mobile platforms, and Amazon Fire TV, Android TV, Apple TV, Chromecast, PlayStation, Roku and Xbox connected device platforms, among others. CBS Interactive operates *CBS All Access*, the Company's digital streaming subscription service, which includes a commercial-free option for on-demand content announced in August 2016. *CBS All Access* offers an on-demand selection of both current and library programming and original series, such as the upcoming *The Good Wife* spin-off *The Good Fight* and *Star Trek: Discovery*, as well as the ability to stream live programming from local CBS Television Stations and certain CBS television station affiliates. In December 2016, the Company commenced a multi-year deal with the NFL for the live, local NFL games broadcast by the CBS Television Network to be streamed on certain *CBS All Access* platforms. *CBS All Access* is available at *CBS.com* and on the multiple digital platforms described above through the CBS app. CBS Interactive also operates *CBSN*, a live digital streaming advertiser-supported news network available 24 hours a day, seven days a week. *CBSN* is available at *CBSNews.com* and on the multiple digital platforms described above through

the CBS News app. Through the *CBS Audience Network™*, the Company delivers video content from its digital properties and television stations and affiliated television stations under an advertiser-supported distribution model to third-party digital properties. The growing slate of the Company's content available online includes full episodes, clips and highlights based on CBS, CBS Sports Network and Showtime Networks programming as well as original made-for-the-Web content.

**CBS Films.** CBS Films produces, acquires and distributes theatrical motion pictures across all genres. The budget for each picture is intended to be up to $50 million (or, in certain cases, higher where a co-financing partner is involved) plus advertising and marketing costs at a level consistent with industry custom. The majority of motion pictures produced or acquired by CBS Films is intended for a wide, commercial theatrical release, similar to motion pictures typically produced and released by major studios. CBS Films' theatrical releases in 2016 were *Middle School: The Worst Years of My Life, Hell or High Water* and *Patriots Day.* In 2017, CBS Films' expected theatrical releases are *Dean*, *The Sense of An Ending* and *American Assassin*.

In general, motion pictures produced or acquired by CBS Films are exhibited theatrically in the U.S. and internationally, followed by exploitation via home entertainment (including DVDs and Blu-ray Discs and electronic rental and sell-through), video-on-demand, pay-per-view, pay television, free television and basic cable, digital media outlets, including subscription video-on-demand, and, in some cases, other channels such as airlines and hotels. CBS Films exploits its motion pictures (including certain ancillary rights such as licensing and merchandising) and generates revenues in all media in the relevant release windows either directly, through affiliated CBS entities, or via third-party distribution arrangements, including CBS Films' multi-year agreement with Lions Gate Films, which was entered into in November 2014, for Lions Gate Films to distribute CBS Films' new wide-release motion pictures in all media, except U.S. pay television.

## Entertainment Competition.

**Television Network.** The television broadcast environment is highly competitive. The principal methods of competition in broadcast television are the development and acquisition of popular programming and the development of audience interest through programming and promotion, in order to sell advertising at profitable rates. Broadcast networks like CBS compete for audience, advertising revenues and programming with other broadcast networks, such as ABC, FOX, NBC, The CW and MyNetworkTV, independent television stations, cable program services, as well as other media, including DVDs and Blu-ray Discs, digital program services, print and the internet. In addition, the CBS Television Network competes with the other broadcast networks to secure affiliations with independently owned television stations in markets across the country which are necessary to ensure the effective distribution of network programming to a nationwide audience.

**Television Production and Syndication.** As a producer and distributor of programming, the Company competes with studios, television production groups, and independent producers and syndicators, such as Disney, Fox, NBCUniversal, Sony and Warner Bros., to produce and sell programming both domestically and internationally. The Company also competes to obtain creative talent and story properties which are essential to the success of all of the Company's entertainment businesses.

**CBS Interactive.** CBS Interactive competes with a variety of online properties for users, advertisers, and partners, including the following: general purpose portals, such as AOL, MSN and Yahoo!; search engines such as Google, Yahoo! and Bing; online comparison shopping and retail properties, including Amazon.com; vertical content sites in the categories that CBS Interactive's brands serve such as technology, gaming, music, news, business, food, entertainment and lifestyle focused digital properties; other content sites and apps, such as ESPN.com, HBO GO, Hulu and Netflix, as well as major television broadcast company digital properties, including digital streaming services and apps; and platforms such as blogs, podcasts and video properties. CBS Interactive also competes for users and advertisers with diversified media companies that provide both online and offline content, including magazines, cable television, network television, radio and newspapers.

**CBS Films.** Motion picture production and distribution is a highly competitive business. During the life cycle of the development and production of a motion picture project, CBS Films must compete for the rights to compelling underlying source material and talent such as writers, producers, directors, on-screen performers and other creative personnel. CBS Films must also compete with other buyers for the acquisition of third-party produced motion pictures. Once a motion picture is completed or acquired, CBS Films must compete with numerous other motion pictures produced and/or distributed by various studios and independent producers, including Paramount Pictures Corporation, Walt Disney Studios Motion Pictures, Warner Bros. Entertainment Inc., Lions Gate Entertainment, STX Entertainment, The Weinstein Company, Metro-Goldwyn-Mayer Studios Inc. and Lakeshore Entertainment Group, among others, for audience acceptance as well as limited exhibition outlets across all of the relevant release windows. In addition, the ultimate consumer has many options for entertainment other than motion pictures including video games, sports, travel, outdoor recreation, the internet, and other cultural and computer-related activities.

**Cable Networks** (16%, 18% and 17% of the Company's consolidated revenues in 2016, 2015 and 2014, respectively, and 33%, 37% and 37% of the Company's total segment operating income in 2016, 2015 and 2014, respectively)

The Cable Networks segment is composed of Showtime Networks, which operates the Company's premium subscription program services, including a digital streaming subscription offering; *CBS Sports Network*, the Company's cable network focused on college athletics and other sports; and Smithsonian Networks, a venture with Smithsonian Institution, which operates *Smithsonian Channel* and a digital streaming subscription service.

**Showtime Networks.** Showtime Networks owns and operates three commercial-free, premium subscription program services in the U.S.: *Showtime*, offering original series, recently released theatrical feature films, documentaries, boxing and other sports-related programming, and special events; *The Movie Channel*, offering recently released theatrical feature films and related programming; and *Flix*, offering theatrical feature films primarily from the last several decades; and a digital streaming subscription offering of the *Showtime* service which launched in July 2015. At December 31, 2016, *Showtime, The Movie Channel* and *Flix*, in, the aggregate, had approximately 76 million subscriptions in the U.S., certain U.S. territories and Bermuda.

Showtime Networks makes versions of *Showtime, The Movie Channel* and *Flix* available on-demand, enabling television subscribers to watch individual programs at their convenience. Showtime Networks also makes available *Showtime Anytime®*, an authenticated version of *Showtime*, which can be accessed on computers via *showtimeanytime.com™* or via certain internet-connected devices through a *Showtime Anytime* app free of charge to *Showtime* subscribers as part of their *Showtime* subscription through participating Showtime Networks' distributors. Through *Showtime Anytime*, *Showtime* subscribers can view on-demand programming as well as the live telecast of the east and west coast feeds of *Showtime*. Showtime Networks additionally operates the Website *SHO.com™* which promotes *Showtime, The Movie Channel* and *Flix* programming, and provides information and entertainment and other services. Showtime Networks also makes available a digital streaming subscription offering of the *Showtime* service for purchase by consumers without a traditional MVPD video subscription. This offering allows subscribers to view on-demand programming as well as the live east and west coast linear feeds of *Showtime*, and is available at *showtime.com™*, through the *Showtime* app on multiple digital platforms, and as an add-on subscription to Amazon Prime, Hulu or Sony's PlayStation Vue.

Showtime Networks derives revenue principally from the license of its program services to numerous MVPDs, with a substantial portion of such revenue coming from three of the largest such distributors. The costs of acquiring exhibition rights to programming and producing original series are the principal expenses of Showtime Networks. Showtime Networks enters into commitments to acquire rights, with an emphasis on acquiring exclusive rights for *Showtime* and *The Movie Channel*, from motion picture studios and other distributors typically covering the U.S. and Bermuda for varying durations, including exclusive motion picture output agreements with CBS Films, Open Road Films, STX Entertainment, Amblin Partners and, for certain DreamWorks motion pictures, Buena Vista Pay Television, a subsidiary of The Walt Disney Company. Showtime Networks' original series telecast in 2016 included *Ray Donovan, Billions, Masters of Sex, The Affair, The Circus, Penny Dreadful, Shameless* and *House of Lies*, among others. In 2016, Showtime Networks also telecast various sports-related programs, including *Inside the NFL, 60 Minutes Sports*

and *A Season With Florida State Football*, and documentaries such as *Weiner, Michael Jackson's Journey from Motown to Off the Wall* and *Madonna: Rebel Heart Tour*.

Showtime Networks has entered into and may from time to time enter into co-financing, co-production and/or distribution arrangements with other parties to reduce the net cost to Showtime Networks for its original programming. In addition, Showtime Networks derives revenue by licensing rights it retains in certain of its original programming. The Company enters into licensing arrangements with television networks, internet content distributors, such as Amazon and Netflix, and/or other media companies for the exhibition of certain *Showtime* original programming domestically and in various international territories. For example, the Company has output agreements with Bell Media Inc. for Canada, and with Sky-affiliated entities for Austria, Germany, Ireland, Italy and the U.K. The Company entered into an output agreement in January 2016 with Stan Entertainment PTY Limited for Australia, and an output agreement in September 2016 with Moviestar+ for Spain.

Showtime Networks also owns a majority of and manages Smithsonian Networks, a venture with Smithsonian Institution, which operates *Smithsonian Channel*, a basic cable service in the U.S., featuring programs of a cultural, historical, scientific and educational nature. Smithsonian Networks offers a companion on-demand version, makes *Smithsonian Channel* content available on an authenticated basis to certain distributors in the U.S. and licenses *Smithsonian Channel* content outside of the U.S., including to Blue Ant Television Ltd. in connection with *Smithsonian Channel* in Canada. In September 2016, Smithsonian Networks launched *Smithsonian Channel* in Singapore. Smithsonian Networks also operates the Website *SmithsonianChannel.com™* and various apps, which promote *Smithsonian Channel* programming and provide information and entertainment services. Smithsonian Networks also operates *Smithsonian Earth™*, its digital streaming subscription service featuring original nature and wildlife content in ultra-high definition resolution (4K), which is available to consumers without a traditional MVPD video subscription. Consumers can subscribe to *Smithsonian Earth* on multiple digital platforms, including Apple TV, Roku and Amazon Fire TV and Prime.

**CBS Sports Network.** CBS Sports Network is a 24 hours a day, seven days a week cable program service that provides sports and related content, with a strong focus on college sports. The network televises over 600 live professional, amateur, semi-professional and collegiate events annually, highlighted by Division I college football, basketball, hockey and lacrosse, as well as professional bull riding (PBR), professional lacrosse (MLL), arena football (AFL), World's Toughest Mudder, and various styles of motor sports events (including asphalt, dirt, and off road racing). In addition, the network showcases a variety of original programming, including documentaries, features and studio shows, highlighted by *That Other Pre-Game Show (TOPS), NFL Monday QB, Inside College Basketball, Inside College Football, Time to Schein* and a first of its kind all-female panel talk show, *We Need to Talk.* CBS Sports Network also provides ancillary coverage for CBS Sports relating to major events, such as the NCAA Division I Men's Basketball Tournament, Masters Tournament and PGA Championship, and for Showtime Networks relating to Showtime Championship Boxing. CBS Sports Network produces weekday simulcasts of the radio shows *Boomer and Carton* and *The Doug Gottlieb Show*. Further, CBS Sports Network televises a diverse slate of additional programming under the *CBS Sports Spectacular™* brand, including mixed martial arts, skiing, bowling, surfing, boxing, horse racing, volleyball, cheerleading and skate boarding, among other events. CBS Sports Network had approximately 55 million subscribers as of December 31, 2016. The network derives its revenues from subscription fees and the sale of advertising. CBS Sports Network has secured carriage arrangements with the top MVPDs. The Company also has agreements for the digital streaming of CBS Sports Network programming on several digital streaming services, including Hulu's upcoming live television streaming service.

**Cable Networks Competition.**

**Showtime Networks.** Showtime Networks primarily competes with other providers of premium subscription program services in the U.S., including Home Box Office, Inc. and Starz, LLC. Competition among these premium subscription program services in the U.S. is dependent on: (i) the production, acquisition and packaging of original series and other original programming and the acquisition and packaging of an adequate number of recently released theatrical motion pictures; and (ii) the offering of prices, marketing and advertising support and other incentives to distributors for carriage so as to favorably position and package Showtime Networks' premium subscription program

I-8

services to subscribers. In addition, Showtime Networks competes with non-traditional subscription programming services delivered via the internet, such as Amazon, Hulu and Netflix, for original programming, theatrical motion pictures and viewership. Showtime Networks also competes for programming, distribution and/or audiences with basic cable program services, broadcast television and other media, including video games and other internet apps.

Smithsonian Networks competes for programming, distribution and/or audiences with non-fiction and other basic cable program services, including Discovery Channel, National Geographic Channel and History, as well as with broadcast television and other media.

**CBS Sports Network.** CBS Sports Network principally competes with cable programming services, including other sports-oriented cable programming services, for distribution and license fee revenue among MVPDs, as well as for viewership and advertising revenue. The effects of consolidation among MVPDs and consumer pricing sensitivity have made it more difficult for niche channels to secure broad distribution in mainstream programming packages. In addition, the largest cable providers have created sports tiers for sports programming services which have not, in many cases, achieved significant subscriber penetration or acceptance. CBS Sports Network continues its repositioning to be included in programming packages with more subscribers. Re-alignment of college athletic conferences and their member institutions may adversely impact CBS Sports Network's programming arrangements. CBS Sports Network also competes with cable programming services generally, including other sports programming services, such as ESPN, FOX Sports Networks and NBC Sports Network, in acquiring the television and multimedia rights to sporting events, resulting in increased rights fees and increased production expenses.

The terms and favorable renewal of agreements with distributors for the distribution of the Company's subscription program services are important to the Company. The effects of consolidation among MVPDs and other marketplace factors make it more difficult to reach and maintain favorable terms and positioning and could have an adverse effect on revenues.

**Publishing** (6% of the Company's consolidated revenues in each of 2016, 2015 and 2014, and 4% of the Company's total segment operating income in each of 2016, 2015 and 2014)

The Publishing segment consists of Simon & Schuster, which publishes and distributes consumer books in the U.S. and internationally.

Simon & Schuster publishes and distributes adult and children's consumer books in printed, digital and audio formats in the U.S. and internationally. Its digital formats include electronic books and audio books. Simon & Schuster's major adult imprints include *Simon & Schuster*, *Pocket Books, Scribner*, *Atria Books, Gallery Books*, *Touchstone* and *Howard Books®*. Simon & Schuster's major children's imprints include *Simon Pulse®, Aladdin®, Atheneum Books for Young Readers®, Margaret K. McElderry Books™, Saga Press™* and *Simon & Schuster Books For Young Readers™*. Simon & Schuster also develops special imprints and publishes titles based on the products of certain CBS businesses as well as that of third parties and distributes products for other publishers. Simon & Schuster distributes its products directly and through third parties. Simon & Schuster also delivers content and promotes its products on its own Websites, social media, general internet sites as well as those dedicated to individual titles. Its created assets include online videos showcasing Simon & Schuster authors and new releases on AOL, YouTube, Amazon, Bio.com, MSN.com, Google Newsstand, iTunes, *SimonandSchuster.com* and other sites. International publishing includes the international distribution of English-language titles through Simon & Schuster UK, Simon & Schuster Canada, Simon & Schuster Australia, Simon & Schuster India and other distributors, as well as the publication of locally originated titles by its international companies.

In 2016, Simon & Schuster had 277 New York Times bestsellers in hardcover, paperback and electronic formats, collectively, including 33 New York Times #1 bestsellers. Best-selling titles in 2016 include *Born to Run* by Bruce Springsteen, *A Man Called Ove* by Fredrik Backman and *End of Watch* by Stephen King. Best-selling children's titles include *Lady Midnight* by Cassandra Clare, *Dork Diaries 11: Tales from a Not-So-Friendly Frenemy* by Rachel Renée Russell and *Rush Revere and The Presidency* by Rush Limbaugh and Kathryn Adams Limbaugh. *Simon &*

I-9

*Schuster Digital™*, through *SimonandSchuster.com*, publishes original content, builds reader communities and promotes and sells Simon & Schuster's books over the internet.

The consumer publishing marketplace is subject to increased periods of demand in the summer months and during the end-of-year holiday season. Major new title releases represent a significant portion of Simon & Schuster's sales throughout the year. Simon & Schuster's top two accounts drive a significant portion of its annual revenue. Consumer print books are generally sold on a fully returnable basis, resulting in the return of unsold books. In the domestic and international markets, the Company is subject to global trends and local economic conditions. In 2016, the sale of digital content represented approximately 23% of Simon & Schuster's revenues. The Company expects that electronic books will continue to represent a significant portion of Simon & Schuster revenues in the coming years.

**Publishing Competition.** The consumer publishing business is highly competitive and has been affected over the years by consolidation trends and electronic distribution methods and models. Mass merchandisers and on-line retailers are significant factors in the industry contributing to the general trend toward consolidation in the retail channel. The growth of the electronic book market has impacted print book retailers and wholesalers and could result in a reduction of these channels for the sales and marketing of the Company's books. In addition, unfavorable economic conditions and competition may adversely affect book retailers' operations, including distribution of the Company's books. The Company must compete with other larger publishers, such as Penguin Random House, Hachette and HarperCollins, for the rights to works by authors and sales to retailers and customers. Competition is particularly strong for well-known authors and public personalities. In addition, technological changes have made it increasingly possible for authors to self-publish and have led to the development of new digital distribution models in which the Company's books must compete with the availability of both a larger volume of books as well as non-book content.

**Local Media** (14%, 12% and 13% of the Company's consolidated revenues in 2016, 2015 and 2014, respectively, and 22%, 19% and 20% of the Company's total segment operating income in 2016, 2015 and 2014, respectively)

The Local Media segment is composed of CBS Television Stations, the Company's 30 owned broadcast television stations, all of which operate under licenses granted by the Federal Communications Commission ("FCC") pursuant to the Communications Act of 1934, as amended (the "Communications Act"). The licenses are renewable every eight years. The Company's television stations are located in the 6 largest, and 15 of the top 20, television markets in the U.S. The Company owns multiple television stations within the same designated market area ("DMA") in 10 major markets. These multiple station markets are: New York (market #1), Los Angeles (market #2), Philadelphia (market #4), Dallas-Fort Worth (market #5), San Francisco-Oakland-San Jose (market #6), Boston (market #9), Detroit (market #13), Miami-Ft. Lauderdale (market #16), Sacramento-Stockton-Modesto (market #20), and Pittsburgh (market #23). This group of television stations enables the Company to reach a wide audience within and across geographically diverse markets in the U.S. The stations produce news and broadcast public affairs, sports and other programming to serve their local markets and offer CBS, The CW or MyNetworkTV programming and syndicated programming. The CBS Television Stations group principally derives its revenues from the sale of advertising time on its television stations. In addition, the CBS Television Stations group receives retransmission fees from MVPDs for authorizing the MVPDs' carriage of the Company's owned television stations. The Company also has agreements for the digital streaming of the Company's owned television stations on several digital streaming services, including Hulu's upcoming live television streaming service. The Company's digital streaming subscription service, *CBS All Access*, offers an extensive on-demand selection of both current programming and library, original series as well as the ability to stream live programming from local CBS Television Stations and certain CBS television station affiliates. *CBS All Access* is available at *CBS.com* and through the CBS app on multiple digital platforms. The Company's television stations have a digital presence on CBS Local Websites which are operated by CBS Local Digital Media. The CBS Local Websites and related apps promote the Company's stations' programming as well as provide live and on-demand news, traffic, weather, entertainment and sports information, among other services for their local communities. CBS Radio's local sports and news radio stations also have a digital presence on CBS Local Websites which is expected to continue for specified periods after the closing of the Radio Transaction pursuant to a digital services agreement with the Company. The CBS Local Websites principally derive revenues from the sale of advertising. The "Television Stations and CBS Local Digital Media Websites" table below includes information with respect to these properties within U.S. television markets. CBS Television Stations and Weigel Broadcasting own and operate through an

I-10

approximately 50/50 joint venture *DECADES*™, a national entertainment program service featuring classic television content, movies and original programming for local television stations' digital sub-channels, which utilize a local television station's available broadcast spectrum to provide a companion to that station's primary channel.

**Local Media Competition.** Television stations compete for programming, on-air talent, audiences and advertising revenues with other stations and cable networks in their respective coverage areas and, in some cases, with respect to programming, with other station groups, and, in the case of advertising revenues, with other local and national media. The owned and operated television stations' competitive position is largely influenced by the quality of the syndicated programs and local news programs in time periods not programmed by the network; the strength of the CBS Television Network programming and, in particular, the viewership of the CBS Television Network in the time period immediately prior to the late evening news; and in some cases, by the quality of the broadcast signal. The Company's television stations face increasing competition from technologies such as audio and visual content delivered via the internet, which create new ways for audiences to consume content of their choosing while avoiding traditional commercial advertising. The Company's television stations' Websites face competition for advertisers and visitors from other digital sources of local content.

### Television Stations and CBS Local Digital Media Websites

The following table sets forth information with regard to the Company's owned television stations and related CBS Local Digital Media Websites, as of February 10, 2017, within U.S. television markets:

| Television<br>Market and Market Rank[2] | Stations | Type | Network Affiliation | CBS Local Digital Media[1]<br>Websites |
| --- | --- | --- | --- | --- |
| New York, NY (#1) | WCBS-TV | UHF | CBS | newyork.cbslocal.com |
| | WLNY-TV | UHF | Independent | |
| Los Angeles, CA (#2) | KCAL-TV | VHF | Independent | losangeles.cbslocal.com |
| | KCBS-TV | UHF | CBS | |
| Chicago, IL (#3) | WBBM-TV | VHF | CBS | chicago.cbslocal.com |
| Philadelphia, PA (#4) | KYW-TV | UHF | CBS | philadelphia.cbslocal.com |
| | WPSG-TV | UHF | The CW | |
| Dallas-Fort Worth, TX (#5) | KTVT-TV | UHF | CBS | dfw.cbslocal.com |
| | KTXA-TV | UHF | Independent | |
| San Francisco, CA (#6) | KPIX-TV | UHF | CBS | sanfrancisco.cbslocal.com |
| | KBCW-TV | UHF | The CW | |
| Boston, MA (#9) | WBZ-TV | UHF | CBS | boston.cbslocal.com |
| | WSBK-TV | UHF | MyNetworkTV | |
| Atlanta, GA (#10) | WUPA-TV | UHF | The CW | atlanta.cbslocal.com |
| Tampa-St. Petersburg, FL (#11) | WTOG-TV | UHF | The CW | tampa.cbslocal.com |
| Detroit, MI (#13) | WKBD-TV | UHF | The CW | detroit.cbslocal.com |
| | WWJ-TV | UHF | CBS | |
| Seattle-Tacoma, WA (#14) | KSTW-TV | VHF | The CW | seattle.cbslocal.com |
| Minneapolis, MN (#15) | WCCO-TV | UHF | CBS | minnesota.cbslocal.com |
| | KCCO-TV[3] | VHF | CBS | |
| | KCCW-TV[4] | VHF | CBS | |
| Miami-Ft. Lauderdale, FL (#16) | WFOR-TV | UHF | CBS | miami.cbslocal.com |
| | WBFS-TV | UHF | MyNetworkTV | |
| Denver, CO (#17) | KCNC-TV | UHF | CBS | denver.cbslocal.com |
| Sacramento, CA (#20) | KOVR-TV | UHF | CBS | sacramento.cbslocal.com |

| Television Market and Market Rank[2] | Stations | Type | Network Affiliation | CBS Local Digital Media[1] Websites |
|---|---|---|---|---|
| | KMAX-TV | UHF | The CW | |
| Pittsburgh, PA (#23) | KDKA-TV | UHF | CBS | pittsburgh.cbslocal.com |
| | WPCW-TV | VHF | The CW | |
| Baltimore, MD (#26) | WJZ-TV | VHF | CBS | baltimore.cbslocal.com |
| Indianapolis, IN (#27) | WBXI-CA[5] | UHF | Independent | |

---

(1)   The Company's television stations' Websites, which are operated by the CBS Local Digital Media group, promote the stations' programming and provide news, traffic, weather, entertainment and sports information, among other services for their local communities.

(2)   Television market (DMA) rankings based on Nielsen Media Research Local Market Universe Estimates, September 2016.

(3)   KCCO-TV is operated as a satellite station of WCCO-TV.

(4)   KCCW-TV is operated as a satellite station of WCCO-TV.

(5)   WBXI-CA is a Class A low power television station. Class A low power television stations do not implicate the FCC's ownership rules.

## REGULATION

The Company's businesses are either subject to or affected by regulations of federal, state and local governmental authorities in the U.S. and of national, regional and local authorities in foreign countries. The rules, regulations, policies and procedures affecting these businesses are subject to change. The descriptions which follow are summaries and should be read in conjunction with the texts of the statutes, rules and regulations described herein. The descriptions do not purport to describe all present and proposed statutes, rules and regulations affecting the Company's businesses.

### Intellectual Property and Privacy

Laws affecting intellectual property are of significant importance to the Company. (See "Intellectual Property" on page I-16 for more information on the Company's brands.)

*Unauthorized Distribution of Copyrighted Content and Piracy.* Unauthorized distribution, reproduction or display of copyrighted material in digital formats without regard to content owners' copyright rights in television programming, motion pictures, clips and books, such as through pirated DVDs and Blu-ray Discs, unauthorized stored copies and live streaming, internet downloads, file "sharing" and peer-to-peer services, is a threat to copyright owners' ability to protect and exploit their property. The Company's digital delivery services and commercial arrangements with digital content providers help reduce the risks associated with unauthorized access to its content. The Company is also engaged in enforcement and other activities to protect its intellectual property and participates in various litigation, public relations programs and legislative activity. These business strategies and enforcement efforts are dependent upon laws and practices that protect the rights of creators and authorized distributors of content.

*Laws and Content.* The Company derives revenues from the creation and exploitation of creative content, for which the copyright law grants certain exclusive rights, including to reproduce, publicly perform and distribute. The duration of the protection afforded to the Company's intellectual property depends on the type of property and the laws and regulations of the relevant jurisdiction. Any changes to copyright laws or related regulations that enable the Company to control the distribution of its content, including through court decisions, which diminish the scope of a copyright owner's exclusive rights, could impact the Company. Proposed legal amendments, such as to the law governing territorial exclusivity of the distribution of content in Europe, could adversely impact the Company's ability to control and distribute its content.

*Privacy.* The laws and regulations governing the collection, use and transfer of consumer information are complex and rapidly evolving, particularly as they relate to the Company's interactive businesses. The Company monitors and considers these laws and regulations in the design and operation of its Websites, digital content services and legal and regulatory compliance programs.

**Broadcasting**

*General.* Television and radio broadcasting are subject to the jurisdiction of the FCC pursuant to the Communications Act. The Communications Act empowers the FCC, among other actions, to issue, renew, revoke and modify broadcasting licenses; determine stations' frequencies, locations and operating power; regulate some of the equipment used by stations; adopt other regulations to carry out the provisions of the Communications Act and other laws, including requirements affecting the content of broadcasts; and to impose penalties for violation of its regulations, including monetary forfeitures, short-term renewal of licenses and, in egregious cases, license revocation or denial of license renewals.

Under the Communications Act, the FCC also regulates certain aspects of the operation of MVPDs and certain other electronic media that compete with broadcast stations.

*Indecency and Profanity Regulation.* The FCC's rules prohibit the broadcast of obscene material at any time and indecent or profane material between the hours of 6 a.m. and 10 p.m. Broadcasters risk violating the prohibition against broadcasting indecent or profane material because the vagueness of the FCC's indecency/profanity definition makes it difficult to apply, particularly with respect to spontaneous, live programming. The FCC's maximum forfeiture penalty per station for broadcasting indecent or profane programming is approximately $383,000 per indecent or profane utterance with a maximum forfeiture exposure of approximately $3.5 million for any continuing violation arising from a single act or failure to act. The Company has been involved in litigation and, from time to time, has received and may receive in the future letters of inquiry from the FCC prompted by complaints alleging that certain programming on its broadcast stations included indecent or profane material.

*License Renewals.* Television and radio broadcast licenses are typically granted for standard terms of eight years. The Communications Act requires the FCC to renew a broadcast license if the FCC finds that the station has served the public interest, convenience and necessity and, with respect to the station, there have been no serious violations by the licensee of either the Communications Act or the FCC's rules and regulations and there have been no other violations by the licensee of the Communications Act or the FCC's rules and regulations that, taken together, constitute a pattern of abuse. The Company has no pending renewal applications. A station remains authorized to operate while its license renewal application is pending.

*License Assignments.* The Communications Act requires prior FCC approval for the assignment of a license or transfer of control of an FCC licensee. Third parties may oppose the Company's applications to assign, transfer or acquire broadcast licenses.

*Ownership Regulation.* The Communications Act and FCC rules and regulations limit the ability of individuals and entities to have certain official positions or ownership interests, known as "attributable" interests, above specific levels in broadcast stations as well as in other specified mass media entities. In seeking FCC approval for the acquisition of a broadcast television or radio station license, the acquiring person or entity must demonstrate that the acquisition complies with the FCC's ownership rules or that a waiver of the rules is in the public interest.

In August 2016, the FCC issued an Order as part of its quadrennial review of its broadcast ownership rules (the "2016 FCC Order") that largely retained the existing rules, which are briefly summarized below. However, several parties have petitioned the FCC to reconsider this decision and the FCC may relax certain of these rules in 2017, including those related to local television ownership.

*Local Television Ownership.* Under the FCC's local television ownership rule, one party may own up to two television stations in the same DMA, so long as at least one of the two stations is not among the top-four ranked stations in the market based on audience share as of the date an application for approval of an acquisition is filed with the FCC, and at least eight independently owned and operating full-power television stations would remain in the market following the acquisition of the second television station. The 2016 FCC Order modified the local television station ownership rule to prohibit transactions involving the sale or swap of

network affiliations between same-market television station owners that would result in an entity holding an attributable interest in two top-four ranked television stations. Further, without regard to the number of remaining independently owned television stations, the rule permits the ownership of more than one television station within the same DMA so long as certain signal contours of the stations involved do not overlap. "Satellite" television stations that simply rebroadcast the programming of a "parent" television station are exempt from the local television ownership rule if located in the same DMA as the "parent" station.

*Television National Audience Reach Limitation.* Under the national television ownership rule, one party may not own television stations which reach more than 39% of all U.S. television households. In a separate September 2016 decision, the FCC eliminated the UHF discount, pursuant to which a UHF television station was attributed with reaching only 50% of the television households in its market. This action is under reconsideration by the FCC, which may lead to the reinstatement of the UHF discount in 2017. The Company currently owns and operates television stations that reach approximately 38% of all U.S. television households not taking into account the UHF discount.

*Radio-Television Cross-Ownership Rule.* The radio-television cross-ownership rule limits the common ownership of radio and television stations in the same market. The cross-ownership rule may in certain circumstances be more restrictive than the rules that separately limit the ownership of local television stations or local radio stations. The numeric limit under the cross-ownership rule varies according to the number of independent media voices in the market. The Company is in compliance with the cross-ownership rule.

*Newspaper-Broadcast Cross-Ownership.* The newspaper-broadcast cross-ownership rule, which was largely left unchanged by the 2016 FCC Order, prohibits the common ownership of a television or radio station and daily newspaper in the same market absent a waiver by the FCC.

*Local Radio Ownership.* The FCC's local radio ownership rule applies in all markets where the Company owns radio stations. Under that rule, one party may own up to eight radio stations in the largest markets, no more than five of which may be either AM or FM. With a few exceptions, the rule permits the common ownership of 8 radio stations in the top 50 markets, where CBS Radio has significant holdings.

*Dual Network Rule.* The dual network rule prohibits any of the four major networks, ABC, CBS, FOX and NBC, from combining.

*Attribution of Ownership.* Under the FCC's attribution rules, a direct or indirect purchaser of various types of securities of an entity which holds FCC licenses, such as the Company, could violate the foregoing FCC ownership regulations or policies if that purchaser owned or acquired an "attributable" interest in other media properties. Under the FCC's rules, an "attributable" interest for purposes of the FCC's broadcast ownership rules generally includes: equity and debt interests which combined exceed 33% of a licensee's total assets, if the interest holder supplies more than 15% of the licensee's total weekly programming, or has an attributable same-market media interest, whether television, radio, cable or newspaper; a 5% or greater direct or indirect voting stock interest, including certain interests held in trust, unless the holder is a qualified passive investor in which case the threshold is a 20% or greater voting stock interest; any equity interest in a limited liability company or a partnership, including a limited partnership, unless the interest holder is properly "insulated" from management activities; and any position as an officer or director of a licensee or of its direct or indirect parent. The FCC is reviewing its single majority voting stockholder attribution exemption, which renders as non-attributable voting interests up to 49% in a licensee controlled by a single majority voting stockholder. Because NAI holds an attributable interest in both the Company and Viacom Inc., the business of each company is attributable to the other for certain FCC purposes, which may have the effect of limiting and affecting the activities, strategic business alternatives and business terms available to the Company. (See Item 1A. "Risk Factors—The Businesses of the Company and Viacom Inc. Will Be Attributable to the Other Company for Certain Regulatory Purposes, Which May Limit Business Opportunities").

*Alien Ownership.* In general, the Communications Act prohibits foreign individuals or entities from owning more than 25% of the voting power or equity of the Company. In September 2016, the FCC clarified

and expanded certain rules and procedures and adopted and standardized filing and review procedures for broadcasters seeking to obtain FCC consent to exceed the 25% threshold.

*Cable and Satellite Carriage of Television Broadcast Stations.* The 1992 Cable Act and implementing FCC regulations govern the retransmission of commercial television stations by cable television operators. Every three years, a television station must elect, with respect to cable systems within its DMA, either "must carry" status, pursuant to which the cable system's carriage of the station is mandatory, or "retransmission consent," pursuant to which the station gives up its right to mandatory carriage and secures instead the right to negotiate consideration in return for consenting to carriage. The Company's owned television stations have elected the retransmission consent option in substantially all cases, and, since 2006, the Company has implemented a systematic process of seeking monetary consideration for its retransmission consent.

Similarly, federal legislation and FCC rules govern the retransmission of broadcast television stations by DBS operators. DBS operators are required to carry the signals of all local television broadcast stations requesting carriage in local markets in which the DBS operator carries at least one signal pursuant to the statutory local-to-local compulsory copyright license. Every three years, each television station in such markets must elect "must carry" or "retransmission consent" status, in a manner similar to that described above with respect to cable systems. The Company's owned and operated television stations are being transmitted into their local markets by the two major DBS operators pursuant to retransmission consent agreements.

*Children's Television Programming.* Federal legislation and FCC rules limit the amount and content of commercial matter that may be shown on television stations during programming designed for children 12 years of age and younger, and require stations to broadcast on their main program stream three hours per week of educational and informational programming ("E/I programming") designed for children 16 years of age and younger. FCC rules also impose E/I programming requirements on each additional digital multicast program stream transmitted by television stations, with the requirement increasing in proportion to the additional hours of free programming offered on multicast channels. These rules also limit the display during children's programming of internet addresses of Websites that contain or link to commercial material or that use program characters to sell products.

*Program Access.* Under the Communications Act, vertically integrated cable programmers (more fully described below) are generally prohibited from offering different prices, terms or conditions for programming to competing MVPDs unless the differential is justified by certain permissible factors set forth in the FCC's regulations. Until 2012, the FCC's "program access" rules also generally prohibited vertically integrated cable programmers from entering into exclusive distribution arrangements with cable operators. The FCC continues to assess the competitive impact of such individual exclusive contracts. A cable programmer is considered to be vertically integrated under the FCC's program access attribution rules if it owns or is owned in whole or in part by either a cable operator or a telephone company that provides video programming directly to subscribers.

The Company's wholly owned program services are not currently subject to the program access rules. The Company's flexibility to negotiate the most favorable terms available for carriage of these services and its ability to offer cable operators exclusive programming could be adversely affected if it were to become subject to the program access rules. Because the Company and Viacom Inc. are under common control by NAI, Viacom Inc.'s businesses could be attributable to the Company for purposes of the FCC's program access rules. (See Item 1A. "Risk Factors—The Businesses of the Company and Viacom Inc. Will Be Attributable to the Other Company for Certain Regulatory Purposes, Which May Limit Business Opportunities").

*National Broadband Plan.* In response to the FCC's March 2010 National Broadband Plan, which seeks to provide affordable broadband access throughout the U.S., Congress passed legislation in February 2012 authorizing the FCC to conduct voluntary auctions to reclaim spectrum utilized by broadcast television stations to provide additional spectrum for wireless broadband services. The television stations that continue their operations may have to change channels once the FCC "repacks" the remaining spectrum dedicated to broadcast television use after the auctions. The legislation provides that the FCC will assist television stations in retaining their current coverage areas, no UHF band stations will be forced into the VHF band and a fund will be established to reimburse broadcasters for reasonable

relocation expenses relating to the spectrum-repacking. These spectrum auctions commenced in May 2016 and are expected to conclude in 2017.

## INTELLECTUAL PROPERTY

The Company creates, owns, distributes and exploits under licenses intellectual property worldwide. It is the Company's practice to protect its products, including its television, radio and motion picture products, characters, publications and other original and acquired works and audiovisual works made for digital exploitation. The following logos, trade names, trademarks and related trademark families are among those strongly identified with the product lines they represent and are significant assets of the Company: *CBS®, CBS Entertainment™, CBS News®, CBS Sports®, CBSSports.com®, CBS All Access®, CBSN®, CNET®, Showtime®, Showtime Anytime®, The Movie Channel®, Flix®, CBS Films®, CBS Audience Network®, TV.com™, Last.fm®, MetroLyrics®, CSI:®, NCIS®, Entertainment Tonight®, Star Trek®, Simon & Schuster®, CBS Sports Network®, CBS Interactive™, CBS Local Digital Media™, CBS Radio®* and all the call letters for the Company's stations. As a result, domestic and foreign laws protecting intellectual property rights are important to the Company and the Company actively enforces its intellectual property rights against infringements.

## EMPLOYEES

A t December 31, 2016, the Company employed approximately 15,550 full-time and part-time salaried employees and had approximately 5,720 additional project-based staff, including employees and project-based staff of CBS Radio, which has been presented as a discontinued operation in the Company's consolidated financial statements.

## FINANCIAL INFORMATION ABOUT SEGMENTS AND FOREIGN AND DOMESTIC OPERATIONS

Financial and other information by segment and relating to foreign and domestic operations for each of the last three years ending December 31 is set forth in Note 17 to the Consolidated Financial Statements.

## AVAILABLE INFORMATION

CBS Corp. makes available free of charge on its Website, www.cbscorporation.com (Investors section), its Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and any amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934. Such material is made available through the Company's Website as soon as reasonably practicable after such material is electronically filed with or furnished to the Securities and Exchange Commission. These documents are also available on the SEC's Website at www.sec.gov.

**Item 1A. *Risk Factors.***

## CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING STATEMENTS

This document, including "Item 7. Management's Discussion and Analysis of Results of Operations and Financial Condition," and the documents incorporated by reference into this Annual Report on Form 10-K, contain both historical and forward-looking statements. All statements other than statements of historical fact are, or may be deemed to be, forward-looking statements within the meaning of section 27A of the Securities Act of 1933 and section 21E of the Securities Exchange Act of 1934. These forward-looking statements are not based on historical facts, but rather reflect the Company's current expectations concerning future results and events. These forward-looking statements generally can be identified by the use of statements that include phrases such as "believe," "expect," "anticipate," "intend," "plan," "foresee," "likely," "will," "may," "could" or other similar words or phrases. Similarly, statements that describe the Company's objectives, plans or goals are or may be forward-looking statements. These forward-looking statements involve known and unknown risks, uncertainties and other factors that are difficult to predict and which may cause the actual results, performance or achievements of the Company to be different from any future results, performance and achievements expressed or implied by these statements. More information about these risks, uncertainties and

**Exhibit 31(a)**

**CERTIFICATION**

I, Leslie Moonves, certify that:

1.  I have reviewed this annual report on Form 10-K of CBS Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 17, 2017

/s/ Leslie Moonves
_____
Leslie Moonves
Chairman of the Board, President and Chief Executive Officer

**Exhibit 31(b)**

**CERTIFICATION**

I, Joseph R. Ianniello, certify that:

1.  I have reviewed this annual report on Form 10-K of CBS Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 17, 2017

/s/ Joseph R. Ianniello
_____
Joseph R. Ianniello
Chief Operating Officer

**Exhibit 32(a)**

**Certification Pursuant to 18 U.S.C. Section 1350,**
**as adopted pursuant to**
**Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of CBS Corporation (the "Company") on Form 10-K for the year ended December 31, 2016 as filed with the Securities and Exchange Commission (the "Report"), I, Leslie Moonves, Chairman of the Board, President and Chief Executive Officer of the Company, certify that to my knowledge:

1.   the Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.   the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Leslie Moonves
Leslie Moonves
February 17, 2017

**Exhibit 32(b)**

**Certification Pursuant to 18 U.S.C. Section 1350,**
**as adopted pursuant to**
**Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of CBS Corporation (the "Company") on Form 10-K for the year ended December 31, 2016 as filed with the Securities and Exchange Commission (the "Report"), I, Joseph R. Ianniello, Chief Operating Officer of the Company, certify that to my knowledge:

1.   the Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.   the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Joseph R. Ianniello

Joseph R. Ianniello
February 17, 2017

NO. DC-17-15389

| | | |
|---|---|---|
| JOHN H. ADAMS and LORRAINE ADAMS, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| 3M COMPANY, et al | § | |
| | § | |
| Defendants. | § | 192ND JUDICIAL DISCTRICT |

**PLAINTIFFS' ANSWERS TO MASTER DISCOVERY REQUESTS
TO ALL DEFENDANTS IN ALL ASBESTOS-RELATED PERSONAL
INJURY AND DEATH CASES AND RESPONSES
TO ALL DEFENDANTS' RULE 194 REQUESTS FOR DISCLOSURE**

TO: ALL DEFENDANTS, by and through their anticipated counsel of record.

COME NOW, Plaintiffs herein and by and through their counsel of record, file these, their Answers to Master Discovery Requests and Responses to Rule 194 Requests for Disclosure propounded by all defendants and also in response and supplemental response to written discovery previously propounded by the Defendants to the Plaintiffs and responses to any and all defendants' Rule 194 Requests for Disclosure pursuant to the Texas Rules of Civil Procedure.

Respectfully submitted,

**WATERS & KRAUS, LLP**

_____

DAVID C. HUMEN
State Bar No. 24087769
dhumen@waterskraus.com
GIBBS C. HENDERSON
State Bar No. 24041084
ghenderson@waterskraus.com
3141 Hood Street, Suite 700
Dallas, Texas 75219
(214) 357-6244
(214) 357-7252 Fax

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing Answers to Master Discovery Requests was sent certified mail and/or electronic service to all known Registered Agents and to all anticipated counsel of record on the 15th day of November, 2017.

_____

DAVID C. HUMEN

A.    **"FAST-TRACK" INTERROGATORIES TO BE ANSWERED AT LEAST SEVEN (7) DAYS BEFORE EXIGENT PLAINTIFF DEPOSITIONS (Pursuant to Section III.A.1.(c) of the Case Management Order)**

**INTERROGATORY NO. 1:**

State the following personal information pertaining to the plaintiff/decedent who claims to have sustained an asbestos-related disease:

    (a)    full name;

    (b)    current residence address;

    (c)    social security number(s);

    (d)    date of birth;

    (e)    name of spouse;

    (f)    spouse's residence address, if different from plaintiff's;

    (g)    date of death (if applicable); and

    (h)    cause of death (if applicable).

**ANSWER:**

    (a)    John H. Adams

    (b)    124 N Camp Rd, Ishpeming, MI 49849

    (c)    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

    (d)    1/22/1922

    (e)    Lorraine Alice Adams

    (f)    N/A

    (g)    N/A

    (h)    N/A

**INTERROGATORY NO. 2:**

State the following injury information pertaining to the plaintiff/decedent who claims to have sustained an asbestos-related disease:

     (a)     the asbestos-related injury or injuries claimed;

     (b)     the first date of diagnosis of each of the plaintiff or decedent's asbestos-related condition(s); and

     (c)     name and address of the physician/health care provider(s) who rendered the diagnosis or diagnoses.

**ANSWER:**

     (a)     malignant mesothelioma

     (b)     9/6/2017

     (c)     Plaintiff believes Dr. George A. Krzymowski first diagnosed him with malignant mesothelioma in September of 2017.  Dr. Krzymowski is located at 420 W. Magnetic St., Marquette, MI 49855.  For more information please see Mr. Adams' diagnosing report, attached hereto as **Exhibit 3**.

**INTERROGATORY NO. 3:**

Identify all doctors, hospitals, and other health care providers or facilities that have ever treated the plaintiff/decedent for any heart, lung, chest-related injury, or cancer and all doctors, hospitals, and other health care providers or facilities where the plaintiff/decedent has been treated at any time during the preceding ten (10) years, to include:

     (a)     the approximate dates of the treatment;

     (b)     the names and current addresses of the doctors, hospitals or other healthcare providers; and

     (c)     the reasons for the treatment and diagnosis.

**ANSWER:**   Plaintiff objects to this Interrogatory to the extent it seeks information regarding health conditions other than those at issue in this matter: namely, mesothelioma. Such inquiries are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.   Subject to, and without waiving this objection, the responsive information that Plaintiff can recall is including in the Physicians, Hospital, and Hospice List attached as **Exhibit 1**.   Please also see Plaintiff's authorizations, attached as **Exhibit 2**.  For more information please also see the upcoming deposition of Mr. Adams.

## INTERROGATORY NO. 4:

State the plaintiff/decedent's tobacco use history; including quantity, product smoked, and when started and stopped.

**ANSWER:**   Plaintiff objects to this Interrogatory on the grounds that it is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Mesothelioma is a signature disease of asbestos exposure.  Subject to and without waiving these objections, please see Plaintiff's Smoking History, attached as **Exhibit 4**.  For more information, please also see the upcoming deposition of Mr. Adams.

## INTERROGATORY NO. 5:

State the plaintiff/decedent's occupation and union membership, if any, and the dates of membership. If plaintiff was or is an officer or steward in any union, state the dates that such position, if any, was held.

**ANSWER:**   Plaintiff has never been a member of any unions.

## INTERROGATORY NO. 6:

Using extreme diligence, provide detailed work and asbestos exposure history of the plaintiff/decedent (or if exposure is claimed through another person, of that other person) to include the following information (provide answers to each subpart):

(a)   the location and name of the owner/occupier of each premises, the specific unit or area of the premises where exposure to asbestos is alleged to have occurred;

(b)   the manufacturer, description, model name and number, serial number, and location at the time of plaintiff/decedent's alleged exposure, of any and all equipment, including but not limited to Heavy Equipment, pumps, vessels, boilers, turbines, furnaces, tractors, engines, mobile or affixed equipment containing or utilizing asbestos or asbestos-containing products or component part(s) to which the plaintiff/decedent claims, or has claimed, exposure;

(c)     the identity of each Contractor that the plaintiff/decedent claims, or has claimed, caused them to be exposed to asbestos and for each Contractor, each act or omission of that Contractor that caused exposure, including the premises, location and date of each such claimed exposure;

(d)     each product, to include manufacturer, supplier or distributor and brand name (regardless of whether the manufacturer is a party), that the plaintiff/decedent claims, or has claimed, to have caused his/her asbestos exposure. The plaintiff must state if the name of the manufacturer is not known by the plaintiff;

(e)     a specific description of each alleged exposure, including the specific time period, the work or task being performed, the length of time in hours, days, or months, as appropriate, and the specific nature of the exposure alleged;

(f)     the plaintiff/decedent's employer and occupation or craft at the time of each exposure identified;

(g)     if any exposure in question is the result of ship-board exposure in the navy or otherwise, the work history must identify the name of any ship on which the plaintiff claims exposure occurred and, if known, the hull number, the owner/operator of the ship, the dates of service on the ship and any berths or yards where the ship was located when not at sea or in operation; and

(h)     whether any exposure in question is claimed to have occurred on United States government property, and if so, the complete name and location of the site, relevant dates of alleged exposure, and describe the nature of the exposure and the asbestos-containing products to which plaintiff was exposed at that time.

**ANSWER:**     Plaintiff objects to this Interrogatory on the ground that it is premature. Discovery is in its preliminary phase and all relevant information has not yet been received. Plaintiff further objects to the extent that responsive information is in the possession, custody or control of the various Defendants in this lawsuit and has not been produced to the Plaintiffs, and to the extent that responsive information is contained in the upcoming deposition of Mr. Adams and any co-workers depositions to be taken in this case, on the basis that it is unduly burdensome to recreate information in an Interrogatory response that may be obtained from the depositions.  Subject to and without waiver of the foregoing objections, Please see Plaintiff's Work History as follows:

Approximate Years:   1951-1955
Employer:            US Navy
Location:            Hickam Air Force Base; NAS North Island
Job Duties:          Aviation Electronics Repair

Approximate Years:   1956
Employer:            Calumet and Hecla

Location:               Kearsarge Mine, Calumet, Michigan
Job Duties:             Boiler Tender

Approximate Years:      1957-1958
Employer:               Misc. Contractors
Location:               Various locations
Job Duties:             Carpenters' Helper

Approximate Years:      1959-1961
Employer:               General Electric
Location:               Various Locations
Job Duties:             Electrical Engineering

Approximate Years:      1961-1963
Employer:               Celotex Corp.
Location:               L'Anse, Michigan
Job Duties:             Electrical Engineering

Approximate Years:      1963-1966
Employer:               Cleveland Cliffs Iron Co.
Location:               Republic Mine, Ishpeming, MI
Job Duties:             Electrical Engineering

Approximate Years:      1966-1967
Employer:               Pan American World Airway
Location:               Cape Canaveral, FL
Job Duties:             Engineering

Approximate Years:      1967-1974
Employer:               Bendix Corp.
Location:               Kennedy Space Center, Orlando, FL
Job Duties:             Engineering and Operations

Approximate Years:      1974-1995
Employer:               Cleveland Cliffs Iron Co.
Location:               Ishpeming, MI
Job Duties:             Electrical Engineering

**INTERROGATORY NO. 7:**   State the identity of each co-worker or other product identification witness who can provide product identification information, the specific site or sites at which each co-worker or product identification witness worked with the Decedent, the specific units or areas in each site at which each co-worker or product identification witness worked with the Decedent, the dates that the co-worker or witness worked at each site, and the products and manufacturer, supplier and distributor of the alleged asbestos-containing products, and any other products that allegedly released asbestos in their use, that each co-worker, or other

12/11/2017 9:48 AM
Chris Daniel - District Clerk Harris County
Envelope No. 21196419
By: Lakeisha Williams
Filed: 12/11/2017 9:48 AM

# MEHAFFYWEBER
Houston | Beaumont

**ATTORNEYS**
*A Professional Corporation*
MehaffyWeber.com

**BARBARA J. BARRON**
ATTORNEY AT LAW
SHAREHOLDER
barbarabarron@mehaffyweber.com

Licensed To Practice Law in Texas, California,
Arkansas, Oklahoma, and Mississippi

2615 Calder | Suite 800
Post Office Box 16 |
Beaumont, Texas 77704
409.835.5011 | Fax 409.835.5177

500 Dallas | Suite 1200
Houston, TX 77002
713.655.1200 | Fax 713.655.0222

December 11, 2017

**Re:** **No. 2017-81591; John H. Adams and Lorraine Adams v. 3M Company, et al; Before the Asbestos MDL Pre-Trial Judge; In the 11th District Court, Harris County, Texas;**
**Transferred from**
**No. DC-17-15389; John H. Adams and Lorraine Adams v. 3M Company, et al; In the 192nd District Court, Dallas County, Texas; MW File No. 11074-0001**

Mr. Chris Daniel
District Clerk/Harris County
201 Caroline
Houston, Texas 77002

Dear Mr. Daniel:

Enclosed please find on behalf of Meriden Molded Plastics, Inc. the following document regarding the above referenced cause:

1. **Defendant's Special Appearance of Meriden Molded Plastics, Inc. and Subject Thereto, Motion to Transfer, Motion to Dismiss for Forum Non Conveniens, Original Answer to Plaintiffs' Original Petition and Answer to all Cross-Actions.**

By copy of this letter we are sending a copy of same to all interested parties. Thank you for your assistance in this matter.

Sincerely,

Barbara J. Barron
For the Firm

BJB/hsr/Enclosure

**MEHAFFYWEBER**

Page 2

---

cc:
Mr. David C. Humen
Susannah B. Chester-Schindler
Waters & Kraus, LLP
3141 Hood Street, Suite 700
Dallas, Texas 75219                      **Via File & Serve XPress**

All Defense Counsel                      **Via File & Serve XPress**

12/11/2017 9:48 AM
Chris Daniel - District Clerk Harris County
Envelope No. 21196419
By: Lakeisha Williams
Filed: 12/11/2017 9:48 AM

NO. 2017-81591-ASB

BEFORE THE ASBESTOS MDL PRETRIAL JUDGE

| | | |
|---|---|---|
| JOHN H. ADAMS AND LORRAINE ADAMS | ) | IN THE DISTRICT COURT OF |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | HARRIS COUNTY, TEXAS |
| | ) | |
| 3M COMPANY f/k/a MINNESOTA MINING AND MANUFACTURING, ET AL | ) | |
| | ) | |
| Defendants | ) | 11TH JUDICIAL DISTRICT |

NO. DC-17-15389

| | | |
|---|---|---|
| JOHN H. ADAMS AND LORRAINE ADAMS | ) | IN THE DISTRICT COURT OF |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | DALLAS COUNTY, TEXAS |
| | ) | |
| 3M COMPANY f/k/a MINNESOTA MINING AND MANUFACTURING, ET AL | ) | |
| | ) | |
| Defendants | ) | 192ND JUDICIAL DISTRICT |

**SPECIAL APPEARANCE OF MERIDEN MOLDED PLASTICS, INC.
AND SUBJECT THERETO, MOTION TO TRANSFER, MOTION TO DISMISS FOR
FORUM NON CONVENIENS, ORIGINAL ANSWER TO PLAINTIFFS' ORIGINAL
PETITION AND ANSWER TO ALL CROSS ACTIONS**

Meriden Molded Plastics, Inc. ("Meriden") files this Special Appearance to this entire proceeding before any other plea, pleading, or motion under Rule 120a of the Texas Rules of Civil Procedure and requests that this case be dismissed for lack of personal jurisdiction.

## I.
## SPECIAL APPEARANCE

1.      As required by Rule 120a of the Texas Rules of Civil Procedure, Meriden files and verifies this sworn special appearance before any other plea, pleading, or motion.  Meriden

objects to the jurisdiction of this Court because it is not amendable to process issued by the courts of the State of Texas. Texas courts do not have personal jurisdiction over Meriden because Meriden is not "at home" in the State of Texas, and Meriden did not establish minimum contacts with Texas. This Court cannot constitutionally exercise personal jurisdiction over Meriden; therefore, this entire proceeding against Meriden should be dismissed for lack of personal jurisdiction.

2.      Meriden's Special Appearance to contest the Court's assertion of personal jurisdiction was filed before any other plea, pleading, or motion made on behalf of this Defendant. All pleadings and other matters filed hereafter are strictly conditioned upon and made subject to Meriden's Special Appearance. Even if a subsequent pleading or other matter filed herein does not expressly state that it is subject to Meriden's Special Appearance, it is, nevertheless, **subject to** Meriden's Special Appearance.[1]

3.      In support of Meriden's Special Appearance, Meriden alleges and would show as follows:

A.      Meriden is a Connecticut with its principal place of business in the State of Connecticut.

B.      Meriden is no longer doing business and has not done business for over 30 years.

C.      Meriden is not a resident of the State of Texas.

D.      Meriden has never had its principal place of business in the State of Texas.

E.      Meriden does not conduct business in the State of Texas nor does Meriden conduct business under any other name in the State of Texas.

F.      Meriden has never been a resident of the State of Texas.

G.      Meriden has no employees located in the State of Texas.

H.      Meriden has never had employees who, while employed by Meriden, office in the State of Texas.

---

[1] Stated differently, Meriden will **not** waive its special appearance.

I.   Meriden does not own and has never owned any real or personal property in Texas.

J.   Meriden has never had any offices, warehouses, or leased space in Texas.

*See* Affidavit in Support of Meriden's Special Appearance, attached as **Exhibit 1** and incorporated herein by reference.

4.   Texas courts do not have jurisdiction over a nonresident defendant unless the nonresident defendant had purposefully established "minimum contacts" with Texas, and the Court's exercise of jurisdiction over the defendant comports with traditional notions of "fair play and substantial justice." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474-76 (1985); *BMC Software Belg. v. Marchland,* 83 S.W.3d 789, 795 (Tex. 2002); *Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex. 1991).

A court has general jurisdiction over a defendant only if its "affiliations with the [s]tate are so continuous and systematic as to render it essentially at home in the forum [s]tate." *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 72 (Tex. 2016).  Courts do not have general jurisdiction over corporate defendants that are neither incorporated in the forum state nor have their principal place of business there, absent some relatively substantial contacts with the forum state. *Id.* Meriden has no such contacts with Texas. *See* **Exhibit 1.**

6.   Texas courts cannot exercise specific jurisdiction over a non-resident defendant unless the non-resident defendant's activities are purposely directed to Texas and the litigation resulted from injuries that are alleged to arise out of or relate to those activities.  *National Industrial Sand Ass'n v. Gibson,* 897 S.W.2d 769, 774 (Tex. 1995); *see Helicopteros Nacionales v. Hall,* 466 U.S. 408, 414 (1984).  That also has not happened.

7.   The Plaintiff has the initial burden of pleading sufficient allegations to bring a non-resident defendant within the provisions of the Texas long-arm statute. "If the plaintiff fails

to plead facts bringing the defendant within reach of the long-arm statute (i.e., for a tort claim, that the defendant committed tortious acts in Texas), the defendant need only prove that it does not live in Texas to negate jurisdiction." *Kelly v. General Interior Const., Inc.*, 301 S.W.3d 653, 658-59 (Tex.. 2010).   Here, Plaintiffs have not made any specific allegation that Meriden committed a single specific tortious act in Texas.   Therefore, Meriden "can meet [its] burden of proof . . . by simply presenting evidence that [it is] not a Texas resident." *Id.* at 660-61 ("GIC failed to plead facts within the reach of the long-arm statute because it did not allege that the Officers committed any tortious acts in Texas. As noted, GIC's live pleading contains no allegations that the Officers' wrongdoing occurred in Texas. Regarding the fraud claim, GIC did allege several fraudulent acts (e.g., providing false affidavits to Meristar and misrepresenting to GIC that it would be paid in full), but it did not allege that any fraudulent acts occurred in Texas.").

8.      In fact, Meriden is *not* a resident of Texas.   *See* Exhibit 1.   This fact independently warrants dismissal of Meriden from this case in the absence of jurisdictional allegations.

9.      No issue in this lawsuit "arises out of" or "relates to" any "purposeful activity" of Meriden in the State of Texas; therefore, the exercise of either specific or general jurisdiction over Meriden in this action is not justified. *See CSR,* 925 S.W.2d at 595-96 ("[D]efendant must take action *'purposefully directed* toward the forum state' to be subject to the jurisdiction of its courts") (emphasis in original); *Guardian Royal,* 815 S.W.2d at 226-27.   Therefore, the exercise of jurisdiction over Meriden would offend the traditional notions of fair play and substantial justice.

10.     For the foregoing reasons, the Court should dismiss Meriden based on a lack of personal jurisdiction.

## II.
### SUBJECT TO SPECIAL APPEARANCE
### MOTION TO TRANSFER VENUE

Subject to and without waiver of its special appearance, Dallas County, Texas, is not a proper county of venue as it is not:

1. The county in which all or a substantial part of the events or omissions giving rise to each Plaintiff's claim occurred;
2. The county of the Defendant's principal office in this state; or
3. The county in which Plaintiffs resided at the time of the accrual of the cause of action.

It appears that the only reason why this lawsuit was filed in Dallas County, Texas is because Plaintiff's counsel is located in Dallas County, Texas.  The Court should grant Defendant's special appearance and dismiss this lawsuit.  Subject to Defendant's special appearance, the Court should transfer this case to a proper venue.

## III.
### SUBJECT TO SPECIAL APPEARANCE, REQUEST FOR DISMISSAL
### UNDER DOCTRINE OF FORUM NON-CONVENIENS

Subject to and without waiver of its special appearance, this case should be dismissed under the doctrine of forum non conveniens, as it should **_not_** have been brought in Texas. Plaintiff's discovery responses indicate that Plaintiff lives in Michigan, was diagnosed with his alleged asbestos-related disease in Michigan, has received all of his medical treatment related to his alleged asbestos-related disease in Michigan, and worked in Michigan and other jurisdictions in the United States of America other than the State of Texas.  Additionally, three of Plaintiff's children reside in Michigan and none reside in Texas.

There is no connection between Plaintiff and the State of Texas, and it is believed that

5

plaintiffs' co-workers, relatives, treating doctors, and all other fact witnesses are similarly not located in Texas.

Because the witnesses are outside of the jurisdiction of the forum, this Court lacks the power to compel the attendance of any non-party witness to a hearing or trial of this matter, or to compel any response to discovery request.    Each of the defendants in this action will undoubtedly incur unnecessary expenses in travel to obtain depositions and information relating to this cause.

## IV.
## ORIGINAL ANSWER
## SUBJECT TO SPECIAL APPEARANCE

Subject to and without waiver of its special appearance, Meriden Molded Plastics, Inc. (hereinafter "Meriden") also files its Original Answer to Plaintiffs' Original Petition and Answer to All Cross Actions, and would show as follows:

## A.

Subject to its Special Appearance, Defendant generally denies each and every, all and singular, of the material allegations of fact contained in plaintiffs' Original petition and says the same are untrue in whole or in part, and demands strict proof of the evidence before a jury.

## B.
## AFFIRMATIVE DEFENSES
## SUBJECT TO SPECIAL APPEARANCE

1.    Plaintiff's claims are barred by the statute of limitations.

2.    Plaintiff's damages, if any, were caused by a new and independent cause not reasonably foreseeable by Defendant.  This new and independent cause was the immediate and efficient cause of injury, if any.  The acts or omissions alleged by Plaintiff against Defendant were remote and were not the proximate or producing cause of any of Plaintiff's alleged damages.

3.      Defendant would show that plaintiff has failed to satisfy the notice requirements and other conditions precedent under the Texas Business & Commercial Code and/or the Uniform Commercial Code to assert a claim for breach of express or implied warranty, and has therefore waived those theories of recovery.

4.      Defendant states that the alleged injuries of plaintiffs were caused, in whole or in part, by their own acts or omissions and such alleged injuries were due solely to disease and other causes in no manner connected with or related to Defendant or any of its alleged actions or inactions or products sold.

5.      In the alternative, and by way of separate or affirmative defense, Defendant alleges that any injuries and damages alleged by plaintiffs were solely caused by the acts and omissions of others over whom Defendant had no supervision or control.

6.      To the extent plaintiffs have an obligation to mitigate any damages they claim to have sustained, they have failed to do so.

7.      By way of separate or affirmative defense, plaintiffs are barred from recovery by the doctrines of contributory negligence, comparative negligence and/or comparative causation. Defendant would show that plaintiffs are guilty of various acts and omissions that amounted to negligence which were each a proximate and producing cause of their injuries.  Such negligence by the plaintiffs exceeded the negligence and/or fault attributed to Defendant, if any. Accordingly, plaintiffs are barred from recovery.

8.      In the alternative, and by way of separate or affirmative defense, Defendant alleges that plaintiffs' injuries, if any, were pre-existing and/or not the result of any contact with any products manufactured, sold, used, or distributed by Defendant.

9.      In the alternative, and by way of separate or affirmative defense, Defendant alleges that

the plaintiffs' damages, if any, were caused by negligent acts or omissions or breach of warranty

of third parties and/or other defendants and/or exposure to certain products used, manufactured

or distributed by third parties and/or other defendants.  Under applicable provisions of statutory

or decisional law, Defendant is entitled to a comparative apportionment of fault, if any, as to

other defendants and cross-defendants and/or third parties and is entitled to a judgment against

them herein for contribution and/or indemnity and/or a percentage reduction in accordance with

the apportionment of fault for the negligence liability, or other conduct that is attributable to

plaintiffs or to any other party or any person or entity who has settled with plaintiffs.

10.     Plaintiff's damages, if any, were caused by an unavoidable act or occurrence without any

negligence on the part of Defendant.  The illnesses and damages, if any, are due solely to other

causes and matters which are not related to Defendant's acts, operations, conduct or facilities.

11.     At all times relevant hereto, Defendant exercised reasonable care in accordance with the

state of the valid medical and scientific knowledge available.

12.     Insofar as the petition purports to assert a claim for punitive damages, it is premised on

an alleged course of conduct vis-à-vis the general public, and the plaintiff in this action is

therefore not the real party in interest and is barred and foreclosed form asserting such claim.

Further, Defendant did not participate in any of the alleged activities for which plaintiffs

assert that punitive damages may be assessed.  To the extent plaintiffs seek to recover punitive

damages from Defendant, such recovery violates Article I, Sections 13 and 19 of the Texas

Constitution and violates Defendant's right to due process of law and equal protection of the law

under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as

Article 1, Article 10, and Article 13 of the Constitution of the State of Texas and the constitution

of laws of any other state deemed to apply in this case.

Additionally, plaintiffs' claims are so vague and indefinite that they fail to clearly

appraise Defendant of the nature and character of the damages for which plaintiffs seek to hold it

liable.  However, if plaintiffs' petition can be construed as seeking punitive damages against

Defendant, the granting of such relief would be in violation of Defendant's constitutional rights

under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution in that:

(a)     punitive damages are penal in nature and tantamount to imposition of a criminal
        fine;

(b)     the guidelines, standards and/or instructions for the imposition of punitive
        damages are vague, indefinite and uncertain, and set no limit on the damages
        which can be awarded, and furthermore, do not apprise this Defendant of the
        conduct that will subject it to criminal penalties;

(c)     punitive damages expose this Defendant to multiple punishment and fines for the
        same act;

(d)     punitive damages discriminate against this Defendant on the basis of wealth, in
        that different amounts can be awarded against different Defendants for the same
        act, but who suffer only in material wealth; and

(e)     the facts in this case do not meet the standard for punitive damages set forth by
        the *Supreme Court Transportation Ins. Co. v. Moriel*, 870 S.W.2d 10 (Tex. 1994).

(f)     Any award of punitive damages would be imposed under a standard of conduct
        formulated years after any of Defendant's actions; a retroactive application of the
        standard of conduct to Defendant would be a violation of due process.

(g)     If a punitive damage award is not necessarily barred by the Fifth or Fourteenth
        Amendment, an award of punitive damages -- depending upon its size,
        relationship for the award, and other factors -- could violate the Fifth and
        Fourteenth Amendments.

Punitive damages under Texas procedural law constitute an excessive fine in violation of the

Eighth Amendment of the United States Constitution.  The punitive damages sought as a part of

this petition are also unconstitutional since plaintiffs have failed to place a limit on the amount of

such damage award, and they are therefore void for vagueness.   To the extent necessary, Defendant asserts the limit on punitive damages permitted by law under Tex. Civ. Prac. & Rem. Code §41.008, *et seq.*

13.     In the alternative, and by way of separate or affirmative defense, Defendant would show that unless Defendant's liability for punitive damages and the appropriate amount of punitive damages are each required to be established by clear and convincing evidence under Texas law or the law of any other state, any award of punitive damages would violate Defendant's due process rights guaranteed by the Fourteenth Amendment to the United States Constitution, Section 19 of Article I of the Texas Constitution, and the constitution or laws of any other state deemed to apply in this case.

14.     In the alternative, and by way of separate or affirmative defense, Defendant would show that  the Plaintiffs' claim for punitive damages against Defendant cannot be sustained because an award of punitive damages under Texas law or the applicable law of any other state, or federal law is (which Defendant asserts preempts state law and precludes any recovery of punitive damages) subject to no predetermined limit on the amount of punitive damages that a jury may impose, such as a maximum multiple of compensatory or a maximum dollar amount, would violate the Excessive Fines Clause of the United States Constitution and Defendants' due process rights guaranteed by the Fourteenth Amendment to the United States Constitution, Section 19 of Article I of the Texas Constitution, and the constitution or laws of any other state deemed to apply in this case.

15.     In the alternative, and by way of separate or affirmative defense, Defendant would show that the Plaintiffs' claim for punitive damages against Defendant  cannot be sustained because an award of punitive damages under Texas law or the laws of any other state by a jury that (1) is not

provided any standard of sufficient clarity for determining the appropriateness, or the appropriate size, of any punitive damage award, (2) is not instructed on the limits on punitive damages imposed by the applicable principles of deterrence, (3) is not expressly prohibited from awarding punitive damages, or determining the amount of an award of punitive damages, or determining the amount of an award of punitive damages, in whole or in part, on the basis of invidiously discriminatory characteristics, (4) is permitted to award punitive damages that is vague and arbitrary and does not define with sufficient clarity the conduct or mental state that makes punitive damages permissible, and (5) is not subject to judicial review on the basis of objective standards, would violate Defendant's due process rights guaranteed by the Fourteenth Amendment to the United States Constitution, Section 19 of Article I of the Texas Constitution, and the constitution or laws of any other state deemed to apply in this case.

16.     In the alternative, and by way of affirmative defense, Defendant would show that Plaintiffs' claim for relief, if granted, would constitute a taking of private property for public use without just compensation, and would contravene Defendant's rights as preserved by the Fourteenth Amendment to the Constitution of the United States, the Constitution of the State of Texas, and the constitution or laws of any other state deemed to apply to this case.

17.     Should an award of punitive damages be assessed and sustained, Defendant pleads the statutory cap for punitive damages set forth in Texas Civil Practice & Remedies Code §41.008(b).

18.     In the alternative, and by way of separate or affirmative defense, Defendant would show the Plaintiffs failed to allege a claim in Plaintiffs' Petition on which punitive damages can be recovered.

19.     Defendant breached no legal duty.

20.     That Plaintiff's claims in this action are barred by the doctrine of election of remedies.

21.     That Plaintiffs lack standing or capacity to sue or have sued in an improper or incorrect capacity.

22.     The joint and several liability provisions as set forth in the Texas Civil Practice & Remedies Code, section 33.013(c) and otherwise, are unconstitutional as applied to Defendant. Such provisions violate the Equal Protection, Excessive Fines, Due Process, and open courts provisions of the Texas and United States constitutions.

23.     Defendant would further show that at all times in question, that it had Workers Compensation Insurance and that it was an insured under that Act providing coverage for all of its employees. That Plaintiff's claims in this action are barred by the exclusive-remedy and waiver provisions of applicable workers' compensation laws.

24.     Any claim for medical expenses is limited to actually paid or incurred by or on behalf of the Plaintiff. Additionally, "list" prices for claimed medical expenses are excessive, and any such recovery should be limited to Medicare reimbursement rates that are accepted by thousands of medical providers across the country.

25.     Defendant respectfully reserves the right at this time to amend this original answer to Plaintiff's allegations after said Defendant has had the opportunity to more closely investigate these claims, as is the right and privilege of said Defendant under the Rules of Civil Procedure and the laws of the State of Texas.

## V.
## ANSWER TO CROSS-ACTIONS
## SUBJECT TO SPECIAL APPEARANCE

In answer to any cross-actions for indemnity or contribution filed or to be filed in the future by other defendants, Defendant denies that such defendants are entitled to indemnity or

contribution from this Defendant, denies each and every allegation in said cross-action, and demands strict proof thereof.

## VI.
## CONCLUSION

WHEREFORE, Defendant Meriden Molded Plastics, Inc. respectfully prays that its Special Appearance be granted and that plaintiffs' suit be dismissed. Subject to its Special Appearance Meriden Molded Plastics, Inc. prays that plaintiffs take nothing by this suit, that this case be dismissed with prejudice to the refiling of same with all costs taxed against plaintiffs plus for such other and further relief to which it may show itself justly entitled.

Respectfully Submitted,
MEHAFFYWEBER P.C.

By: _____
Barbara J. Barron
State Bar No. 01817250
P. O. Box 16
Beaumont, Texas 77704
(409) 835-5011
(409) 835-5729
Attorneys for Meriden Molded Plastics, Inc.

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing instrument has been forwarded to Plaintiffs' counsel of record on this the _____ day of _____ 2017.

_____
Barbara J. Barron

Book 20091015 1.docx

NO. 2017-_____-ASB

BEFORE THE ASBESTOS MDL PRETRIAL JUDGE

| | | |
|---|---|---|
| JOHN H. ADAMS AND LORRAINE ADAMS | ) | IN THE DISTRICT COURT OF |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | HARRIS COUNTY, TEXAS |
| | ) | |
| 3M COMPANY f/k/a MINNESOTA | ) | |
| MINING AND MANUFACTURING, | ) | |
| ET AL | ) | |
| Defendants | ) | 11TH JUDICIAL DISTRICT |

NO. DC-17-15389

| | | |
|---|---|---|
| JOHN H. ADAMS AND LORRAINE ADAMS | ) | IN THE DISTRICT COURT OF |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | DALLAS COUNTY, TEXAS |
| | ) | |
| 3M COMPANY f/k/a MINNESOTA | ) | |
| MINING AND MANUFACTURING, | ) | |
| ET AL | ) | |
| Defendants | ) | 192ND JUDICIAL DISTRICT |

**AFFIDAVIT IN SUPPORT OF MERIDEN MOLDED PLASTICS, INC.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

| | |
|---|---|
| STATE OF CONNECTICUT | ) |
| | ) |
| COUNTY OF NEW HAVEN | ) |

BEFORE ME, the undersigned authority, on this day personally appeared H. Robert Grossman, known to me to be the person whose name is subscribed to this foregoing instrument, and having been by me duly sworn, upon her oath stated as follows:

1.  I, H. Robert Grossman, duly sworn and under oath, depose and state that I am an adult; I am not under any disability; and further state under oath as follows:

2.  I have personal knowledge of the facts contained herein, and they are all true and correct.

120091015v.1

20091015 1.docx

3.   Meriden Molded Plastics Inc. ("Meriden") is incorporated in the state of Connecticut and when it was in business, had its principal place of business in the State of Connecticut.

4.   Meriden is no longer doing business and has not done business for over 30 years.

5.   Meriden is not a resident of the State of Texas.

6.   Meriden has never had its principal place of business in the State of Texas.

7.   Meriden does not conduct business in the State of Texas nor does Meriden conduct business under any other name in the State of Texas.

8.   Meriden has never been a resident of the State of Texas.

9.   Meriden has no employees located in the State of Texas.

10.  Meriden has never had employees who, while employed by Meriden, office in the State of Texas.

11.  Meriden does not own and has never owned any real or personal property in Texas.

12.  Meriden has never had any offices, warehouses, or leased space in Texas.

Further Affiant sayeth not.

AFFIANT

Subscribed and sworn to me this 7ᵗʰ day of December, 2017.

Notary Public

Christine F. Robertson
My comm. expires: 8/31/21

120091015v.1

12/11/2017 10:12 AM
Chris Daniel - District Clerk Harris County
Envelope No. 21197685
By: Lakeisha Williams
Filed: 12/11/2017 10:12 AM

**CAUSE NO. 2017-81591-ASB**

**BEFORE THE ASBESTOS MDL PRE-TRIAL JUDGE**

| | | |
|---|---|---|
| JOHN H. ADAMS and LORRAINE ADAMS, | § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| vs. | § § | HARRIS COUNTY, TEXAS |
| 3M COMPANY, *et al.* | § § | |
| Defendants. | § | 11TH JUDICIAL DISTRICT |

**<u>Transferred From</u>**

**CAUSE NO.  DC-17-15389**

| | | |
|---|---|---|
| JOHN H. ADAMS and LORRAINE ADAMS, | § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| v. | § § | DALLAS COUNTY, TEXAS |
| 3M COMPANY, et al., | § § | |
| Defendants. | § § | 192ND JUDICIAL DISTRICT |

---

**DEFENDANT CBS CORPORATION'S MOTION TO TRANSFER VENUE, ANSWER TO PLAINTIFFS' ORIGINAL PETITION, ANSWER TO CROSS-ACTIONS AND REQUEST FOR BIFURCATED TRIAL SUBJECT TO SPECIAL APPEARANCE**

---

TO THE HONORABLE JUDGE OF SAID COURT:

DEFENDANT CBS CORPORATION, A DELAWARE CORPORATION, F/K/A VIACOM INC., SUCCESSOR BY MERGER TO CBS CORPORATION, A PENNSYLVANIA CORPORATION, F/K/A WESTINGHOUSE ELECTRIC CORPORATION ("Westinghouse"), one of the Defendants in the above-entitled and numbered cause, files this Motion to Transfer Venue, Answer to Plaintiff's ("Plaintiff" herein referred to singularly or plurally, living or deceased,

possessively or in any such capacity as may apply) Original Petition (the "petition"), Answer to Cross-Actions, and Request for Bifurcated Trial Subject to Special Appearance.  It is expressly noted that CBS files this instrument subject to its previously filed Special Appearance in which it objected to the jurisdiction of this Court.

## I.    MOTION TO TRANSFER VENUE

1.    Plaintiff contends that venue is proper in Dallas County as to his claims against all Defendants.  In pleading venue, Plaintiff makes the conclusory allegation that venue is proper because all or a substantial part of the events giving rise to this cause of action occurred in Dallas County, Texas, and/or one of more Defendants maintain a principal office in Dallas County, Texas.  Plaintiff provides no detailed information in his petition regarding the substantial portion of events leading to Plaintiff's claims that occurred in Dallas County and/or which Defendant maintains its principal office in Dallas County.  Therefore, Westinghouse specifically denies that a substantial portion of the events leading to Plaintiff's claims occurred in Dallas County and/or that any Defendant maintains its principal office in Dallas County, Texas.[1]

2.    Westinghouse says that Harris County, Texas, is a proper county in which this suit could be brought.  Specifically, under Tex. Civ. Prac. & Rem. Code § 15.018(b)(2), Harris County, Texas, is a county of proper venue in that Westinghouse maintains its principal office in Texas in Harris County.  Accordingly, Westinghouse requests that this suit be transferred to Harris County, Texas.

---

[1]    Since Plaintiff's venue allegations are conclusory and lack evidentiary support, and because of the due order of pleading requirements of the Texas Rules of Procedure, Westinghouse is left with no option other than to specifically deny Plaintiff's venue allegations at this time.

## II.    <u>GENERAL DENIAL</u>

3.      Westinghouse denies each and every, all and singular, the material allegations contained in the petition and demands strict proof thereof by a preponderance of the evidence before this Court and a jury.  To the extent that any of the allegations relate to Defendants other than Westinghouse, Westinghouse has no obligation to answer and therefore, denies any such allegation.

4.      Defendant admits that it is a corporation organized and existing under the laws of the State of Delaware, and that it has its principal place of business in the State of New York.

5.      Defendant denies that Plaintiff sustained any injury or illness as a result of contact with or around any product manufactured, sold or distributed by Westinghouse or which was caused or produced by any product manufactured, sold or distributed by Westinghouse.

## III.    <u>DEFENSES</u>

6.      Westinghouse would show that there is insufficient evidence of the dose, including length, duration or concentration of any alleged exposure or identification of actual use of specific product(s) manufactured by Westinghouse.  The Westinghouse product(s) were not substantial factors in causing any alleged harm.  Plaintiff has failed to provide properly designed and executed epidemiological studies supporting claims of causation.

7.      Westinghouse will show that claims in the subject petition are barred by the applicable statutes of limitation pursuant to Chapter 16, Tex. Civ. Prac. & Rem. Code, § 16.001 <u>et seq.</u>, and all other applicable statutes of limitations including those applicable claims of strict liability and breach of express or implied warranty, and those applicable limitation provisions of appropriate state jurisdictions.

- 3 -

8.      Jurisdiction to proceed with this action is barred by the Due Process Clause of the Fourteenth Amendment of the United States Constitution because the State of Texas lacks sufficient contacts with the parties and the controversy to render the assertion of jurisdiction fair and reasonable.

9.      Alternatively, this Court should decline jurisdiction under the doctrine of forum non conveniens.

10.     The subject petition has failed to state a claim upon which relief can be granted.

11.     The claims of Plaintiff are barred by the Texas Statute of Repose, § 16.009 and/or § 16.012 of the Tex. Civ. Prac. & Rem. Code or any other applicable statute of repose.

12.     Westinghouse will show that Plaintiff is not entitled to recovery against Westinghouse for any alleged breach or warranty, express or implied, as there are no warranties express or implied and no privity of contract between Westinghouse and Plaintiff.

13.     Recovery is barred from Westinghouse by the doctrine of assumption of risk (volenti non fit injuria).  Westinghouse will show that Plaintiff may have assumed the risk of any injuries or damages that may have been incurred as a result of alleged exposure to products manufactured, sold or distributed by Westinghouse because further investigation may reveal that Plaintiff or his employers had equal or greater knowledge of the alleged hazards of exposure to asbestos, and that Plaintiff may have used the product without showing proper regard for his or her health and safety.

14.     The claims of Plaintiff are barred by laches.

15.     Westinghouse will show that the subject petition has failed to satisfy the notice requirements and other required conditions precedent under Tex. Bus. & Com. Code and/or the

Uniform Commercial Code allowing this Plaintiff to assert a claim for breach of an express or implied warranty.  Therefore, a waiver of claim has occurred.

16.     Westinghouse will show that there could be no claim based upon strict liability for any alleged exposure to toxic materials and substances occurring prior to June 7, 1967 when the Texas Supreme Court first adopted the Rule of Strict Liability under § 402A, Restatement 2d of Torts, <u>McKisson v. Sales</u>, 416 S.W.2d 787 (Tex. 1967).

17.     Westinghouse will show that there should be no recovery of exemplary/punitive damages for the reason that an award of such damages pursuant to § 41.001 <u>et seq.</u>, Tex. Civ. Prac. & Rem. Code, or pursuant to common law, would be unconstitutional in failing to place a limit on the amount of such damage award; an award of such damages would be void for vagueness and violative of the Equal Protection Clause of the Fifth and Fourteenth Amendments to the U.S. Constitution; an award of such damages would violate Art. 1, § 10 and § 13 of the Constitution of the State of Texas.

18.     Any award of punitive damages would violate the Excessive Fines Clause of the Eighth Amendment of the United States Constitution.

19.     Punitive damages are a form of punishment imposed by the Court, and the standard of proof to sustain such damages must be clear and convincing evidence and comport with the Due Process Clause of the Fourteenth Amendment of the United States Constitution, Section 19 of the Constitution of the State of Texas or the Constitution and laws of any other state deemed to apply in this case.

20.     Any award of punitive damages would be imposed under a standard of conduct formulated years after any of Westinghouse's actions; a retroactive application of the standard of conduct would be a violation of due process.

21.     Westinghouse did not participate in any of the alleged activities or conduct for which the subject petition asserts that punitive damages may be assessed.

22.     Exemplary damages, as requested in the subject petition herein, may not exceed an amount equal to the great of: two (2) times the amount of economic damages; plus an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or $200,000, pursuant to § 41.008 of the Texas Civil Practice & Remedies Code.

23.     Westinghouse will show that if it manufactured or sold any products containing asbestos, the alleged exposure, if any, to such product(s) was minimal, de minimis and insufficient to establish to a reasonable degree the probability that such product caused any alleged injury.

24.     Westinghouse will show that there should be no recovery against this Defendant because, if Plaintiff was injured, the injuries were caused by the superseding and intervening negligence of third parties, and this conduct, either by omission or commission, interrupted the natural and proximate causal relationship between any act or omission of Westinghouse and the alleged resulting injuries, if any, to Plaintiff.

25.     Westinghouse will show that there should be no recovery against it because Plaintiff failed to mitigate any alleged damages.

26.     Further, the said Workers' Compensation Act provides Worker's Compensation benefits for the disability of an employee if such resulted from injury or occupational disease incurred or sustained in the course of employment as an exclusive remedy.  Any exposure by

- 6 -

Plaintiff to any alleged product was during a period when Plaintiff was employed by any entity while it was a subscriber to Workers' Compensation insurance.  As to any alleged exposure, Workers' Compensation with its attendant benefits is the exclusive remedy for any alleged injury or occupational disease incurred.

27.     Westinghouse will show that at all relevant times, all of Westinghouse's products complied with industry standards and with federal and state standards and regulations governing the manufacturing, sale, packaging and distribution of such products.

28.     Westinghouse will show that any absence of warning did not lead to reliance by Plaintiff on the safety of any product at issue.

29.     Recovery is barred because Plaintiff misused or improperly used the materials in question, which was the sole cause of alleged resulting damages, if any, or alternatively, which thereby proximately caused or contributed to causing or was the producing cause of the alleged resulting damages to Plaintiff.

30.     The negligent conduct and/or fault of Plaintiff was/were the sole cause of any injury or resulting damages allegedly suffered, therefore, recovery by Plaintiff is barred.

31.     The negligent conduct and/or fault of Plaintiff was/were a proximate and producing cause of any injury or alleged damages suffered and same exceeded any negligence or other fault of Westinghouse and other Defendants and recovery by Plaintiff is therefore barred.

32.     Alternatively, the claims of Plaintiff are barred to the extent of the comparative negligence or comparative fault of Plaintiff.  To the extent that any alleged exposure occurred prior to September 30, 1972, then Plaintiff's negligence, whether it be the sole cause or a contributing cause, is a complete bar to recovery.

33.     If Plaintiff sustained any injuries or damages, they were caused by the other Defendants named herein over whom Westinghouse had no right of control.

34.     Alternatively, Westinghouse states and will show that Plaintiff and his superiors had knowledge of the products used and the risks, if any, in using the products; therefore, Westinghouse breached no duty.

35.     Plaintiff's employers or supervisors had notice and knowledge of any dangers for which Plaintiff now complains and Westinghouse, therefore, breached no duty.

36.     Westinghouse will further show the Plaintiff's alleged injuries, if any, were preexisting or not the result of any contact with any products manufactured, sold, or distributed by Westinghouse.

37.     Westinghouse will also show that the Plaintiff's alleged injuries, if any, were caused in whole or in part by a history of smoking and failure to stop smoking, and any risks related to such smoking were assumed by Plaintiff.

38.     If Plaintiff has an asbestos-related disease it was due to employment of an occupational nature and was acquired over a long period of time and was not the result of working with any particular product or products.

39.     Westinghouse will show there is no claim based upon allegations of product liability from any alleged exposure and related personal injuries under § 82.001 et. seq. of the Texas Civil Practice and Remedies Code.

40.     Westinghouse alleges and will show that it was, if at all, a mere conduit for any alleged supplier of asbestos products and did not manufacture, sell or specify any asbestos-containing products to which exposure is claimed in the subject petition.

- 8 -

41.     There was no concert of action between Westinghouse and any other Defendant herein.

42.     Without accepting the truth of the pleadings and denying all liability, Westinghouse reserves it right pursuant to Chapters 32 and 33, Tex. Civ. Prac. & Rem. Code, Westinghouse says that if it is found to have any liability to Plaintiff, Westinghouse is entitled to a set-off, percentage or pro rata reduction of its liability, if any, or to a credit for the amount of any settlement paid by each settling Defendant.  To the extent that this action involves amended portions of Chapters 32 and 33 of the Texas Civil Practice & Remedies Code, and without accepting the truth of the pleadings and denying all liability, Westinghouse reserves its right pursuant to Chapters 32 and 33 of the Texas Civil Practice & Remedies Code to designate any and all Responsible Third Parties and have any judgment reduced in proportion to the percentage liability found against plaintiff(s), defendant(s) and/or Responsible Third Parties as those terms are defined under Texas Law.

43.     Alternatively, in the event Westinghouse is not entitled to judgment otherwise as a matter of law, Westinghouse invokes the system of apportionment of damages as adopted by the Texas Supreme Court in Duncan v. Cessna Aircraft Co., 665 S.W.2d 414 (Tex. 1984), and alleges that if it is found to be liable for any portion of damages to Plaintiff, that it is then liable only for the percentage of damages for which it is found to be comparatively at fault, and alleges that should this case be submitted to the jury, it should be submitted in such a manner as to secure determination as to the relative fault of the causation of damages by Plaintiff and by any settling or responsible third parties, and that any judgment that is to be entered should be so limited.

- 9 -

44.     Westinghouse will further show it is entitled to indemnity and/or contribution from the Defendant manufacturers or suppliers of any asbestos-containing insulation product sold, distributed, or applied by Westinghouse which results in any liability to Westinghouse.

45.     Westinghouse denies that Plaintiff sustained any injury as a result of contact with or use of any product manufactured by Westinghouse.

46.     Westinghouse states and will show it is not legally liable for the sale, distribution, application, or manufacture of any asbestos-containing insulation product by any former or current subsidiary or predecessor.

47.     Westinghouse states and will show, in the alternative, that the alleged claims of injuries and damages of Plaintiff, if any, were the result of an unavoidable accident or occurrence.

48.     Westinghouse states and will show, that any alleged defects were beyond the scientific and medical knowledge available at the time of manufacturing, and the state-of-the-art prevented Westinghouse from knowing of such product defect, if any.

49.     Westinghouse states and will show that the products it sold were at all times reasonably fit and suitable for the purposes for which they were sold and Westinghouse denies that such products were in anyway defective for the use for which they were sold.  The alleged injuries, if any, to Plaintiff did not result from any defect in any product manufactured, sold, or distributed by Westinghouse.  If the products at issue were altered after they left Westinghouse's control, such changes were the legal and proximate cause of any alleged damages.

50.     Westinghouse contends that if Plaintiff has released, settled, entered into an accord and satisfaction, or otherwise compromised his or her claims herein, then, accordingly, said claims are barred.

51.     Plaintiff's recovery of medical or health care expenses incurred, if any, is limited by TEX. CIV. PRAC. & REM. CODE §41.0105 to the amount actually paid or incurred by or on behalf of Plaintiff's for that care.

52.     Westinghouse also adopts all affirmative defenses pled by other Defendants.

53.     Westinghouse reserves the right to amend its pleadings upon completion of discovery.

54.     Westinghouse reserves the right to amend and adopt all defenses applicable under the laws of any other state.

## IV.     ANSWER TO ALL CROSS-ACTIONS

55.     In answer to any and all cross-actions for indemnity and/or contribution filed or to be filed in the future by any other Defendants herein, Westinghouse denies that such Defendants are entitled to indemnity and/or contribution from Westinghouse.

## V.     REQUEST FOR BIFURCATED TRIAL

56.     Westinghouse requests that the trial of issues regarding punitive/exemplary damages and/or gross negligence be bifurcated and that a separate trial be conducted upon said issues.

WHEREFORE, PREMISES CONSIDERED, Westinghouse respectfully prays that venue be transferred to Harris County, Texas, and that upon final trial and hearing hereof, Plaintiff take nothing by reason of said claims, and that Westinghouse be discharged and recover its costs and attorneys' fees expended on its behalf, and for such other and further relief, both at law and in equity, to which Westinghouse may show itself justly entitled.

Respectfully submitted,

PAINE | BICKERS LLP
900 S. Capital of Texas Highway
Las Cimas IV, Ste. 460
Austin, Texas 78746
(512) 328-5551 Telephone
(512) 328-5556 Facsimile

By: _____
    Ryan L. Harrison
    State Bar Number 24068704
    rlh@painebickers.com
    Brian E. Berger
    State Bar Number 24089985
    beb@painebickers.com

**ATTORNEYS FOR CBS
CORPORATION, A DELAWARE
CORPORATION, F/K/A VIACOM INC.,
SUCCESSOR BY MERGER TO CBS
CORPORATION, A PENNSYLVANIA
CORPORATION, F/K/A
WESTINGHOUSE ELECTRIC
CORPORATION**

- 12 -

DEFENDANT CBS CORPORATION'S MOTION TO TRANSFER VENUE, ANSWER
TO PLAINTIFFS' ORIGINAL PETITION, ANSWER TO CROSS-ACTIONS AND REQUEST FOR BIFURCATED
TRIAL SUBJECT TO SPECIAL APPEARANCE

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been forwarded to counsel for Plaintiffs John H. Adams and Lorraine Adams and all known counsel of record via File&ServeXpress on this _11_ day of December 2017.

David C. Humen                                          *via File&ServeXpress*
Susannah B. Chester-Schindler
Waters & Kraus, LLP
3141 Hood Street, Suite 700
Dallas, TX 75219
schester@waterskraus.com
dhumen@waterskraus.com
*Attorneys for Plaintiffs*

All Counsel of Record                                   *via File&ServeXpress*


_____
Ryan L. Harrison

DEFENDANT CBS CORPORATION'S MOTION TO TRANSFER VENUE, ANSWER
TO PLAINTIFFS' ORIGINAL PETITION, ANSWER TO CROSS-ACTIONS AND REQUEST FOR BIFURCATED
TRIAL SUBJECT TO SPECIAL APPEARANCE

12/11/2017 4:59 PM
Chris Daniel - District Clerk Harris County
Envelope No. 21219196
By: Lakeisha Williams
Filed: 12/11/2017 4:59 PM

CAUSE NO. 2017-81591-ASB

**BEFORE THE ASBESTOS MDL PRE-TRIAL JUDGE**

| JOHN H. ADAMS and | § | IN THE DISTRICT COURT |
| LORRAINE ADAMS | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| 3M COMPANY, *et al.* | § | 11th JUDICIAL DISTRICT |

*Transferred from*
CAUSE NO. DC-17-15389

| JOHN H. ADAMS and | § | IN THE DISTRICT COURT |
| LORRAINE ADAMS | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| 3M COMPANY, *et al.* | § | 192nd JUDICIAL DISTRICT |

**DEFENDANT EMERSON ELECTRIC CO.'S RULE 120(a) SPECIAL APPEARANCE, MOTION TO DISMISS ON THE BASIS OF FORUM NON CONVENIENS, MOTION TO TRANSFER VENUE, AND SUBJECT THERETO, ANSWER TO PLAINTIFFS' ORIGINAL PETITION, CROSS-CLAIM AND ANSWER TO ALL CROSS-CLAIMS**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW EMERSON ELECTRIC CO., sued herein as "EMERSON ELECTRIC CO. (sued individually and as successor-in-interest to APPLETON GRP LLC d/b/a APPLETON GROUP), a Missouri Corporation with its principal place of business in the State of Missouri", hereafter referred to as "Defendant," and files its Rule 120(a) Special Appearance to Contest Jurisdiction, Motion to Dismiss on the Basis of Forum Non Conveniens, Motion to Transfer Venue, and Subject Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims and in support thereof would respectfully show unto the Court the following:

## SPECIAL APPEARANCE

Defendant moves the Court to dismiss Plaintiff's Petition and all claims against this Defendant pursuant to Tex. R. Civ. P. 120(a) because the Court lacks personal jurisdiction over Defendant. In support of this Motion, Defendant would show the following:

(a)     According to the Petition, Plaintiffs are residents of the State of Michigan;

(b)     The Petition does not allege that any act or omission that was the proximate or producing cause of the Plaintiffs' injuries occurred in the State of Texas;

(c)     Where a claim does not arise out of a defendant's contacts with the forum, as required by specific jurisdiction, a plaintiff must invoke general jurisdiction by establishing that a defendant's affiliations with the forum state are so "continuous and systematic" as to render them "at home" in the forum state. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.Ct. 2846, 2851 (2011). A corporate defendant is "at home" to include only its formal place of incorporation or the state of its principal place of business. *Daimler AG v. Bauman*, 134 S. Ct. 746, 751 (2014).

(d)     Defendant is incorporated in the State of Missouri;

(e)     Defendant's principal place of business is in St. Louis, Missouri;

(f)     In support of this Special Appearance objecting to the jurisdiction, Defendant is in the process of obtaining, and will supplement by filing, an affidavit at least seven (7) days before any hearing on this Special Appearance.

WHEREFORE, Defendant requests that the Petition be dismissed for lack of personal jurisdiction.

*John H. Adams and Lorraine Adams v. 3M Company, et al.*                                          Page 2 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

## DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' CLAIMS ON THE BASIS OF FORUM NON CONVENIENS, SUBJECT TO ITS SPECIAL APPEARANCE

Subject to its Special Appearance, Defendant moves the Court to dismiss Plaintiffs' Petition and claims in their entirety under the doctrine of *forum non conveniens* contained in § 71.051 of the Texas Civil Practice and Remedies Code.

In support of this Motion, Defendant would show as follows:

(a)      According to the Petition, Plaintiffs are not legal residents of the State of Texas;

(b)      No act or omission that was the proximate or producing cause of the non-Texas resident Plaintiff's injuries or death, if any, occurred in the State of Texas;

(c)      A forum outside the State of Texas is a more appropriate forum for the determination of the non-Texas resident's claims, in that:

i.      an alternative forum exists in which the claims or action may be tried;

ii.      the alternative forum provides an adequate remedy;

iii.      maintenance of the claim or action in the courts of this state would work a substantial injustice upon Defendant;

iv.      the alternate forum can exercise jurisdiction over all the Defendants properly joined to the Plaintiffs' claims;

v.      the balance of the private interests of the parties and the public interest of the state predominates in favor of the claims or actions being brought in an alternate forum;

vi.      the dismissal would not result in unreasonable duplication or proliferation of litigation.

WHEREFORE, Defendant requests that the Petition be dismissed, or alternatively, that the case be transferred to the appropriate state.

*John H. Adams and Lorraine Adams v. 3M Company, et al.*      Page 3 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

## DEFENDANT'S MOTION TO TRANSFER VENUE, SUBJECT TO ITS SPECIAL APPEARANCE

### I.

Defendant objects to venue in Dallas County, Texas, the county in which this action was instituted because Dallas County, Texas is not a county of proper venue and no basis exists permitting or mandating venue in said county.  The Plaintiffs in Plaintiffs' Original Petition have failed to satisfy the general venue requirements of the Texas Civil Practice and Remedies Code.

### II.

Tex. Civ. Prac. & Rem. Code §15.002 governs venue and provides that lawsuits shall be brought:

1)  in the county in which all or a substantial part of the events or omissions giving rise to the claim occurred; or

2)  in the county of Defendant's residence at the time the cause of action accrued if Defendant is a natural person; or

3)  in the county of Defendant's principal office in this state if Defendant is not a natural person; or

4)  if Subdivisions (1), (2), and (3) do not apply, in the county in which the Plaintiffs resided at the time of the accrual of the cause of action.

### III.

Plaintiffs makes conclusory allegations in their Petition and fail to plead facts sufficient to establish venue in Dallas County.  Defendant specifically denies: (1) that the cause of action against this Defendant accrued in whole or in substantial part in Dallas County, Texas; (2) that this Defendant maintains a principal office in Dallas County, Texas, as defined in Texas Civil Practice and Remedies Code §15.001; (3) that Plaintiffs resided in Dallas County at the time of the occurrence of the cause of action; and (4) that any mandatory venue provision applies.

*John H. Adams and Lorraine Adams v. 3M Company, et al.*                    Page 4 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

**IV.**

In the alternative, any Defendants which reside or have agents or representatives in Dallas County are not properly joined in this action, and therefore, venue is not proper as to these Defendants.

WHEREFORE, Defendant respectfully prays that this Court grant its Motion to Transfer Venue, and transfer this case to an appropriate county, wherein Defendant has a principal office in the State of Texas, and for all further relief to which Defendant may be justly entitled.

## DEFENDANT'S ANSWER SUBJECT TO ITS SPECIAL APPEARANCE AND MOTION TO TRANSFER VENUE

Defendant asserts a General Denial as authorized by Rule 92 of the Texas Rules of Civil Procedure, and denies each and every, all and singular, the allegations of material fact contained in Plaintiffs' Original Petition, and respectfully requests that the Court and Jury require the Plaintiffs to prove their charges, claims and allegations by a preponderance of the evidence as required by the Constitution and the laws of the State of Texas.

## AFFIRMATIVE DEFENSES

1.      Defendant would show that Plaintiff's alleged injuries and illnesses were due in whole or in part to causes other than exposure to asbestos.

2.      Defendant did not owe a duty to Plaintiff.

3.      Defendant specifically denies the allegations contained in Plaintiffs' Original Petition as they relate to this Defendant and would show that Plaintiff was never exposed to any asbestos-containing products manufactured, sold or distributed by Defendant that could have been a proximate cause of Plaintiff's alleged injuries and illnesses.

4.      In the alternative, Defendant would show that Plaintiff suffered from conditions and injuries sustained elsewhere, prior to or subsequent to the events alleged in the Petition.

*John H. Adams and Lorraine Adams v. 3M Company, et al.*                                                    Page 5 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

Plaintiff's disabilities, if any, were caused or aggravated by smoking, or some other medical cause unrelated to exposure to any product sold or manufactured by Defendant.

5.     Pleading further and, in the alternative, Defendant would show that if Plaintiff sustained any injuries or damages, which Defendant expressly denies, such injuries or damages were caused by exposure to products of the other Defendants named herein, and not by exposure to any products manufactured, distributed or sold by Defendant.

6.     Plaintiff was guilty of acts or omissions of contributory and comparative negligence or other forms of fault or comparative responsibility, each of which, separately or concurrently, were the sole proximate cause, or, alternatively, a proximate cause of Plaintiff's alleged illnesses or injuries so that Plaintiff's claims are barred and/or Plaintiff's claims for recovery should be reduced as set forth in Chapter 33 of the Texas Civil Practice and Remedies Code.

7.     Defendant would further show that the acts or omissions of a separate and independent agency, not reasonably foreseeable, destroyed the causal connection, if any, between the acts or omissions of Defendant, if any, and the occurrences in question, and thereby became the sole cause of such occurrences.

8.     Defendant would further show that Plaintiff failed to mitigate, which a person of ordinary prudence would have done under the same or similar circumstances, the alleged damages, if any, which may have resulted from the occurrences made the basis of this lawsuit.

9.     Plaintiff is barred from recovery herein by the applicable statutes of limitations, including, but not limited to, the Two-Year and Four-Year Texas Statutes of Limitations and doctrine of laches.  In addition, if the Plaintiff alleges an injury occurring in any other State of

*John H. Adams and Lorraine Adams v. 3M Company, et al.*                                          Page 6 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

the Union besides Texas, then Defendant pleads any and all of the statutes of limitations of the respective states where the alleged cause of action arose.

10. In the alternative, without waiving the foregoing, Defendant would show that Plaintiff's alleged causes of action are barred by the applicable statutes of repose. *See* Tex. Civ. Prac. & Rem. Code § 16.008, 16.009.

11. In the alternative, the Defendant would show that Plaintiff could have no claim based upon strict liability in tort for any alleged exposure of Plaintiff to the Defendant's products prior to June 7, 1967, when the Texas Supreme Court first adopted the rules of strict liability set forth in RESTATEMENT (SECOND) OF TORTS 402A. Until this time, when the Supreme Court decided in *McKisson v. Sales Affiliates, Inc.,* 416 S.W.2d 787 (Tex. 1967), the doctrine of strict liability had not applied to manufacturers or sellers of non-food products. All claims asserted by Plaintiff, or any other party herein, for recovery based upon strict liability for exposure prior to June 7, 1967, should therefore be stricken and denied. Further, the application of strict liability on a retroactive basis would be violative of Article I, § 16, of the Texas Constitution.

12. In the alternative, Defendant would further show that if any product allegedly manufactured or distributed by the Defendant was defective in any way, which is not admitted but is specifically denied, then any such defect arose after such product left the possession of the Defendant and that said product or products were materially altered, modified or changed, as those terms are known in the law of products liability, by third persons or instrumentalities who were not in any manner connected with or controlled by Defendant prior to use by Plaintiff, and that such alteration was a proximate cause of any injuries or damages alleged by Plaintiff. Any

*John H. Adams and Lorraine Adams v. 3M Company, et al.*                                      Page 7 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

alleged defects were caused by Plaintiff, his employers or third parties or instrumentalities over whom the Defendant had no control.

13.     Defendant denies that it owed any duty or warranty to Plaintiff and denies any fault or breach of warranty.    Defendant would affirmatively show that any products manufactured, distributed or sold by Defendant were at all times reasonably fit and suitable for the purpose for which they were manufactured, distributed and sold, and that Plaintiff's alleged injuries did not result from any defect in said product or products.

14.     In the alternative, if such be necessary and subject to the foregoing pleas and without waiving same, Defendant would show the Court that this Defendant is not liable to Plaintiff under any alleged obligations under the Texas Business and Commerce Code for breach of express or implied warranty, if any, since Plaintiff has not fulfilled all conditions precedent to the alleged liability on any warranty theory in that Plaintiff has not provided this Defendant with written notice of his claims pursuant to section 2.607 of the Texas Business and Commerce Code.

15.     Pursuant to Chapters 32 and 33, Texas Civil Practice and Remedies Code, if Defendant is found to have any liability to the Plaintiff, which is specifically denied, Defendant is entitled to a set-off, percentage or pro rata reduction of its liability to the Plaintiff or to a credit for the amount of any settlement paid by each settling Defendant and/or to indemnity or contribution from each of the other Defendants.

16.     Defendant would further show that the state of the medical and scientific knowledge prior to recent years regarding asbestos exposure to workers from gaskets was such that the medical and scientific community were of the opinion that the exposures of workers were below the Threshold Limit Values recommended by the American Conference of

*John H. Adams and Lorraine Adams v. 3M Company, et al.*                                    Page 8 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

Government Hygienists for dust-containing asbestos particles and such occupation was reasonably safe. Therefore, the manufacturers or suppliers of asbestos-containing products were charged with no greater knowledge than that of the medical and scientific community, and such manufacturers or suppliers had no reason to foresee any injury to workers from the application of gasket products which contained some asbestos. Furthermore, this Defendant would show that the suppliers of asbestos-containing products should not be charged with knowledge greater than that of the medical and scientific community, and such suppliers had no reason to foresee or warn of any injury to workers from the use of products which contained some asbestos.

17.     Defendant would show that the alleged products it supplied to Plaintiff or to Plaintiff's employers, if any, complied in all respects with the standards, rules and regulations promulgated by the Occupational Safety and Health Administration (OSHA), the National Institute of Occupational Safety and Health (NIOSH), and the Bureau of Mines. Any products Defendant supplied to Plaintiff, or Plaintiff's employers, if any, were specifically approved by the aforementioned governmental agencies for use, and such products represent the "state of the art." Further, any claim in state Court would be subject to federal preemption due to the aforementioned governmental agencies' involvement.

18.     Defendant alleges that Plaintiff's employers, by virtue of the notice given in publications of the Federal Register and otherwise, had notice of dangers Plaintiff complains of and were obligated under federal law to eliminate any such dangers.

19.     Plaintiff is barred from recovery because Plaintiff misused or improperly used the material in question which was the sole cause of any resulting damages alleged; or, alternatively, which thereby proximately caused or contributed to cause any resulting damages alleged.

*John H. Adams and Lorraine Adams v. 3M Company, et al.*                                     Page 9 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

20.     Pleading in the alternative, Defendant would show that the employers or supervisors of Plaintiff had notice and knowledge of any dangers about which Plaintiff complained, and this Defendant, therefore, breached no duty owed to Plaintiff.

21.     Defendant alleges that Plaintiff's employers knew, or should have known, of any risks Plaintiff was exposed to in the workplace and were negligent by, including, but not limited to, failing to reduce the release of dust; failing to warn Plaintiff of any alleged exposure; failing to provide proper training and equipment; and/or failing to provide a safe work environment. Such actions were a new, intervening and/or superseding cause.  This new intervening and/or superseding conduct was the proximate and/or producing cause of any alleged injury, damage or loss to Plaintiff, and, therefore, precludes Plaintiff from obtaining recovery in whole, or alternatively in part, from Defendant.

22.     Defendant alleges that Plaintiff's employers had knowledge of the risks in Plaintiff's work place.  Plaintiff's employers were informed intermediaries and sophisticated users of Defendant's products.  Plaintiff's employers were in a superior position to eliminate any hazards of which Plaintiff complained related to the use of any of Defendant's products.

23.     If Plaintiff sustained any injuries, said occurrence and injuries were suffered in the course of his employment, and are the fault of his employers, over whom this Defendant has no control.  Alternatively, the sole cause of the alleged occurrence and damages, if any, was the negligence of his employers.

24.     The products complained of as being manufactured, distributed or sold by Defendant were manufactured, distributed and sold for use in a limited market to a limited number of purchasers for use by a limited class of workmen, all of whom held themselves out as having special knowledge and expertise in the handling and use of the products.  The purchasers

*John H. Adams and Lorraine Adams v. 3M Company, et al.*
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims
Page 10 of 17

of Defendant's products are experienced members of that limited class of skilled and knowledgeable entities or individuals with special knowledge and expertise concerning the danger of the operations in which Defendant's products are used, and this Defendant was entitled to rely upon such specialized knowledge and expertise.

25.    Defendant alleges that it had no duty or responsibility with regard to the manner, method or means for performing Plaintiff's work.  There was no relationship between Plaintiff and Defendant which created any duty on the part of Defendant regarding the manner and method or the conditions under which Plaintiff performed the work.  Defendant had no right to control the manner or method in which the work was performed or the conditions under which it was performed.

26.    In the alternative, Defendant would show that there is and was no legal liability on the part of the Defendant, since the alleged occurrences and the alleged injuries or damages, if any, were brought about by or caused by transitory conditions arising in the course of work that Plaintiff was doing and ordinarily incident thereto, and since Plaintiff and his employers were using their own manner, method and means of doing their work, the Defendant owed no duty to Plaintiff with respect thereto.

27.    Defendant states that no party is entitled to recover punitive damages or exemplary damages in any form or fashion in this cause of action, in that it would violate the Defendant's rights under the Constitution of the United States and the Constitution of the State of Texas in the following:

(i)    The contracts Clause of Article I, Section 10 of the United States Constitution is

violated because any party's claim of punitive damages is an attempt to impose punitive

damages through retrospective application of new judge-made substantive rules.  Due

*John H. Adams and Lorraine Adams v. 3M Company, et al.*                                              Page 11 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

process requires fair notice of the type of conduct that will subject a person or entity to monetary punishment, and fair notice of a range of any monetary punishment that may be imposed for deviation from the standard. Due process prohibits punishment for violation of unsettled standards and standards not judicially established until the conduct complained of has taken place.

(ii)     Defendant further affirmatively pleads that this court does not have jurisdiction or authority to award punitive damages for any alleged act or omission which occurred outside the State of Texas. Defendant further affirmatively pleads that pursuant to the doctrine of *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S. Ct. 1589 (1996), no state has the power to project its practices and policies upon any other sister state; therefore, the court sitting in the State of Texas lacks the authority or jurisdiction to award punitive damages for alleged acts or omissions, whether the result of intentional misconduct or negligence, which occurred outside the State of Texas. Any such award of punitive damages would be grossly excessive, unconstitutional and in violation of the due process clause of the U.S. Constitution.

(iii)     Due process requires proof of gross negligence and punitive damages by a standard greater than the "preponderance of the evidence" standard. Due process requires proof of such claims by at least a clear and convincing standard of proof. Lack of a sufficient standard governing punitive damages in Texas violates the due process clause of the Constitution of the United States.

(iv)     The assessment of punitive damages, a remedy that is essentially criminal in nature, without safeguards greater than those afforded by Texas procedural and statutory law, constitutes infliction of a criminal penalty without the safeguards guaranteed by the

*John H. Adams and Lorraine Adams v. 3M Company, et al.*                    Page 12 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

Fifth, Sixth, Eighth and Fourteenth Amendments of the Constitution of the United States, and of Article I, Section 19 of the Constitution of the State of Texas.

(v)     Punitive damages under Texas procedural and statutory law constitute an excessive fine in violation of the Eighth Amendment of the Constitution of the United States, and of Article I, Section 19 of the Constitution of the State of Texas.

(vi)    Punitive damages under Texas procedural and statutory law violate and are not in accord with those standards set forth by the United States Supreme Court in *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424 (2001).

(vii)   Punitive damages under Texas law are a violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, and of Article I, Section 19 of the Constitution of the State of Texas.

28.     Pleading further in the alternative, Defendant alleges that it is not responsible for any injury or occurrence caused in whole or in part by the negligence of Plaintiff's employers, under circumstances where Defendant is not allowed recourse against those employers, because such would constitute an application of Defendant's property to public use without adequate compensation being made in violation of Article I, Section 17 of the Texas Constitution. The imposition of such responsibility would constitute a taking of private property, for public use, without just compensation in violation of the Fifth Amendment to the United States Constitution.

29.     Defendant alleges that any award of prejudgment interest for damages which have not yet accrued would violate Defendant's rights to: (a) substantive and procedural due process under the Fifth and Fourteenth Amendments to the United States Constitution, as well as Article I, Sections 14, 16 and 19 of the Texas Constitution; and (b) equal protection of the laws under

*John H. Adams and Lorraine Adams v. 3M Company, et al.*                              Page 13 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

the Fourteenth Amendment to the United States Constitution and under Article 1, Section 3 of the Texas Constitution.

30.     In the alternative, Defendant pleads and invokes the standards of recovery and limitations on the amount of recovery for punitive or exemplary damages as set forth in Chapter 41 of the Texas Civil Practice & Remedies Code.

31.     Plaintiff is barred in whole or in part from recovery to the extent any products to which Plaintiff was allegedly exposed were produced in accordance with specifications and/or regulations of the United States Government, and Defendant claims the benefit of the Government Contractor Defense announced in *Boyle v. United Technologies Corp.,* 487 U.S. 500 (1988).

32.     Defendant had no duty to warn of any asbestos hazards.  Defendant demands strict proof of a specific "dose" of asbestos to which Plaintiff was exposed from Defendant's products and proof that any such "dose" was a significant contributing factor to any complained of disease.

33.     Alternatively, or in addition, if Plaintiff was in fact exposed to Defendant's product or material, if at all, such exposure was only brief and not substantial, and any exposure to asbestos as a result of Plaintiff's contact with the Defendant's products or materials was minimal in nature or nonexistent, and the purported illness or injury, if any, of Plaintiff was not caused by contact with or use of this Defendant's products or materials, but on the contrary, would have occurred just as it did had Plaintiff not used or been in contact with this Defendant's products or materials.  There is no "causation" (producing or proximate) as it relates to any such exposure and Plaintiff's alleged injury or illness.

*John H. Adams and Lorraine Adams v. 3M Company, et al.*                                    Page 14 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

34.     Plaintiff has the burden of forwarding evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the Plaintiff actually worked.  *Borg-Warner Corp. v. Flores*, 232 S.W. 3d 765 (Tex. 2007) citing *Lohrmann v. Pittsburg Corning Corp.*, 782 F.2d 1156 (4th Cir. 1986). Furthermore, the *Borg-Warner* decision requires that, in addition to a "regularity, proximity, and frequency" test, Plaintiff must establish that asbestos in a particular Defendant's product was a substantial contributing factor in bringing about the Plaintiff's injuries.

35.     Plaintiff is barred from recovery because of the doctrines of *volenti non injuria* and assumption of the risk.

36.     Plaintiff's claims fail to state a claim upon which relief can be granted to the extent that Defendant is alleged to be liable for failing to warn about the dangers of any asbestos product or material which Defendant did not manufacture, sell, distribute, or otherwise place in the stream of commerce, even where it is alleged that such defective product was used in conjunction with or applied to Defendant's own product.

37.     Further answering, in the alternative, this Defendant says that Plaintiff's injuries and damages, if any, were the result of unavoidable accident.

38.     Defendant further invokes the defense of waiver.

39.     Defendant states that the Petition should be dismissed for lack of jurisdiction over the subject matter.

40.     Defendant states that the Petition should be dismissed for lack of jurisdiction over the person.

*John H. Adams and Lorraine Adams v. 3M Company, et al.*                                                    Page 15 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

## CROSS-CLAIM AGAINST ALL OTHER CO-DEFENDANTS

Defendant denies that it is or may be liable to Plaintiffs on any claims asserted against it in this action.  In the alternative, Defendant hereby incorporates by reference the averments of Plaintiffs' Original Petition, without admission to same, and states that, if in the unlikely event it is found liable to Plaintiffs, then all other co-defendants now parties to this action and/or co-defendants joined in the future, are jointly and/or severally liable with the Defendant or liable over to the Defendant for indemnification and/or contribution.

## ANSWER TO ALL CROSS-CLAIMS

Defendant specifically denies all allegations contained in any and all Cross-Claims that have been asserted or that may be asserted against it in the future by any other Defendants in this action and further specifically denies that it has any liability, including without limitation any liability for contribution and/or indemnification to any parties in this action.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that upon final hearing hereof, that Plaintiff has and recover nothing of and from Defendant, and that the Defendant be dismissed with costs and for all other relief, legal or equitable, general or special, to which the Defendant may show itself justly entitled.

*John H. Adams and Lorraine Adams v. 3M Company, et al.*                    Page 16 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

Respectfully submitted,

_[signature]_

_____
Robert E. Dodson      TX Bar No. 05942250
Richard N. Dodson     TX Bar No. 05942230

**DODSON & DODSON, LLP**
5515 Plaza Drive
P.O. Box 1877
Texarkana, TX  75504
Phone:  (903) 794-3121
Fax:  (903)793-4801
bobdodson@dodsondodson.com
dickdodson@dodsondodson.com

*Attorneys for Defendant,*
*Emerson Electric Co.*

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of *Defendant Emerson Electric Co.'s Rule 120(a) Special Appearance, Motion to Dismiss on the Basis of Forum Non Conveniens, Motion to Transfer Venue, and Subject Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims* has been sent via electronic filing to all counsel of record on this 11th day of December, 2017.

_[signature]_

_____
Robert E. Dodson

*John H. Adams and Lorraine Adams v. 3M Company, et al.*     Page 17 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

12/11/2017 5:04 PM
Chris Daniel - District Clerk Harris County
Envelope No. 21219508
By: Lakeisha Williams
Filed: 12/11/2017 5:04 PM

CAUSE NO. 2017-81591-ASB

**BEFORE THE ASBESTOS MDL PRE-TRIAL JUDGE**

| | | |
|---|---|---|
| JOHN H. ADAMS and<br>LORRAINE ADAMS | §<br>§<br>§ | IN THE DISTRICT COURT |
| v. | §<br>§ | HARRIS COUNTY, TEXAS |
| 3M COMPANY, *et al.* | §<br>§ | 11th JUDICIAL DISTRICT |

*Transferred from*
CAUSE NO. DC-17-15389

| | | |
|---|---|---|
| JOHN H. ADAMS and<br>LORRAINE ADAMS | §<br>§<br>§ | IN THE DISTRICT COURT |
| v. | §<br>§ | DALLAS COUNTY, TEXAS |
| 3M COMPANY, *et al.* | §<br>§ | 192nd JUDICIAL DISTRICT |

**DEFENDANT APPLETON GRP LLC'S RULE 120(a) SPECIAL APPEARANCE, MOTION TO DISMISS ON THE BASIS OF FORUM NON CONVENIENS, MOTION TO TRANSFER VENUE, AND SUBJECT THERETO, ANSWER TO PLAINTIFFS' ORIGINAL PETITION, CROSS-CLAIM AND ANSWER TO ALL CROSS-CLAIMS**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW APPLETON GRP LLC (sued herein as "APPLETON GRP LLC d/b/a APPLETON GROUP and EMERSON ELECTRIC CO., a Delaware Corporation with its principal place of business in the State of Illinois"), hereafter referred to as "Defendant," and files its Rule 120(a) Special Appearance to Contest Jurisdiction, Motion to Dismiss on the Basis of Forum Non Conveniens, Motion to Transfer Venue, and Subject Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims and in support thereof would respectfully show unto the Court the following:

## SPECIAL APPEARANCE

Defendant moves the Court to dismiss Plaintiff's Petition and all claims against this Defendant pursuant to Tex. R. Civ. P. 120(a) because the Court lacks personal jurisdiction over Defendant. In support of this Motion, Defendant would show the following:

(a)     According to the Petition, Plaintiffs are residents of the State of Michigan;

(b)     The Petition does not allege that any act or omission that was the proximate or producing cause of the Plaintiffs' injuries occurred in the State of Texas;

(c)     Where a claim does not arise out of a defendant's contacts with the forum, as required by specific jurisdiction, a plaintiff must invoke general jurisdiction by establishing that a defendant's affiliations with the forum state are so "continuous and systematic" as to render them "at home" in the forum state. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.Ct. 2846, 2851 (2011). A corporate defendant is "at home" to include only its formal place of incorporation or the state of its principal place of business. *Daimler AG v. Bauman*, 134 S. Ct. 746, 751 (2014).

(d)     Defendant is incorporated in the State of Delaware;

(e)     Defendant's principal place of business is Rosemount, Illinois;

(f)     In support of this Special Appearance objecting to the jurisdiction, Defendant is in the process of obtaining, and will supplement by filing, an affidavit at least seven (7) days before any hearing on this Special Appearance.

WHEREFORE, Defendant requests that the Petition be dismissed for lack of personal jurisdiction.

*John H. Adams and Lorraine Adams v. 3M Company, et al.*          Page 2 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

## DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' CLAIMS ON THE BASIS OF FORUM NON CONVENIENS, SUBJECT TO ITS SPECIAL APPEARANCE

Subject to its Special Appearance, Defendant moves the Court to dismiss Plaintiffs' Petition and claims in their entirety under the doctrine of *forum non conveniens* contained in § 71.051 of the Texas Civil Practice and Remedies Code.

In support of this Motion, Defendant would show as follows:

(a)     According to the Petition, Plaintiffs are not legal residents of the State of Texas;

(b)     No act or omission that was the proximate or producing cause of the non-Texas resident Plaintiff's injuries or death, if any, occurred in the State of Texas;

(c)     A forum outside the State of Texas is a more appropriate forum for the determination of the non-Texas resident's claims, in that:

i.      an alternative forum exists in which the claims or action may be tried;

ii.     the alternative forum provides an adequate remedy;

iii.    maintenance of the claim or action in the courts of this state would work a substantial injustice upon Defendant;

iv.     the alternate forum can exercise jurisdiction over all the Defendants properly joined to the Plaintiffs' claims;

v.      the balance of the private interests of the parties and the public interest of the state predominates in favor of the claims or actions being brought in an alternate forum;

vi.     the dismissal would not result in unreasonable duplication or proliferation of litigation.

WHEREFORE, Defendant requests that the Petition be dismissed, or alternatively, that the case be transferred to the appropriate state.

*John H. Adams and Lorraine Adams v. 3M Company, et al.*                                              Page 3 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

## DEFENDANT'S MOTION TO TRANSFER VENUE,
## SUBJECT TO ITS SPECIAL APPEARANCE

### I.

Defendant objects to venue in Dallas County, Texas, the county in which this action was instituted because Dallas County, Texas is not a county of proper venue and no basis exists permitting or mandating venue in said county. The Plaintiffs in Plaintiffs' Original Petition have failed to satisfy the general venue requirements of the Texas Civil Practice and Remedies Code.

### II.

Tex. Civ. Prac. & Rem. Code §15.002 governs venue and provides that lawsuits shall be brought:

1)    in the county in which all or a substantial part of the events or omissions giving rise to the claim occurred; or

2)    in the county of Defendant's residence at the time the cause of action accrued if Defendant is a natural person; or

3)    in the county of Defendant's principal office in this state if Defendant is not a natural person; or

4)    if Subdivisions (1), (2), and (3) do not apply, in the county in which the Plaintiffs resided at the time of the accrual of the cause of action.

### III.

Plaintiffs makes conclusory allegations in their Petition and fail to plead facts sufficient to establish venue in Dallas County. Defendant specifically denies: (1) that the cause of action against this Defendant accrued in whole or in substantial part in Dallas County, Texas; (2) that this Defendant maintains a principal office in Dallas County, Texas, as defined in Texas Civil Practice and Remedies Code §15.001; (3) that Plaintiffs resided in Dallas County at the time of the occurrence of the cause of action; and (4) that any mandatory venue provision applies.

*John H. Adams and Lorraine Adams v. 3M Company, et al.*                          Page 4 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

## IV.

In the alternative, any Defendants which reside or have agents or representatives in Dallas County are not properly joined in this action, and therefore, venue is not proper as to these Defendants.

WHEREFORE, Defendant respectfully prays that this Court grant its Motion to Transfer Venue, and transfer this case to an appropriate county, and for all further relief to which Defendant may be justly entitled.

### DEFENDANT'S ANSWER SUBJECT TO ITS SPECIAL APPEARANCE AND MOTION TO TRANSFER VENUE

Defendant asserts a General Denial as authorized by Rule 92 of the Texas Rules of Civil Procedure, and denies each and every, all and singular, the allegations of material fact contained in Plaintiffs' Original Petition, and respectfully requests that the Court and Jury require the Plaintiffs to prove their charges, claims and allegations by a preponderance of the evidence as required by the Constitution and the laws of the State of Texas.

### AFFIRMATIVE DEFENSES

1. Defendant would show that Plaintiff's alleged injuries and illnesses were due in whole or in part to causes other than exposure to asbestos.

2. Defendant did not owe a duty to Plaintiff.

3. Defendant specifically denies the allegations contained in Plaintiffs' Original Petition as they relate to this Defendant and would show that Plaintiff was never exposed to any asbestos-containing products manufactured, sold or distributed by Defendant that could have been a proximate cause of Plaintiff's alleged injuries and illnesses.

4. In the alternative, Defendant would show that Plaintiff suffered from conditions and injuries sustained elsewhere, prior to or subsequent to the events alleged in the Petition.

*John H. Adams and Lorraine Adams v. 3M Company, et al.*     Page 5 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

Plaintiff's disabilities, if any, were caused or aggravated by smoking, or some other medical cause unrelated to exposure to any product sold or manufactured by Defendant.

5.      Pleading further and, in the alternative, Defendant would show that if Plaintiff sustained any injuries or damages, which Defendant expressly denies, such injuries or damages were caused by exposure to products of the other Defendants named herein, and not by exposure to any products manufactured, distributed or sold by Defendant.

6.      Plaintiff was guilty of acts or omissions of contributory and comparative negligence or other forms of fault or comparative responsibility, each of which, separately or concurrently, were the sole proximate cause, or, alternatively, a proximate cause of Plaintiff's alleged illnesses or injuries so that Plaintiff's claims are barred and/or Plaintiff's claims for recovery should be reduced as set forth in Chapter 33 of the Texas Civil Practice and Remedies Code.

7.      Defendant would further show that the acts or omissions of a separate and independent agency, not reasonably foreseeable, destroyed the causal connection, if any, between the acts or omissions of Defendant, if any, and the occurrences in question, and thereby became the sole cause of such occurrences.

8.      Defendant would further show that Plaintiff failed to mitigate, which a person of ordinary prudence would have done under the same or similar circumstances, the alleged damages, if any, which may have resulted from the occurrences made the basis of this lawsuit.

9.      Plaintiff is barred from recovery herein by the applicable statutes of limitations, including, but not limited to, the Two-Year and Four-Year Texas Statutes of Limitations and doctrine of laches.  In addition, if the Plaintiff alleges an injury occurring in any other State of

*John H. Adams and Lorraine Adams v. 3M Company, et al.*                                    Page 6 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

the Union besides Texas, then Defendant pleads any and all of the statutes of limitations of the respective states where the alleged cause of action arose.

10.   In the alternative, without waiving the foregoing, Defendant would show that Plaintiff's alleged causes of action are barred by the applicable statutes of repose. *See* Tex. Civ. Prac. & Rem. Code § 16.008, 16.009.

11.   In the alternative, the Defendant would show that Plaintiff could have no claim based upon strict liability in tort for any alleged exposure of Plaintiff to the Defendant's products prior to June 7, 1967, when the Texas Supreme Court first adopted the rules of strict liability set forth in RESTATEMENT (SECOND) OF TORTS 402A.   Until this time, when the Supreme Court decided in *McKisson v. Sales Affiliates, Inc.,* 416 S.W.2d 787 (Tex. 1967), the doctrine of strict liability had not applied to manufacturers or sellers of non-food products.   All claims asserted by Plaintiff, or any other party herein, for recovery based upon strict liability for exposure prior to June 7, 1967, should therefore be stricken and denied.   Further, the application of strict liability on a retroactive basis would be violative of Article I, § 16, of the Texas Constitution.

12.   In the alternative, Defendant would further show that if any product allegedly manufactured or distributed by the Defendant was defective in any way, which is not admitted but is specifically denied, then any such defect arose after such product left the possession of the Defendant and that said product or products were materially altered, modified or changed, as those terms are known in the law of products liability, by third persons or instrumentalities who were not in any manner connected with or controlled by Defendant prior to use by Plaintiff, and that such alteration was a proximate cause of any injuries or damages alleged by Plaintiff.   Any

*John H. Adams and Lorraine Adams v. 3M Company, et al.*                                         Page 7 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

alleged defects were caused by Plaintiff, his employers or third parties or instrumentalities over whom the Defendant had no control.

13.     Defendant denies that it owed any duty or warranty to Plaintiff and denies any fault or breach of warranty. Defendant would affirmatively show that any products manufactured, distributed or sold by Defendant were at all times reasonably fit and suitable for the purpose for which they were manufactured, distributed and sold, and that Plaintiff's alleged injuries did not result from any defect in said product or products.

14.     In the alternative, if such be necessary and subject to the foregoing pleas and without waiving same, Defendant would show the Court that this Defendant is not liable to Plaintiff under any alleged obligations under the Texas Business and Commerce Code for breach of express or implied warranty, if any, since Plaintiff has not fulfilled all conditions precedent to the alleged liability on any warranty theory in that Plaintiff has not provided this Defendant with written notice of his claims pursuant to section 2.607 of the Texas Business and Commerce Code.

15.     Pursuant to Chapters 32 and 33, Texas Civil Practice and Remedies Code, if Defendant is found to have any liability to the Plaintiff, which is specifically denied, Defendant is entitled to a set-off, percentage or pro rata reduction of its liability to the Plaintiff or to a credit for the amount of any settlement paid by each settling Defendant and/or to indemnity or contribution from each of the other Defendants.

16.     Defendant would further show that the state of the medical and scientific knowledge prior to recent years regarding asbestos exposure to workers from gaskets was such that the medical and scientific community were of the opinion that the exposures of workers were below the Threshold Limit Values recommended by the American Conference of

*John H. Adams and Lorraine Adams v. 3M Company, et al.*                                    Page 8 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

Government Hygienists for dust-containing asbestos particles and such occupation was reasonably safe. Therefore, the manufacturers or suppliers of asbestos-containing products were charged with no greater knowledge than that of the medical and scientific community, and such manufacturers or suppliers had no reason to foresee any injury to workers from the application of gasket products which contained some asbestos. Furthermore, this Defendant would show that the suppliers of asbestos-containing products should not be charged with knowledge greater than that of the medical and scientific community, and such suppliers had no reason to foresee or warn of any injury to workers from the use of products which contained some asbestos.

17.     Defendant would show that the alleged products it supplied to Plaintiff or to Plaintiff's employers, if any, complied in all respects with the standards, rules and regulations promulgated by the Occupational Safety and Health Administration (OSHA), the National Institute of Occupational Safety and Health (NIOSH), and the Bureau of Mines. Any products Defendant supplied to Plaintiff, or Plaintiff's employers, if any, were specifically approved by the aforementioned governmental agencies for use, and such products represent the "state of the art." Further, any claim in state Court would be subject to federal preemption due to the aforementioned governmental agencies' involvement.

18.     Defendant alleges that Plaintiff's employers, by virtue of the notice given in publications of the Federal Register and otherwise, had notice of dangers Plaintiff complains of and were obligated under federal law to eliminate any such dangers.

19.     Plaintiff is barred from recovery because Plaintiff misused or improperly used the material in question which was the sole cause of any resulting damages alleged; or, alternatively, which thereby proximately caused or contributed to cause any resulting damages alleged.

*John H. Adams and Lorraine Adams v. 3M Company, et al.*                    Page 9 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

20.     Pleading in the alternative, Defendant would show that the employers or supervisors of Plaintiff had notice and knowledge of any dangers about which Plaintiff complained, and this Defendant, therefore, breached no duty owed to Plaintiff.

21.     Defendant alleges that Plaintiff's employers knew, or should have known, of any risks Plaintiff was exposed to in the workplace and were negligent by, including, but not limited to, failing to reduce the release of dust; failing to warn Plaintiff of any alleged exposure; failing to provide proper training and equipment; and/or failing to provide a safe work environment. Such actions were a new, intervening and/or superseding cause.  This new intervening and/or superseding conduct was the proximate and/or producing cause of any alleged injury, damage or loss to Plaintiff, and, therefore, precludes Plaintiff from obtaining recovery in whole, or alternatively in part, from Defendant.

22.     Defendant alleges that Plaintiff's employers had knowledge of the risks in Plaintiff's work place.  Plaintiff's employers were informed intermediaries and sophisticated users of Defendant's products.  Plaintiff's employers were in a superior position to eliminate any hazards of which Plaintiff complained related to the use of any of Defendant's products.

23.     If Plaintiff sustained any injuries, said occurrence and injuries were suffered in the course of his employment, and are the fault of his employers, over whom this Defendant has no control.  Alternatively, the sole cause of the alleged occurrence and damages, if any, was the negligence of his employers.

24.     The products complained of as being manufactured, distributed or sold by Defendant were manufactured, distributed and sold for use in a limited market to a limited number of purchasers for use by a limited class of workmen, all of whom held themselves out as having special knowledge and expertise in the handling and use of the products.  The purchasers

*John H. Adams and Lorraine Adams v. 3M Company, et al.*                                    Page 10 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

of Defendant's products are experienced members of that limited class of skilled and knowledgeable entities or individuals with special knowledge and expertise concerning the danger of the operations in which Defendant's products are used, and this Defendant was entitled to rely upon such specialized knowledge and expertise.

25.     Defendant alleges that it had no duty or responsibility with regard to the manner, method or means for performing Plaintiff's work.  There was no relationship between Plaintiff and Defendant which created any duty on the part of Defendant regarding the manner and method or the conditions under which Plaintiff performed the work.  Defendant had no right to control the manner or method in which the work was performed or the conditions under which it was performed.

26.     In the alternative, Defendant would show that there is and was no legal liability on the part of the Defendant, since the alleged occurrences and the alleged injuries or damages, if any, were brought about by or caused by transitory conditions arising in the course of work that Plaintiff was doing and ordinarily incident thereto, and since Plaintiff and his employers were using their own manner, method and means of doing their work, the Defendant owed no duty to Plaintiff with respect thereto.

27.     Defendant states that no party is entitled to recover punitive damages or exemplary damages in any form or fashion in this cause of action, in that it would violate the Defendant's rights under the Constitution of the United States and the Constitution of the State of Texas in the following:

(i)     The contracts Clause of Article I, Section 10 of the United States Constitution is violated because any party's claim of punitive damages is an attempt to impose punitive damages through retrospective application of new judge-made substantive rules.  Due

*John H. Adams and Lorraine Adams v. 3M Company, et al.*                                                    Page 11 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

process requires fair notice of the type of conduct that will subject a person or entity to monetary punishment, and fair notice of a range of any monetary punishment that may be imposed for deviation from the standard. Due process prohibits punishment for violation of unsettled standards and standards not judicially established until the conduct complained of has taken place.

(ii)     Defendant further affirmatively pleads that this court does not have jurisdiction or authority to award punitive damages for any alleged act or omission which occurred outside the State of Texas. Defendant further affirmatively pleads that pursuant to the doctrine of *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S. Ct. 1589 (1996), no state has the power to project its practices and policies upon any other sister state; therefore, the court sitting in the State of Texas lacks the authority or jurisdiction to award punitive damages for alleged acts or omissions, whether the result of intentional misconduct or negligence, which occurred outside the State of Texas. Any such award of punitive damages would be grossly excessive, unconstitutional and in violation of the due process clause of the U.S. Constitution.

(iii)     Due process requires proof of gross negligence and punitive damages by a standard greater than the "preponderance of the evidence" standard. Due process requires proof of such claims by at least a clear and convincing standard of proof. Lack of a sufficient standard governing punitive damages in Texas violates the due process clause of the Constitution of the United States.

(iv)     The assessment of punitive damages, a remedy that is essentially criminal in nature, without safeguards greater than those afforded by Texas procedural and statutory law, constitutes infliction of a criminal penalty without the safeguards guaranteed by the

*John H. Adams and Lorraine Adams v. 3M Company, et al.*                                    Page 12 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

Fifth, Sixth, Eighth and Fourteenth Amendments of the Constitution of the United States, and of Article I, Section 19 of the Constitution of the State of Texas.

(v)     Punitive damages under Texas procedural and statutory law constitute an excessive fine in violation of the Eighth Amendment of the Constitution of the United States, and of Article I, Section 19 of the Constitution of the State of Texas.

(vi)     Punitive damages under Texas procedural and statutory law violate and are not in accord with those standards set forth by the United States Supreme Court in *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424 (2001).

(vii)     Punitive damages under Texas law are a violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, and of Article I, Section 19 of the Constitution of the State of Texas.

28.     Pleading further in the alternative, Defendant alleges that it is not responsible for any injury or occurrence caused in whole or in part by the negligence of Plaintiff's employers, under circumstances where Defendant is not allowed recourse against those employers, because such would constitute an application of Defendant's property to public use without adequate compensation being made in violation of Article I, Section 17 of the Texas Constitution.  The imposition of such responsibility would constitute a taking of private property, for public use, without just compensation in violation of the Fifth Amendment to the United States Constitution.

29.     Defendant alleges that any award of prejudgment interest for damages which have not yet accrued would violate Defendant's rights to: (a) substantive and procedural due process under the Fifth and Fourteenth Amendments to the United States Constitution, as well as Article I, Sections 14, 16 and 19 of the Texas Constitution; and (b) equal protection of the laws under

*John H. Adams and Lorraine Adams v. 3M Company, et al.*                                        Page 13 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

the Fourteenth Amendment to the United States Constitution and under Article I, Section 3 of the Texas Constitution.

30.    In the alternative, Defendant pleads and invokes the standards of recovery and limitations on the amount of recovery for punitive or exemplary damages as set forth in Chapter 41 of the Texas Civil Practice & Remedies Code.

31.    Plaintiff is barred in whole or in part from recovery to the extent any products to which Plaintiff was allegedly exposed were produced in accordance with specifications and/or regulations of the United States Government, and Defendant claims the benefit of the Government Contractor Defense announced in *Boyle v. United Technologies Corp.,* 487 U.S. 500 (1988).

32.    Defendant had no duty to warn of any asbestos hazards.  Defendant demands strict proof of a specific "dose" of asbestos to which Plaintiff was exposed from Defendant's products and proof that any such "dose" was a significant contributing factor to any complained of disease.

33.    Alternatively, or in addition, if Plaintiff was in fact exposed to Defendant's product or material, if at all, such exposure was only brief and not substantial, and any exposure to asbestos as a result of Plaintiff's contact with the Defendant's products or materials was minimal in nature or nonexistent, and the purported illness or injury, if any, of Plaintiff was not caused by contact with or use of this Defendant's products or materials, but on the contrary, would have occurred just as it did had Plaintiff not used or been in contact with this Defendant's products or materials.  There is no "causation" (producing or proximate) as it relates to any such exposure and Plaintiff's alleged injury or illness.

*John H. Adams and Lorraine Adams v. 3M Company, et al.*                                              Page 14 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

34.     Plaintiff has the burden of forwarding evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the Plaintiff actually worked. *Borg-Warner Corp. v. Flores*, 232 S.W. 3d 765 (Tex. 2007) citing *Lohrmann v. Pittsburg Corning Corp.*, 782 F.2d 1156 (4th Cir. 1986). Furthermore, the *Borg-Warner* decision requires that, in addition to a "regularity, proximity, and frequency" test, Plaintiff must establish that asbestos in a particular Defendant's product was a substantial contributing factor in bringing about the Plaintiff's injuries.

35.     Plaintiff is barred from recovery because of the doctrines of *volenti non injuria* and assumption of the risk.

36.     Plaintiff's claims fail to state a claim upon which relief can be granted to the extent that Defendant is alleged to be liable for failing to warn about the dangers of any asbestos product or material which Defendant did not manufacture, sell, distribute, or otherwise place in the stream of commerce, even where it is alleged that such defective product was used in conjunction with or applied to Defendant's own product.

37.     Further answering, in the alternative, this Defendant says that Plaintiff's injuries and damages, if any, were the result of unavoidable accident.

38.     Defendant further invokes the defense of waiver.

39.     Defendant states that the Petition should be dismissed for lack of jurisdiction over the subject matter.

40.     Defendant states that the Petition should be dismissed for lack of jurisdiction over the person.

*John H. Adams and Lorraine Adams v. 3M Company, et al.*                    Page 15 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

## CROSS-CLAIM AGAINST ALL OTHER CO-DEFENDANTS

Defendant denies that it is or may be liable to Plaintiffs on any claims asserted against it in this action.  In the alternative, Defendant hereby incorporates by reference the averments of Plaintiffs' Original Petition, without admission to same, and states that, if in the unlikely event it is found liable to Plaintiffs, then all other co-defendants now parties to this action and/or co-defendants joined in the future, are jointly and/or severally liable with the Defendant or liable over to the Defendant for indemnification and/or contribution.

## ANSWER TO ALL CROSS-CLAIMS

Defendant specifically denies all allegations contained in any and all Cross-Claims that have been asserted or that may be asserted against it in the future by any other Defendants in this action and further specifically denies that it has any liability, including without limitation any liability for contribution and/or indemnification to any parties in this action.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that upon final hearing hereof, that Plaintiff has and recover nothing of and from Defendant, and that the Defendant be dismissed with costs and for all other relief, legal or equitable, general or special, to which the Defendant may show itself justly entitled.

*John H. Adams and Lorraine Adams v. 3M Company, et al.*                                                  Page 16 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims

Respectfully submitted,

Robert E. Dodson          TX Bar No. 05942250
Richard N. Dodson          TX Bar No. 05942230

**DODSON & DODSON, LLP**
5515 Plaza Drive
P.O. Box 1877
Texarkana, TX 75504
Phone: (903) 794-3121
Fax: (903)793-4801
bobdodson@dodsondodson.com
dickdodson@dodsondodson.com

*Attorneys for Defendant,*
*Appleton Grp LLC*

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of *Defendant Appleton Grp LLC's Rule 120(a) Special Appearance, Motion to Dismiss on the Basis of Forum Non Conveniens, Motion to Transfer Venue, and Subject Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims* has been sent via electronic filing to all counsel of record on this 11th day of December, 2017.

Robert E. Dodson

*John H. Adams and Lorraine Adams v. 3M Company, et al.*                                  Page 17 of 17
Defendant's Special Appearance, Motion to Dismiss, Motion to Transfer Venue, and Subject
Thereto, Answer to Plaintiffs' Original Petition, Cross-Claim and Answer to All Cross-Claims